**FILED**

December 22, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ lad

DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS – WACO DIVISION

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>　　　　Plaintiff,<br><br>　　　　V.<br><br>SAMSUNG ELECTRONICS<br>AMERICA, INC.<br><br>　　　　Defendant. | CIVIL CASE NO: 6:25-cv-596-DAE<br><br>**JURY TRIAL DEMANDED**<br><br>**(Direct Patent Infringement),**<br>**(Willful Patent Infringement),**<br><br>December 17, 2025 |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,984,619 ('619 Patent); 10,163,287 ('287 Patent), 9,589,439 ('439 Patent); and 9,096,189 for alleged "direct infringement", and/or infringement under the doctrine of equivalents ("patents-in-suit": attached hereto as *Exhibits A - D*) against Defendant SAMSUNG ELECTRONICS AMERICA, INC. ("Samsung" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of

Central Processing Units (CPUs) for both mobile and consumer devices i.e., smartphones, laptops, tablets, smartwatches, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, makes, uses, offer to sell, or sells 's Samsung Exypos CPU/Chipsets; Samsung Galaxy Smartphones; Samsung Galaxy Watches; Samsung Megapixel Cameras; Samsung Android Operating Systems for Samsung Galaxy Smartphones; and Samsung Tizen Operating Systems for Samsung Galaxy Watches  that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, Defendant is a corporation organized and existing under the laws of Delaware. Defendant has a regular and established place of business at 12100 Samsung Blvd., Austin, TX 78754. Defendant can be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19808, at its place of business, or anywhere else it may be found.

On information and belief, Defendant directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell and/or sells infringing products and services in the United States, including in the Western District of Texas, and otherwise directs infringing activities to this District in connection with its products and services.

Samsung directly, and/or under the doctrine of equivalents, distributes, markets, offers to sell, sells, and/or imports the alleged infringing Samsung Exypos CPU/Chipsets; Samsung Galaxy Smartphones; Samsung Galaxy Watches; Samsung Megapixel Cameras; Samsung Android Operating Systems for Samsung Galaxy Smartphones; and Samsung Tizen Operating Systems for Samsung Galaxy Watches.

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused devices of Samsung required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Samsung devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Samsung CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Samsung CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs.

Plaintiff has stated a plausible claim for direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff maintains he has additional factual allegations to support his claims in the form claim charts readily available by order of this Court.

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is when the Samsung accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

## JURISDICTION AND VENUE

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

4

# CONTENTS

**Page**

| | |
|---|---|
| 6 | PLAINTIFF DEMAND FOR A JURY TO DECIDE DAMAGES |
| 11 | SAMSUNG "*MODIFIED*" THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY |
| 14 | The Cell-All Demonstration Participants and Program Outline |
| 20 | Samsung's *"modification"* of the Cell Phone Central Processing Unit (CPU) |
| 26 | Samsung's *"modification"* of the Cell Phone Operating System (OS) |
| 30 | Samsung's *"modification"* of the Cell Phone Internal CBRNE-H Sensor |
| 33 | Samsung's *"modification"* of the Cell Phone External CBRNE-H Detector |
| 38 | Samsung's *"modification"* of the Cell Phone In-Use Safety Features |
| 39 | Advanced-GPS Location and Tracking |
| 39 | Disabling Locking Mechanism |
| 39 | Biometric Fingerprint and Facial Authentication |
| 40 | Near-field Communication (NFC) |
| 43 | Samsung's Direct Infringement of the New, Improved Upon, and Useful Cell Phone |
| 47 | Samsung continues to *"modify"* the cell phone post sell; with "Updates" |
| 60 | When "modification" is construed to mean "Upgrade" or "Update" to Samsung's *"modify"* the Cell Phone Operating System software |
| 61 | CONCLUSION |

## PLAINTIFF DEMAND FOR A JURY TO DECIDE DAMAGES

Plaintiff is demanding damages for Samsung's alleged direct infringement, joint infringement, and indirect forms such as inducement and contributory infringement, for the unauthorized act of making, using, selling, or importing inventions (i.e., Samsung's central processing unit, operating system, smartphone, camera, and smartwatch) for which patents has been issued with the presumption of validity (35 U.S.C. § 282), per the Patent Act.

Damages are a question of fact; thus, a jury will decide damages. The Western District of Texas (WDT) court judge will decide damages if this case is not before a jury. Plaintiff is demanding a jury trial to determine Samsung's alleged patent infringement damages; and, to recover damages adequate to compensate for the alleged patent infringement. A jury can determine damages, but the presiding judge in this Western District of Texas (WDT) court case *Golden v. Samsung* will determine damages if the case is not heard by a jury.

Plaintiff's alleged damages must be sufficient to compensate for the alleged patent infringement and at least amount to a reasonable royalty for Samsungs alleged use of Plaintiff's patented inventions. Plaintiff allege more consumers start buying Samsung's alleged infringing products (i.e., Samsung's central processing unit, operating system, smartphone, camera, or smartwatch) because Plaintiff's invention has improved them. Therefore, Plaintiff is entitled to those profits that should have belonged Plaintiff.

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Samsung's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing item (i.e., Samsung's central

processing unit, operating system, smartphone, camera, or smartwatch) and then multiply that value by the number of items that infringed.

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016). Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Plaintiff believes Samsung's conduct to be "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

Upon information and belief, there's no need for this Court to continue litigating claims made against Samsung for the alleged infringement of Plaintiff's patents because twelve Federal Judges (three in the district courts; nine at the federal circuit) have determined infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Twelve Federal Judges repeatedly confirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| # of Judge(s) | Case Number | Case Title | Court | Filed – Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |

| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |


The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at

least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said,

there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

## SAMSUNG "*MODIFIED*" THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY

Samsung admits infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

11

Samsung also admits infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is "modified by a third party" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

What Samsung failed to admit is: it is Samsung itself who is the party responsible for "modifying" the cell phone to function as a CBRNE-H detection device. Samsung is accused of "making" the alleged infringing products.

The United States impliedly authorized and consented to Samsung "modifying" the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Samsung was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

"… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "***The proposed concept should develop a miniaturized sensor, device and system***…" [DHS S&T BAA07-10 Cell-All Ubiquitous Biological and Chemical Sensing]

Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) … "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)."

Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect



**The Cell-All Demonstration Participants and Program Outline**

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Introduction to "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department: Host location for the demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative: *Phase II* of the *Cell-All* initiative advances the mobile devices (i.e., cell phones, smartphones, or CMDC devices) from devices that include CBRNE sensors "embedded" within the devices (*Phase I*), to mobile devices that include CBRNE detectors and/or sensors remote the mobile devices (i.e., cell phones, smartphones, or CMDC devices). (*Phase II*)

- Dr. Jing Lee, Principal Investigator, NASA Ames Research Center: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a Chem/Bio medical health detection capability". [NASA acquired a license from the medical industry]

- Debra Deininger, Synkera Technologies, Inc.: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected

to, a CBRNE detection capability". Previous work, through a Small Business Innovation Research (SBIR) project, for the miniaturization of sensors.

- Doug Hoffman, Program Manager, Qualcomm: Qualcomm was awarded the *Cell-All* contract, and designated the prime contractor's position responsible for delivering the improved upon cell phones; that include improved upon CPUs; wireless modems; operating systems; and miniaturized sensors for CBRNE detection.

- Chris Needs, Product & Control Manager, NC4: Middleman service for the for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative responsible for monitoring, identifying location, notifying, alerting, and transmitting data.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Setting the scenario for a live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department and Chris Needs, Product & Control Manager, NC4; narrates the live demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T interviews Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; post the live demonstration.

- Panel assembled for Q&A: Panel participants are: Chief Corey Rose [Location Host]; Los Angeles Fire Department; Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; Dr. Jing Lee, Principal Investigator, NASA Ames Research Center; Debra Deininger, Synkera Technologies, Inc.; Doug Hoffman, Program Manager, Qualcomm; and, Chris Needs, Product & Control Manager, NC4.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Closing remarks and thanks to everyone involved in making the live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability" a success.

The government's authorization of or consent to a contractor's infringing activity may be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976).

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

The DHS S&T pursued what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG,

Apple, and *Samsung*. The written agreements, are designed to bring together a private company and a government agency for a specific project, often to accelerate the commercialization of technology developed for government purposes.

Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, three teams: Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology perfected their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station, and technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, a three-year-old San Diego-based startup, is developing advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of UC San Diego Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" developed by Sailor's group, which are composed of nanoparticles that change color in the presence of certain molecules. <u>Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.</u> Rhevision uses its system to

precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds."

"Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded "sleeve" for phones—that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and *Samsung*—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010). Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

In *Golden v. United States* CFC Case No. 13-307C, Samsung was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court notified Samsung to make an appearance to protect its interest in the subject matter of the suit. Samsung failed to appear.

In resolving a petition for mandamus, the Federal Circuit held in *In re UUSI, LLC*, that a third party's potential obligation to indemnify the government for any patent infringement liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests." 549

18

F. App'x 964, 968 (Fed. Cir. 2013), aff'g *UUSI, LLC v. United States*, 110 Fed. Cl. 604 (2013).

While Samsung need not participate in the § 1498 litigation, Samsung's failure to appear in response to the notice under Rule 14(b) acts as a waiver of any later argument that Samsung should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed. As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970)

The notice issued by the United States Court of Federal Claims in *Golden v. United States* CFC Case No. 13-307C satisfies the knowledge requirement for a claim of induced; contributory; joint; and willful infringement.

Samsung was given a second chance to protect its interest in *Golden v. Samsung* NDC Case No. 23-0048; in the subject matter of a lawsuit originally brought against the United States in *Golden v. US* CFC Case No. 13-307C; by claiming the affirmative defense that Samsung was authorized, or received the Government's consent, to manufacture for the Government, under 28 U.S.C. § 1498(a), a "modified, or new, improved upon, or useful cell phone; but failed in both Courts to defend against Plaintiff's claim that Samsung allegedly infringes Plaintiff's CMDC device (a "modified, or new, improved upon, or useful cell phone). Therefore, Samsung should not be given a third chance.

**Samsung's *"modification"* of the Cell Phone Central Processing Unit (CPU)**

Samsung's modification of the cell phone begins with what is recognized in the industry as the "brains" of the cell phone. The central processing unit (CPU), or combination thereof, is considered the "brains" of the *"modified"* cell phone device. Samsung's modified cell phone CPUs carry out the operational and functional instructions of the device's computer program. The Samsung's modified cell phone CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the Samsung's modified cell phone CPU and other components, such as memory and input/output devices.

- Samsung's *"modified"* cell phone central processing unit (CPU): is considered the "brains" of the mobile device (i.e., smartphone).

- Samsung's *"modified"* cell phone central processing unit (CPU): executes instructions from applications and the operating system, performing calculations and data manipulation. The mobile device can run multiple applications simultaneously without significant performance degradation.

- Samsung's *"modified"* cell phone central processing unit (CPU): often feature multiple cores, enabling parallel processing and improved multitasking capabilities.

- Samsung's *"modified"* cell phone central processing unit (CPU): directs the operation of the processor and coordinates activities between the CPU and other components, such as memory and input/output devices. The Mobile CPU manages data storage and retrieval in RAM, ensuring efficient access to information needed by applications: are designed to optimize power consumption,

balancing performance with battery life to enhance user experience in portable devices.

- Samsung's *"modified"* cell phone central processing unit (CPU): architecture refers to the design and organization of the core components of a CPU. It encompasses the instruction set architecture (ISA), microarchitecture, and the physical implementation of the CPU. The ISA defines the set of instructions that the CPU can execute, while the microarchitecture outlines how these instructions are processed. The physical implementation involves the actual manufacturing process and materials used to create the CPU.

The Evolution of the Samsung Exynos CPU Microarchitecture marks one of the many significant advancements (i.e., modifications) in technology over the past two decades. In 2010, Samsung unveiled the Exynos brand, introducing its first processor, the Exynos 3110, based on ARM's Cortex-A8 architecture. This was during a transformative period where smartphones began to outpace feature phones in sales, and there was a need for more powerful, energy-efficient processors.

In 2011, Samsung launched the Exynos 4210, setting a precedent for multi-core designs. It marked the beginning of a trend where performance scaling was achieved through increasing the number of cores.

In 2013, the company transitioned to a 28nm process node with the launch of Exynos 5 Octa. The Exynos 5 Octa was equipped with four Cortex-A15 cores for high-performance tasks; with four Cortex-A7 cores for light workloads.

In 2015, was the introduction of the Exynos 7420, marking the beginning of a trend toward custom CPU microarchitectures. The Exynos 7420 was notable not only for its 14nm FinFET process technology but also included custom CPU cores.

The Exynos 9 Series, introduced in 2016, marked another leap in performance capabilities. The Exynos 9810 included four custom M2 cores, two Cortex-A75 cores, and four Cortex-A55 efficiency cores.

In 2018, the Exynos 9820 debuted as the flagship processor, utilizing an 8nm process node and featuring a more refined custom architecture along with a dedicated neural processing unit (NPU). This integration of specialized processing units exemplifies how CPU microarchitectures are adapting to support the rise of AI applications, with Samsung making considerable investments in AI and machine learning capabilities.

In 2019, Samsung revealed Exynos 9820 with fourth-generation custom core named Exynos M4 (Cheetah). It has been manufactured on Samsung 8nm LPP process. Unlike the past flagship Exynos series with 4+4 dual-cluster settings, Exynos 9820 implemented 2+2+4 core cluster configurations.

In 2020, Samsung released last Mongoose-based SoC, named Exynos 990. Exynos 990 came with their fifth-generation custom core (Exynos M5) codenamed Lion. Exynos continues to produce processors capable of meeting the demands of next-generation applications.

In June 2021, Samsung hired engineers from AMD and Apple to form a new custom architecture team. In October 2021, Google released their Pixel 6 series of phones based on Google's Tensor SoC, which was made in collaboration with Samsung.

In 2024, Samsung officially announced Exynos 2400, with RDNA 3 microarchitecture-based Xclipse 940. In the same year, along with Exynos 2400, Samsung released Exynos 1480, with RDNA.

Samsung's modification of the cell phone's central processing unit (CPU) was necessary to carry out the instructions a CBRNE-H detection, demanded. Plaintiff alleges Samsung's modifications infringes his patented inventions.

**U.S. Patent No: 10,163,287**

4. A communication device comprising:

at least one central processing unit (CPU);

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

23

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals ... to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

### U.S. Patent No: 10,984,619

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

15. The central processing unit (CPU) of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

**Samsung's *"modification"* of the Cell Phone Operating System (OS)**

All Samsung Galaxy phones (i.e., Samsung *"modified"* cell phones) run on Android, but not all Android phones are Samsung Galaxy smartphones (i.e., Samsung *"modified"* cell phones). Samsung makes phones under the "Samsung Galaxy" branding. These *"modified"* cell phones run One UI, a layer of extensive modification on top of stock Android. Samsung has added a ton of features and customizations to help Samsung Galaxy smartphones (i.e., Samsung *"modified"* cell phones) stand out from the crowd of Android smartphones in the market.

Samsung is a multinational company based in South Korea, and it runs multiple businesses under its umbrella. One of them is Samsung Electronics, a sub-company that manufactures smartphones under the "Samsung Galaxy" branding. So, when you refer to a phone as a "Samsung," you actually mean a Samsung Galaxy smartphone (i.e., Samsung *"modified"* cell phone), like the Galaxy S24.

Android is an operating system (OS) that powers smartphones. It is the broad layer of software on a phone. Google developed Android, but it is an open-source OS. Other companies can take this open-source OS, make changes to it, and then use that changed OS as the layer of software on their own phones. This is what Samsung does.

All Samsung Galaxy phones (i.e., Samsung *"modified"* cell phones) are Android (*"modified"*) phones, but all Android phones are not Samsung Galaxy phones. All smartphones sold under the "Samsung Galaxy" branding run on Android. Samsung has made plenty of modifications to Android, and these modifications are collectively called "One UI." One UI is the name of Samsung's modified software skin that lives on top of Android. So, when using a Samsung *"modified"* cell phone, you use One UI, which is still Android under the hood.

One UI, especially in its One UI 6.1 avatar, looks very different from other Android skins from other companies. Google's Pixel smartphones have their own

Pixel UI skin, OnePlus phones have Oxygen OS skin, and so on. All of these skins look different from each other and also function differently. But they are all Android skins, where Android forms the base layer, and the skin forms the top layer of modifications by the phone maker.

On Samsung "*modified*" cell phones, you can use Android apps without any issues. Android is open-source, meaning its source code is available for all of us to read, use, and distribute. You can run this source code on a compatible phone. This open-source Android, called AOSP (Android Open-Source Project), represents the bare shell of the Android experience.

Source Code: Instructions written in a programming language that make up a software program. It is the actual code that developers write and maintain; allowing developers to modify, and enhance the application; requires access to modify or understand the software's inner workings; sed for developing, maintaining, and customizing software applications. Everything that Samsung undertakes, is considered a commercial endeavor, so no code released under a license that restricts it to non-commercial uses. Once open sourced with an accompanying LICENSE, the project must use the LICENSE in the package and any external contributions must sign a License Agreement.

Samsung's One UI includes modifications that Samsung made on top of stock Android. In fact, One UI makes some of the most extensive changes (modifications) to stock Android, so you may find it challenging to recognize the base Android version on any version of One UI.

The Samsung "*modified*" cell phone operating system manages hardware such as the Samsung "*modified*" cell phone central processing unit (CPU). It

provides connections such as: cellular, Wi-Fi, Bluetooth, NFC and communication with other devices.

Wi-Fi: enables connection to local networks and internet. Cellular: supports mobile data through 3G, 4G, and 5G networks. Bluetooth: facilitates short-range communication with other devices. NFC: allows for contactless transactions and data exchange.

Upon information, the Samsung "*modified*" cell phone operating system, performs substantially the same function; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful "transceiver".

**U.S. Patent No: 9,096,189**

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi sensor detection device, or transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, or long-range radio frequency, and short-range radio frequency (RF).

**Samsung's *"modification"* of the Cell Phone Internal CBRNE-H Sensor**

*Phase I* specifications of the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007]; requires Samsung modify the cell phone with "internal" sensors for CBRNE-H detection.

Samsung entered into an agreement with the Government (DHS S&T) to integrate the CBRNE-H internal sensors that was being developed by at least the awarded third-party contractors of the *Cell-All* initiative: Rhevision; SeaCoast; NASA; Qualcomm; and Synkera.

Upon information and belief, Samsung "modified" the cell phone with camera(s) equipped to detect for CBRNE-H. Under the Cell-All initiative Rhevision developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, [] develop[ed] advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of [] Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" [], which are composed of nanoparticles that change color in the presence of certain molecules. Rhevision [] integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor; compare the results with known toxic compounds."

## *PHASE I* – INTERNAL SENSOR OF THE *CELL-ALL* INITIATIVE

### Samsung's "Modified" Cell Phone include Camera(s) for CBRNE-H Detection

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds. |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | Samsung's "modified" cell phone devices, have built-in QR scanners in the camera app, so you don't need a separate app. Simply point the camera at the code, and it should work instantly. Samsung's "modified" cell phone camera QR codes can be integrated with CBRNE (chemical, biological, radiological, nuclear, and explosives) detectors and/or sensors to enhance data sharing and operational efficiency. One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information. Scanning a QR code can simplify the process of retrieving sensor data, making it accessible to personnel without specialized training. QR codes can be printed on CBRNE equipment, allowing quick access to emergency protocols. |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | Samsung's "modified" cell phone-based biosensors are rapidly redefining how the world conducts medical diagnostics, enable precise, real-time detection of biological and chemical agents. Samsung's "modified" cell phone devices have a platform in biosensing ecosystems: facilitating the proliferation of biosensors that capitalize on Samsung's "modified" cell phones' camera optics, wireless connectivity, and computational power. Optical biosensors utilize the Samsung "modified" cell phone cameras and LED flashes to detect visual changes in assays, particularly in colorimetric or fluorescent formats. Images taken by a conventional Samsung cell phone camera can be modified using deep learning algorithms to improve their spatial resolution, signal-to-noise ratio, and color response. |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | Samsung's "modified" cell phone cameras megapixel camera, smaller than the head of a pencil eraser captures the image from the array of nanopores in the silicon chip. "The beauty of this technology is that the number of sensors contained in one of our arrays is determined by the pixel resolution of the cell phone camera. With the megapixel resolution found in cell phone cameras today, we can easily probe a million different spots on our silicon sensor simultaneously. So, we don't need to wire up a million individual sensors," Sailor said. "We only need one. This greatly simplifies the manufacturing process because it allows us to piggyback on all the technology development that has gone into making cell phone cameras lighter, smaller, and cheaper." |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | Radiation incidents on Samsung's "modified" cell phone camera's Complementary Metal Oxide Semiconductor (CMOS) sensor creates a signal which can be isolated from a visible light signal to turn the "modified" cell phone into a radiation detector. Samsung's "modified" cell phone have CMOS cameras that have been widely adopted throughout the world, which makes them potentially useful as tools for monitoring radiation exposure while traveling in an aircraft. Samsung's "modified" cell phone cameras have advanced features, such as accelerated camera pixel intensity, higher image quality, and greater rapidity. These features allow Samsung's "modified" cell phone to be especially useful in detecting radiation |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | Samsung's "modified" cell phone camera sensors: Samsung's "modified" cell phone cameras can capture high-resolution images, which can be analyzed for specific biomarker detection. Various applications utilize machine learning and image processing to identify biomarkers in biological samples, such as blood or saliva. Glucose Monitoring: Samsung's "modified" cell phone apps can analyze images of blood samples to estimate glucose levels. Skin Analysis: Samsung's "modified" cell phone cameras can detect skin conditions or changes that may indicate health issues, such as dehydration or vitamin deficiencies. Samsung's "modified" cell phone can diagnose diseases by analyzing images of bodily fluids or tissues. |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "modified" cell phone with its "modified" cell phone camera | David Breslauer is a graduate student at the University of California, Berkeley, and has developed a fluorescence microscope for portable diagnostics using a cell phone with a built-in camera. Cell phone with built-in camera. The cell phone that you use should at least be able to zoom in and out manually and focus. Using cell phones modified as inexpensive microscopes |

**Samsung's *"modification"* of the Cell Phone External CBRNE-H Detector**

"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)."

Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"Participants will experience the ease of integrating Samsung Galaxy smartwatches into the Android Tactical Assault Kit (ATAK) ecosystem. The demo will showcase real-time location tracking and physiological alerting, including heart rate monitoring and altitude data. Visitors will see how first responders' locations and health status appear seamlessly in ATAK, with alerts that enable rapid decision-making for commanders. This hands-on demo emphasizes the simplicity of setup — devices are worn on the wrist, require no pre-installed infrastructure, and begin tracking immediately."

https://5x5.firstnet.gov/agenda/smartwatch-integrated-tak-solution-with-3-axis-tracking-and-health-alerts/

Draper's Android Tactical Assault Kit (ATAK) Chemical, Biological, Radiological, and Nuclear (CBRN) plug-ins. ATAK can connect to sensors on many platforms (e.g., smartwatches) and has many plugins that warfighters can download … ATAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate).

https://www.dvidshub.net/news/printable/367459

| *PHASE II* – **EXTERNAL DECTECTOR UNDER *CELL-ALL*** ||
|---|---|
| **Samsung's "Modified" Cell Phone Integration with an "External" CBRNE-H Detection Device** ||
| *"Phase II"* – *External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system (U.S. Department of Homeland Security, 2011a). During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). |
| *"Phase II"* – *External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | |
| *"Phase II"* – *External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qual comm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010). |

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | Smartwatches can detect subtle physiological changes — such as temperature shifts and heart rate variations — that may indicate early infection before symptoms appear. Smartwatch features that measure heart rates, oxygen levels, fitness levels and sleep quality have been marketed as valuable tools for people who are eager to monitor their health. Smartwatches' health apps and sensors provide enough information to accurately predict when a person has become infected with a disease like COVID-19 or the flu. Here are all the sensors Samsung lists for the Galaxy Watch 8 on its spec sheet: Samsung Bio-Active Sensor (Optical Bio-signal Sensor + Electrical Heart Signal + Bioelectrical Impedance Analysis); Temperature Sensor; Accelerometer; Barometer; Gyro Sensor; Geomagnetic Sensor; and Light Sensor |
| *"Phase II" – External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | Smartwatches have several sensors and integrated apps that may track vital indicators, identify hazardous chemicals, and provide emergency notifications The smartwatches' built-in sensors and monitoring features enable them to detect possible hazards like excessive levels of poisonous gasses. |
| *"Phase II" – External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | Samsung's Galaxy watches connect to Samsung's "modified" cell phones primarily to enhance functionality and user experience. Samsung's Galaxy watches receive alerts for calls, messages, and app notifications, allowing users to stay informed without checking their phones. Samsung Galaxy watches monitor health metrics (e.g., heart rate, steps) and sync this data with smartphone apps for comprehensive health tracking. Samsung's Galaxy watches use the Samsung "modified" cell phone's GPS for accurate location tracking and navigation assistance. Apps on Samsung's "modified" cell phones have corresponding Samsung's Galaxy watch versions, enabling seamless access to features like fitness tracking. Bluetooth Connectivity: Most Samsung's Galaxy watches connect via Bluetooth, allowing for a low-energy, stable connection to the smartphones. Samsung's Galaxy watches require a companion app on the Samsung "modified" cell phone for setup and to manage settings and updates. This connection significantly expands the capabilities of both devices, making them more useful together than separately. |
| *"Phase II" – External Detection*<br><br>Samsung's "modified" cell phone integrated with an "external" cell phone detection device | In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". |

Plaintiff alleges Samsung's *"modified"* cell phones, that integrates and interconnects a *"modified"* internal sensor (Samsung's camera(s)) and/or an external detector (Samsung's watch) infringes Plaintiff's patented inventions for a "multi-sensor detection system for detecting CBRNE-H, that comprises monitoring equipment of at least that of a cell phone, [] or smartphone for at least one of a receipt or transmission of signals therebetween". Upon information, the Samsung *"modified"* cell phone, performs substantially the same function for detecting CBRNE-H; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful cell phone for CBRNE-H detection.

**U.S. Patent No: 9,096,189**

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi sensor detection device, or transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, or long-range radio frequency, and short-range radio frequency (RF).

**Samsung's *"modification"* of the Cell Phone In-Use Safety Features**

This message is from the Under Secretary (Acting) for Science and Technology April 2017 "I am pleased to submit the following report, "Study on Mobile Device Security," which was prepared by the Department of Homeland Security (DHS) in consultation with the National Institute of Standards and Technology (NIST).

For the purposes of this study, the term "mobile device" refers to smartphones and tablets running mobile operating systems, as defined in NIST Special Publication 800-53, Revision 4. Mobile phones and the subclass of smartphones represent one of the greatest advances in human communication in history.

The threats to government users of mobile devices include the same threats that target consumers, e.g., call interception and monitoring, user location tracking, attackers seeking financial gain through banking fraud, social engineering, ransomware, identity theft, or theft of the device, services, or any sensitive data.

This report categorized the global mobile ecosystem into a threat model organized along clear lines of logical function that also follows industry roles. The threat model's categories consist of:

- Mobile device technology stack, including mobile operating systems and lower-level device components
- Mobile applications
- Networks (e.g., cellular, Wi-Fi, Bluetooth) and services provided by network operators
- Device physical access
- Enterprise mobile services and infrastructure, including mobile device management, enterprise mobile app stores and mobile application management

**Enhanced Location and Tracking**: Samsung's "modified" cell phones use a combination of GPS, Wi-Fi, and cellular network data to establish the device's location. This multi-faceted approach provides greater accuracy and functionality, particularly in urban areas. Location tracking on Samsung's "modified" phones typically utilizes GPS (Global Positioning System) and network triangulation. GPS uses satellites to determine your phone's precise location, while network triangulation uses nearby cell towers and Wi-Fi networks to approximate your location more quickly when GPS signals are weak or unavailable.

**Biometric Fingerprint and Facial Authentication**: As smartphones began to dominate the market, Samsung sought innovative ways to enhance the security of its *"modified"* cell phone. As early as 2010, before large-scale adoption, Samsung started experimenting with various biometric methods, including facial recognition and voice authentication. However, the most effective and reliable method proved to be fingerprint scanning technology. When Samsung introduced in its *"modified"* Galaxy S5 cell phone, it came equipped with its own fingerprint scanner on April 11, 2014.

Samsung has incorporated face recognition into its *"modified"* cell phones for years. The technology began gaining traction with the release of the Galaxy S8 and S8+ in 2017, which introduced the feature as a convenience for unlocking your device.

**Disabling Locking Mechanism**: Samsung *"modified"* cell phones often face lockout after multiple wrong attempts and forgotten screen lock patterns: "[w]hen a Samsung *"modified"* cell phone is locked due to too many incorrect attempts, use the 'Find My Mobile' service or perform a factory reset *via* recovery mode. 'Find My Mobile' requires prior setup and Samsung account login. If unavailable, boot into recovery by holding Volume Up + Power + Home buttons, then select 'Wipe data/factory reset.' This erases all data but restores access.

Regular backups and enabling biometric unlock [plaintiff's biometric authentication] can prevent future lockouts."

Exactly when this feature was added to the Samsung *"modified"* cell phones cannot be accomplished by Plaintiff. What is known is when Samsung released its first *"modified"* cell phone (the first Samsung Galaxy, the Samsung S, was released in June 2010). Assuming the lockout feature was included in the launch of the first Samsung phone in 2010, this date does not antedate Plaintiff's priority date of 2004; nor, does it antedate the agreement date (2008) Samsung made with the Department of Homeland Security to provide the Government with *"modified"* cell phones that include a detection capability and safety features.

**Near-field Communication (NFC):** Samsung *"modified"* the cell phone to include an NFC means of short-range communication over that of RFID because the Department of Homeland Security demonstrated how a RFID frequency can be used to detonate a bomb. The first Android phone with NFC, the Samsung Nexus S, was released in 2010. Read More: https://www.slashgear.com/1556737/nfc-on-android-ways-make-life-easier/

NFC is based on the RFID protocols. The main difference to RFID is that an NFC device can act not only as a reader, but also as a tag (card emulation mode). In peer-to-peer mode, it is also possible to transfer information between two NFC devices. Because of the short-read range limitations, NFC devices have to be in very close proximity - usually no more than a few centimeters. That's why NFC is often used for secure communications.

RFID Signals can Detonate Bombs in Cargo Containers: But How Serious is the Vulnerability? August 10, 2011 Homeland Security Today

"In the fall of 2007, a handful of officials from the Department of Homeland Security (DHS) were invited to attend a live demonstration of how a bomb hidden inside a commercial cargo container could be detonated by a

homemade radio frequency identification (RFID) container tracking tag operating at a frequency that was mandated by the federal government for cargo containers within US port environments.

A cargo container RFID electronic tag, or seal, contains an electronic reader that receives a port's RFID signal that prompts the container's RFID tag to transmit to port authorities' data regarding the cargo that's been encoded on its RFID tag. But as the demonstration showed, it also can be used to close an electronic circuit when it receives a corresponding RF from a port RFID sender/receiver, thereby detonating the bomb.

Indeed. In the November, 2007 test, an RF receiver tuned to pick up a required US port RFID reader frequency triggered the small explosive that had been placed inside the empty container.

What's important about the demonstration is that the homemade RF receiver was operating at a frequency that not only was mandated to be used within port environs, but also was mandated to be made public despite the fact that "the process of selecting a frequency for container security was contentious," Homeland Security Today was told by Powers Global Holdings, Inc. Chairman, a former FBI agent who worked with CBP on border related security issues while in Laredo, Texas."

Samsung *"modified"* the cell phones have an NFC reader/writer built-in, which allows the user to tap the back of the phone to another NFC-enabled device, be that a payment terminal, door lock, Bluetooth device, or a simple NFC tag.

Radio-frequency near-field communication have 'written description' in Plaintiff's patent specifications that has a priority date in a disclosure with the United States Patent and Trademark Office of Nov. 23, 2004.

Following is Claim 5 of Plaintiff's U.S. Patent No: 10,163,287 (the '287 patent) of a communication device that is integrated with, or interconnected to, a CBRNE-H detection capability.

Claim 5 of '287 patent include all four safety elements: advanced GPS location and tracking; disabling locking mechanism; biometric authentication; and near-field communication. Samsung include all in its *"modified"* cell phone.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one *global positioning system (GPS)* connection in communication with the at least one CPU;

at least one of an internet connection or a *Wi-Fi connection* in communication with the at least one CPU;

at least one of a Bluetooth connection, a *cellular connection*, or a *satellite connection* in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one *locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device*;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing *biometric authentication to access the communication device*;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one *radio-frequency near-field communication (NFC)* connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors,

send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

## Samsung's Direct Infringement of the New, Improved, and Useful Cell Phone

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Samsung's *"modified"* cell phone that "include within" or "dispose within", a *"modified"* Samsung camera for CBRNE-H detection; and Samsung's *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Samsung watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015.
"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

❶



12 (twelve) federal judges infer infringement of Golden's CMDC device occurs when the Samsung Galaxy S24 Ultra smartphone is integrated with a CBRNE-H detection capability. Golden's patented CMDC device include Golden's patented CPU; Golden's patented Transceiver (equivalent to Samsung android open-source operating system); and Golden's patented cell phone detection devices

❷



Samsung's Exynos CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device. The Samsung Mobile CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the CPU and other components, such as memory and input/output devices.

❸



The [Samsung] Android Operating System manages hardware such as CPU. Provides connections: cellular, Wi-Fi, Bluetooth, NFC and communication with other devices Wi-Fi: Enables connection to local networks and internet. Cellular: Supports mobile data through 3G, 4G, and 5G networks. Bluetooth: Facilitates short-range communication with other devices. NFC: Allows for contactless transactions and data exchange

❹

Source Code: Instructions written in a programming language that make up a software program. It is the actual code that developers write and maintain; allowing developers to modify, and enhance the application; requires access to modify or understand the software's inner workings; sed for developing, maintaining, and customizing software applications. Everything that Samsung undertakes, is considered a commercial endeavor, so no code released under a license that restricts it to non-commercial uses. Once open sourced with an accompanying LICENSE, the project must use the LICENSE in the package and any external contributions must sign a License Agreement. The Apache license is our preferred license not only for source code but also for hardware. Samsung manages and controls the release of the source codes and licensing agreements.

❺

In the IPR Decision to Institute, we construed [] claim terms. Th[e] constructions are reproduced in the chart below. *DHS v. Golden* IPR2014-00714

| Claim Term | Construction |
|---|---|
| "built in, embedded" | "something is included within, incorporated into, disposed within, affixed to-connected to, or mounted to another device, such that it is an integral part of the device" |

❻



Samsung smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The megapixel camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/ article/10. 1007/s11468-022-01672-1. Also, Samsung's QR reader reads QR tags for CBRNE-H detection



❶

12 (twelve) federal judges infer infringement of Golden's CMDC device occurs when the Samsung Galaxy S24 Ultra smartphone is integrated with a CBRNE-H detection capability. Golden's patented CMDC device include Golden's patented CPU; Golden's patented Transceiver (equivalent to Samsung android open-source operating system); and Golden's patented cell phone detection devices



❷

Samsung's Exynos CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device. The Samsung Mobile CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the CPU and other components, such as memory and input/output devices.



❸

The [Samsung] Android Operating System manages hardware such as CPU. Provides connections: cellular, Wi-Fi, Bluetooth, NFC and communication with other devices Wi-Fi: Enables connection to local networks and internet. Cellular: Supports mobile data through 3G, 4G, and 5G networks. Bluetooth: Facilitates short-range communication with other devices. NFC: Allows for contactless transactions and data exchange

❹

Source Code: Instructions written in a programming language that make up a software program. It is the actual code that developers write and maintain; allowing developers to modify, and enhance the application; requires access to modify or understand the software's inner workings; sed for developing, maintaining, and customizing software applications. Everything that Samsung undertakes, is considered a commercial endeavor, so no code released under a license that restricts it to non-commercial uses. Once open sourced with an accompanying LICENSE, the project must use the LICENSE in the package and any external contributions must sign a License Agreement. The Apache license is our preferred license not only for source code but also for hardware. Samsung manages and controls the release of the source codes and licensing agreements.

❺

In the IPR Decision to Institute, we construed [] claim terms. Th[e] constructions are reproduced in the chart below. *DHS v. Golden* IPR2014-00714

| Claim Term | Construction |
|---|---|
| "built in, embedded" | "something is included within, incorporated into, disposed within, affixed to-connected to, or mounted to another device, such that it is an integral part of the device" |



❿

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics. com/military/research/a18161/ Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches measuring biometrics like heart-rate variability have ability to detect if COVID-19 positive" https://www.biometricupdate.com/ 202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

The charts above demonstrate how Samsung's *"modified"* cell phones allegedly directly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices.

Although illustrated above as components of the Samsung *"modified"* cell phone that allegedly directly infringes Plaintiff's patented CMDC devices; are three products; Samsung's *"modified"* CPU; *"modified"* camera: and *"modified"* watch, that Plaintiff allegedly claims are directly infringes his patented inventions.

Another component listed in the charts above as a component of the Samsung *"modified"* cell phone that allegedly infringes under the doctrine of equivalents Plaintiff's patented Transceiver device: is Samsung's *"modified"* android operating system.

Following are Plaintiff's patent claims that support his ownership rights to a mobile, consumer, or cellular device (i.e., CMDC device) that is integrated with, or interconnected to [IPR claim construction for the term "built-in, embedded"], a CBRNE-H detection capability.

**U.S. Patent No: 9,096,189**

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device ...;

a receiver for receiving signals, data or messages from at least one of

plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device …;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone

## Samsung continues to *"modify"* the cell phone 'post sell'; with "Updates"

Update to fingerprint sensor and Failed Authentication Lock: "One of those improvements [with the update] better protects the fingerprint sensor, preventing "unauthorized access." Another is especially topical, enhancing the security of wired USB connections, which has become a major focus over recent months. Failed Authentication Lock, which automatically locks your screen if someone enters too many incorrect login attempts using a fingerprint, PIN or password.

Identity check protects more settings than previously, too, ensuring better peace of mind whether or not your device falls into the wrong hands." *Forbes: Samsung One UI 8.5 Release—This Changes Android; By Zak Doffman*

### New & Updated Features of Samsung Health Accessory SDK



New & Updated Features of Samsung Health Accessory SDK

Introducing the newly updated Samsung Health Accessory SDK. New to Health sensing and monitoring is the "thermometer". Updated sensing and monitoring are the "blood glucose meter; blood pressure monitor; and heart rate monitor …

The innovative bridge for integrating Samsung Health with partner device data, the Accessory SDK has been enhanced with new features such as Cycling Power Sensor, Cycling Speed & Cadence Sensor, and Thermometer. Existing features have also been improved.

The SDK consolidates scattered user health data from various devices into Samsung Health, enabling more precise, data-driven health management and ultimately delivering greater value to our users. Enrich user health journey with the new and improved Accessory SDK.

## Samsung Electronics Unveils Latest SmartThings Update



Samsung Electronics Unveils Latest SmartThings Update

SmartThings strives to make the platform more valuable for our end users, partners, and developers, with our goal to empower users to create exceptional experiences. In Q1 2025, Samsung Smart-Things launched key updates to enhance home AI. The highlight of this quarter is the integration of SmartThings with Samsung Health, which is designed to improve users' sleep environments while enabling more personalized automation experiences. The update also expands Calm Onboarding to support a wider range of devices and adds compatibility with the Matter 1.4 standard.

## Configuring Instant Server Notifications for Samsung IAP



Configuring Instant Server Notifications for Samsung IAP

Samsung IAP's Instant Server Notification (ISN) service ensures developers stay informed about user actions. When users trigger events such as completing in-app purchases or modifying subscriptions, the developer receives notifications with the details of the event, enabling them to track and manage user transactions more effectively. It's a seamless way to ensure developers stay up to date.

## Evaluation of Wearable Head BCG for PTT Measurement in Blood Pressure Intervention




Evaluation of Wearable Head BCG for PTT Measurement in Blood Pressure Intervention

Managing hypertension and cardiovascular risk demands frequent and accurate blood pressure monitoring. Traditional cuff-based methods, however, have limitations in their portability and real-time measuring aspect.

Samsung Research America has proposed a new system that enables continuous blood pressure tracking using an over-the-ear wireless wearable device. The system uses sensors to capture both ballistocardiography (BCG) and photoplethysmography (PPG) signals, and calculate the pulse transit time (PTT) by combining these two bio-signals. Learn about the potential of a future healthcare solution that lets you track blood pressure with everyday wireless earphones on the Samsung Research blog.

## When *"modification"* is construed to mean "Upgrade" or "Update" to Samsung's *"modified"* Cell Phone Operating System software

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE detection capability.

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without

50

modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the use of the third-party app "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; …

The Android Team Awareness Kit is a geospatial & situational awareness platform. Download the latest version of ATAK-CIV (Civil Use) 5.6.0.5 (cdad6735) [playstore] to enjoy new features and updates immediately. Minor bug fixes and improvements. Install or update to the newest version.

The Android Team Awareness Kit (ATAK), for civilian use, or Android Tactical Assault Kit (also ATAK) for military use - is a suite of software that provides geospatial information and allows user collaboration over geography. These Android apps are a part of the larger TAK family of products. ATAK has a plugin architecture which allows developers to add functionality. This extensible plugin architecture that allows enhanced capabilities for specific mission sets (Direct Action, Combat Advising, Law Enforcement, Protection Operations, Border Security, Disaster Response, Off-grid Communications, Precision Mapping and Geotagging).

ATAK - Civilian (ATAK-CIV) - A distribution controlled but fully-releasable version of the TAK Product line for First Responders, and Licensed Commercial Developers. Distribution for ATAK-CIV is through approved, Government Hosted Sites, and Direct Commercial Sales (DCS).

As of March 31, 2020, the civilian version of ATAK, referred to as CivTAK has been approved for "Public Release" by Army Night Vision and is available for download on takmaps.com and subsequently named Android Team Awareness Kit (ATAK) - Civilian.

Upon running ATAK-PR 4.0.0.1, the application splash screen shows a statement; "Approved for public release; distribution is unlimited." The license conditions are detailed in the ATAK Software License Agreement found in the support menu of ATAK.

Upgrading Samsung's *"modified"* cell phone operating system on the Android-powered device is key to *"modifying"* the device to achieve the best results. Upgrading the Samsung *"modified"* cell phone to the most recent version of Android provides the latest security updates, for keeping the device and data safe. Post sell users will also receive fresh features, enhanced functionality, app updates and bug fixes. These help get the most from *"modified"* cell phone when a new Samsung android operating system update is released.

The Samsung *"modified"* cell phone user will get a notification when an update is available for the device. The user needs to open the notification and tap the update action to begin upgrading Samsung *"modified"* cell phone operating system (OS). System and security updates usually happen automatically.

If the update doesn't finish downloading to Samsung *"modified"* cell phone, it will automatically try again. When it starts again over the next few days, the user will get a notification—tap the update action to begin installation. If the user is downloading security updates, the user will need the latest Android version for the *"modified"* cell phone device.

## COUNT I:

## U.S. Patent No: 10,163,287

1.      Count I incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Samsung Electronics *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices and central processing units (CPUs); resulting in Samsung allegedly "directly infringing" at least independent claims 4, and 5, of Plaintiff's 10,163,287 ('287) patent.

2.      Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Samsung *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

3.      Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 5, of Plaintiff's 10,163,287 ('287) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices of at least that of the Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

4.      Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claim 4, of Plaintiff's 10,163,287 ('287) patent; have in the past, and is currently allegedly being infringed by Samsung's

*"modified"* cell phone devices that comprises at least that of the Samsung
*"modified"* cell phone Exypos CPU/Chipset. The Exypos CPU/Chipset is running
on: Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25,
Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+,
Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G,
Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G,
and the Samsung Galaxy A56 5G.

5.      The alleged direct infringement of Samsung; identified by twelve Federal
Judges, have caused irreparable injury to Plaintiff for which remedies at law are
inadequate. Considering the balance of the hardships between the parties, a remedy
in equity, such as a permanent injunction is warranted and such a remedy would be
in the public interest.

6.      Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550
U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged
"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550
U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer
possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation
omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that
discovery will reveal that the defendant is liable for the misconduct alleged."

### COUNT II:
### U.S. Patent No: 10,984,619

7.      Count II incorporate all the pleadings and attachments of this complaint that
precedes this section which alleges Samsung Electronics *"modified"* cell phone
devices' CPU/Chipsets directly infringes Plaintiff's patented central processing
units (CPUs); resulting in Samsung allegedly "directly infringing" at least

independent claims 1, and 11, and dependent claims 2-10, and 12-20, of Plaintiff's 10,984,619 ('619) patent.

8.    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Samsung *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

9.    Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 1, and 11, and dependent claims 2-10, and 12-20, of Plaintiff's 10,984,619 ('619); have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that comprises at least that of the Samsung *"modified"* cell phone Exypos CPU/Chipset. The Exypos CPU/Chipset is running on: Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

10.    The alleged direct infringement of Samsung; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

11.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer

possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT III:
### U.S. Patent No: 9,589,439

12.    Count III incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Samsung Electronics *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices; Plaintiff's patented cell phone detection devices; and Plaintiff's patented "transceivers"; resulting in Samsung allegedly "directly infringing" and/or infringing under the "doctrine of equivalents" at least independent claims 23, and 19, of Plaintiff's 9,589,439 ('439) patent.

13.    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Samsung *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

14.    Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 23, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices of at least that of the Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+,

Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

15.    Upon information and belief, Plaintiff's patented multi-sensor detection device; claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that carries as standard, at least that of the Samsung *"modified"* cell phone Megapixel camera(s). The Megapixel cameras are running on: Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

16.    Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that are integrated with, or interconnected to, at least that of the Samsung Galaxy Watch FE, Galaxy Watch Ultra, Galaxy Watch7, Galaxy Watch6, Galaxy Watch5, Galaxy Watch4, Galaxy Watch3, Galaxy Watch, Galaxy Watch Active2, and Galaxy Watch Active.

17.    Upon information and belief, Plaintiff's patented multi-sensor detection device; claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that carries as standard, at least that of the Samsung android operating system for the Samsung *"modified"* cell phone devices and the Tizen for the Samsung *"modified"* Watch. The Samsung Android operating system

12, 13, or 14 is running on: Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

The Samsung Tizen operating system series is running on: Samsung Galaxy Gear, Samsung Gear S, Samsung Gear S2, Samsung Gear S3, Samsung Gear 2, Samsung Gear Fit 2, Samsung Gear Fit 2 Pro, Samsung Gear Sport, Samsung Galaxy Watch, Samsung Galaxy Watch Active, Samsung Galaxy Watch Active 2, and Samsung Galaxy Watch 3

18.    Upon information and belief, Samsung's android operating system, is allegedly infringes Plaintiff's patented transceiver because the Samsung's android operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results. ["doctrine of equivalents"]

19.    The alleged direct infringement of Samsung; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

20.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT IV:

## U.S. Patent No: 9,096,189

**21.**     Count IV incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Samsung Electronics *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices; Plaintiff's patented cell phone detection devices; and Plaintiff's patented "transceivers"; resulting in Samsung allegedly "directly infringing" and/or infringing under the "doctrine of equivalents" at least independent claims 1, and 7, of Plaintiff's 9,096,189 ('189) patent.

**22.**     Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Samsung *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

**23.**     Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 1, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices of at least that of the Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

24.     Upon information and belief, Plaintiff's patented multi-sensor detection device; claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that carries as standard, at least that of the Samsung *"modified"* cell phone Megapixel camera(s). The Megapixel cameras are running on: Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15 5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

25.     Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that are integrated with, or interconnected to, at least that of the Samsung Galaxy Watch FE, Galaxy Watch Ultra, Galaxy Watch7, Galaxy Watch6, Galaxy Watch5, Galaxy Watch4, Galaxy Watch3, Galaxy Watch, Galaxy Watch Active2, and Galaxy Watch Active.

26.     Upon information and belief, Plaintiff's patented multi-sensor detection device; claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Samsung's *"modified"* cell phone devices that carries as standard, at least that of the Samsung android operating system for the Samsung *"modified"* cell phone devices and the Tizen for the Samsung *"modified"* watch. The Samsung Android operating system 12, 13, or 14 is running on: Samsung Galaxy Z Fold7, Samsung Galaxy Z Fold5, Samsung Galaxy S25, Samsung Galaxy S25+, Samsung Galaxy S25 Ultra, Samsung Galaxy S24+, Samsung Galaxy S24 FE, Samsung Galaxy S24 Ultra, Samsung Galaxy A15

5G, Samsung Galaxy A16 5G, Samsung Galaxy A25 5G, Samsung Galaxy A35 5G, and the Samsung Galaxy A56 5G.

The Samsung Tizen operating system series is running on: Samsung Galaxy Gear, Samsung Gear S, Samsung Gear S2, Samsung Gear S3, Samsung Gear 2, Samsung Gear Fit 2, Samsung Gear Fit 2 Pro, Samsung Gear Sport, Samsung Galaxy Watch, Samsung Galaxy Watch Active, Samsung Galaxy Watch Active 2, and Samsung Galaxy Watch 3

27.    Upon information and belief, Samsung's android operating system, is allegedly infringes Plaintiff's patented transceiver because the Samsung's android operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results. ["doctrine of equivalents"]

28.    The alleged direct infringement of Samsung; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

29.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## CONCLUSION

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur

when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused devices of Samsung required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Samsung devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Samsung CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Samsung CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs.

Plaintiff has stated a plausible claim for direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is when the Samsung accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015), the PTAB construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Samsung's *"modified"* cell phone that "include within" or "dispose within", a *"modified"* Samsung camera for CBRNE-H detection; and Samsung's *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* by Samsung watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

Also noted, throughout this document a party other than Samsung cannot "modify" the Samsung devices without Samsung's consent and a license to do so. Samsung also control the upgrades and updates to the its operating systems that keeps the devices functioning as a CBRNE-H sensing device.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.    A judgment in favor of Golden that the defendant has infringed claims of the '619 Patent, the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid; and grant Plaintiff his request for damages.

B.    A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from joint and/or direct infringement of the '619, '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.    A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.    As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly and/or infringed under the doctrine of equivalents, the '619, '287, '439, and '189 patents.

E.    According to twelve federal judges, the Defendant is liable for infringement of the '619, '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

F.      Any and all further relief to which the Court may deem Golden entitled.

### DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the United States Constitution.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net



U.S. POSTAGE PAID
PME
MAULDIN, SC 29662
DEC 18, 2025

76701                    **$63.45**

RDC 07                   S2324N504255-92

---

**UNITED STATES POSTAL SERVICE** ®    **PRIORITY MAIL EXPRESS** ®



EI 916 852 249 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)    PHONE (864) 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**RECEIVED**

**PAYMENT BY ACCO (if applicable)**

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
| --- | --- |

DEC 22 2025

CLERK
ORIGIN (POSTAL SERVICE USE ONLY)

WESTERN DISTRICT OF TEXAS
BY _____

DEPUTY CLERK

**DELIVERY OPTIONS (Customer Use Only)**

☑ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)    PHONE 254 750-1501

CLERK'S OFFICE
U.S. DISTRICT COURT
WESTERN DISTRICT TEXAS — WACO
800 FRANKLIN AVE, ROOM 380
WACO, TEXAS

ZIP + 4® (U.S. ADDRESSES ONLY)

7 6 7 0 1 - _ _ _ _

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance Included.

⬇ **PEEL FROM THIS CORNER**

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
| --- | --- | --- |
| 29607 | 12/22/25 | $ 63.45 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
| --- | --- | --- | --- |
| 12/18/25 | ☐ 10:30 AM ☑ 3:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
| --- | --- | --- | --- |
| 9:41 | ☐ AM ☑ PM | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
| --- | --- | --- |
| $ | $ | 63.45 |

| Weight | ☐ Flat Rate | Acceptance Employee Initials |
| --- | --- | --- |
| lbs.    ozs. | | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| --- | --- | --- |
| | ☐ AM ☐ PM | |

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| --- | --- | --- |
| | ☐ AM ☐ PM | |

LABEL 11-B, MAY 2021    PSN 7690-02-000-9996