# Exhibit B

Notice of Fillings

Copy of Amended Complaint in:

*Golden v. Apple* Case No. 26-0224, Dkt. 14; filed in

the Western District of Texas—Waco Court.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS—WACO DIVISION

## CASE NO: 6:26-cv-00224-AM-DNM

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>Plaintiff,<br><br>v.<br><br>APPLE, INC.<br><br>Defendant. | **JURY TRIAL DEMANDED**<br><br>**Infringement of a Patented Process under 35 U.S.C. § 154(a)(1) & 35 U.S.C. § 271(g); Shifting of Burden under 35 U.S.C. § 295; Collecting a Reasonable Royalty under 35 U.S.C. § 284; and, Willful Patent Infringement**<br><br>May 18, 2026 |

## PLAINTIFF'S AMENDED COMPLAINT AS A MATTER OF COURSE

Plaintiff has an automatic right to amend the complaint. Federal rules typically grant a 21-day window after serving the original complaint or a *motion to dismiss* to file an amendment as a matter of course. Defendant's motion to dismiss was filed on 05/05/2026 in the case of *Larry Golden v. Apple, Inc.* WDOT Case No. 6:26-cv-00224-AM-DNM; Doc. No. 9.

Since no formal motion is required, Plaintiff has drafted the revised complaint and is filing the amended complaint on this date 05/18/2026 with the court clerk.

2

## PLAINTIFF'S STATEMENT TO THE COURT

Plaintiff's first amended complaint is made to clarify for the Court, and especially for the Defense the lawful contentions Plaintiff has put forth in this complaint, and to debunk the misdirected and misguided defenses the Defense has filed with this Court in its motion to dismiss. Following are Plaintiff's causes of action; none, of which the Defense addressed or denied:

- Infringement of a Patented Process under 35 U.S.C. § 154(a)(1);
- Infringement of a Patented Process under 35 U.S.C. § 271(g);
- Shifting of Burden under 35 U.S.C. § 295;
- Collecting a Reasonable Royalty under & 35 U.S.C. § 284; and,
- Willful Patent Infringement.

**35 U.S.C. § 154(a)(1):**

"Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof."

On March 14, 2012, the Federal Circuit issued in *Zoltek Corp. v. United States*, No. 2009-5135. Acting *en banc*: "With the full court having vacated its *Zoltek III* decision, the panel addressed the narrower question of whether Lockheed's actions in this case created liability under § 1498(a). The panel voted yes. The panel reasoned that, '[i]f a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under [35 U.S.C.] § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.'"

3

**35 U.S.C. § 271(g):**

> "Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent…"

Thus, under section 271(g), a party can be liable for infringement for importing into the United States, or selling or using in the United States, a product made by a patented process, ***regardless of where the process is performed or where the product was ultimately made***. Congress added section 271(g) to increase protection of U.S. technology industries, specifically the pharmaceutical and biotechnology industries. *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**35 U.S.C. § 295**

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds— (1) that a substantial likelihood exists that the product was made by the patented process; and, (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine; the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made."

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the

4

burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

**35 U.S.C. § 284**

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred; or came to the conclusion: "infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability". The twelve federal judges were also *CORRECT* in their determination: "the accused devices [] required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery has revealed the defendant Apple is responsible for the *"modification"* of a common cell phone to include a CBRNE-H detection capability, and is therefore liable for the misconduct alleged." See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

**Willful Patent Infringement**

For patents, the Supreme Court set the current standard in its 2016 decision in *Halo Electronics, Inc. v. Pulse Electronics, Inc*. The Court described enhanced damages as a "punitive" or "vindictive" sanction reserved for "egregious cases of culpable behavior," using words like "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."

*Note*: None of the causes of actions listed above have ever been litigated before, therefore a "motion to dismiss" under the doctrines of preclusion is not relevant.

## CONTENTS

**Page**

| | |
|---|---|
| 8 | COMPLAINT FOR PATENT INFRINGEMENT |
| 8 | PARTIES |
| 9 | JURISDICTION AND VENUE |
| 13 | PRIOR LITIGATION BETWEEN THE PARTIES |
| 14 | Patent Eligibility and Mutual Exclusivity |
| 16 | STANDARD FOR REVIEW |
| 17 | PLAINTIFF'S DEMAND FOR A JURY TRIAL |
| 19 | Damages |
| 20 | Twelve Federal Judges Validates Plaintiff's Infringement Theory |
| 24 | Twelve Federal Judges Identifies Where on the Inside of the Apple Devices the Detection Capability is Located |
| 26 | Apple's Smartphone Biosensors Submitted to the Courts |
| 26 | Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Apple Devices |
| 28 | APPLE "*MODIFIED*" THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY |
| 30 | The Cell-All Demonstration Participants and Program Outline |
| 36 | APPLE IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF'S PATENTED PROCESS §§ 154(a)(1) & 271(g) |
| 42 | Apple's Production Process of Plaintiff's Patented Process under §§ 154(a)(1) & 271(g) |
| 42 | Apple's iPhone Design |

| | |
|---|---|
| 45 | COUNT I:<br>TWELVE JUDGES HAVE DECIDED PATENT INFRINGEMENT |
| 49 | COUNT II:<br>IMPORTING A PATENTED PROCESS UNDER §§ 154(a)(1) & 271(g) |
| 51 | COUNT III:<br>U.S. Patent No: 10,163,287 |
| 53 | COUNT IV:<br>U.S. Patent No: 10,984,619 |
| 55 | COUNT V:<br>U.S. Patent No: 9,589,439 |
| 58 | COUNT VI:<br>U.S. Patent No: 9,096,189 |
| 62 | COUNT VII:<br>Apple's "*modified*" Cell Phones |
| 75 | COUNT VIII:<br>Apple's CPU for Apple's "*modified*" Cell Phone |
| 90 | COUNT IX:<br>Apple's iOS for Apple's "*modified*" Cell Phone |
| 105 | COUNT X:<br>Apple's Megapixel Camera for Apple's "*modified*" Cell Phone |
| 121 | COUNT XI:<br>Apple's GPS for Apple's "*modified*" Cell Phone |
| 134 | COUNT XII:<br>Apple's Biometric ID for Apple's "*modified*" Cell Phone |
| 146 | COUNT XIII:<br>Apple's Disabling Lock for Apple's "*modified*" Cell Phone |
| 159 | COUNT XIV:<br>Apple's NFC for Apple's "*modified*" Cell Phone |

| | |
|---|---|
| 175 | COUNT XV:<br>Apple's Watch Series for Apple's "*modified*" Cell Phones |
| 192 | COUNT XVI:<br>Apple's Wi-Fi Chips for connecting Apple's "*modified*" Cell Phones |
| 208 | COUNT XVII:<br>Apple's Wireless Protocols for connecting the Apple Watch Series |
| 222 | COUNT XVIII:<br>Apple's Wireless Protocols for connecting Apple's "Find My" |
| 235 | COUNT XIX:<br>Apple's Wireless Protocols for connecting Apple's "Car Key" & Drones |
| 251 | COUNT XX:<br>Apple's Nine "Standard Biosensors" for Apple's "*modified*" Cell Phone |
| 268 | PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT |
| 268 | Willful Infringement Requires a Finding of Direct Infringement |
| 268 | Knowledge requirement for Willful Patent Infringement |
| 268 | Under Rule 14(b) |
| 268 | Correspondence |
| 269 | Service of Complaint |
| 270 | Plaintiff's Demand for a Jury Trial to Decide Willfulness |
| 271 | CONCLUSION |
| 273 | PRAYER FOR RELIEF |
| 275 | DEMAND FOR JURY TRIAL |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff alleges the following:

- Infringement of a Patented Process under 35 U.S.C. § 154(a)(1);

- Infringement of a Patented Process under 35 U.S.C. § 271(g);

- Shifting of Burden under 35 U.S.C. § 295;

- Collecting a Reasonable Royalty under & 35 U.S.C. § 284; and,

- Willful Patent Infringement.

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patents: [7,385,497]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; [10,163,287]; [10,984,619]; and [11,645,898]

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, Defendant Apple is a California corporation with registered and established places of business in this District at 12545 Riata Vista Circle, Austin, Texas 78727; 12801 Delcour Drive, Austin, Texas 78727; and 3121 Palm Way, Austin, Texas 78758. Apple may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. Apple is registered to do business in the State of Texas and has been since at least May 16, 1980.

On information and belief, Apple regularly conducts and transacts business in the State of Texas, throughout the United States, and within this District, and as set forth below, has committed and continues to commit, tortious acts of infringement within and outside the State of Texas and within this District.

Apple's products are offered for sale through numerous mobile carriers in this judicial District, including, but not limited to Verizon stores at 2812 W Loop 340 Suite# H-12, Waco, TX 76711; 1820 S Valley Mills Dr, Waco, TX 7671; and 3590 Greenlawn Blvd Suite 103, Round Rock, TX 78664; T-Mobile Stores at 2448 W Loop 340 Suite 24a, Waco, TX 76711 and 208 Hewitt Dr Suite #200, Waco, TX 76712; and AT&T Stores at 4330 W Waco Dr, Waco, TX 76710; 2320 W Loop 340 #100A, Waco, TX 76711; and 1515 Hewitt Dr Ste A, Waco, TX 76712 (collectively, "Waco and Austin Carrier Stores"). On information and belief, Apple products relevant to the allegations in this Complaint have been sold and used at the Waco and Austin Carrier Stores, and are offered for sale at the Waco and Austin Carrier Stores.

Apple also owns and operates Apple Stores in multiple locations in this District including stores at 3121 Palm Way, Austin, TX 78758; 2901 S. Capital of Texas Hwy, Austin, TX 78746; 15900 La Cantera Parkway, San Antonio, TX 78256; 7400 San Pedro Avenue, San Antonio, TX 78216; and 8401 Gateway Boulevard West, El Paso, TX 79925 where accused Apple products relevant to the allegations in this Complaint have been sold and used, and offered for sale.

Apple also operates a growing $1 billion campus in this District at W. Parmer Ln. & Dallas Dr., Austin, TX 78729. On information and belief, and according to publicly available reports, the Apple Austin campus will initially employ over 5000 people with the ability to employ up to 15,000 people. See https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/ (last visited February 6, 2024).

**JURISDICTION AND VENUE**

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

This Court has personal jurisdiction over Apple by virtue of its systematic and continuous contacts with this jurisdiction, as alleged herein, as well as because the injury to Plaintiff occurred in the State of Texas and the claim for relief possessed by Plaintiff against Apple for that injury arose in the State of Texas. On information and belief, Apple has purposely availed itself of the privileges of conducting business within the State of Texas, such business including but not limited to: (i) at least a portion of the infringements alleged herein; (ii) purposefully and voluntarily placing one or more infringing products or services into the stream of commerce with the expectation that they will be purchased by consumers in this forum; or (iii) regularly transacting or soliciting business, engaging in other persistent courses of conduct, or deriving or attempting to derive substantial revenue and financial benefits from goods and services provided to individuals residing in the State of

Texas and in this District. Thus, Apple is subject to this Court's specific and general personal jurisdiction under due process and the Texas Long Arm Statute.

Personal jurisdiction also exists specifically over Apple because Apple, directly or through subsidiaries or intermediaries (including customers, distributors, retailers, and others), subsidiaries, alter egos, and/or agents – ships, distributes, offers for sale, licenses, sells, imports, advertises, or markets in the State of Texas and in this District, one or more products or services that infringe the Patents-in-Suit.

Apple has purposefully and voluntarily placed one or more of its infringing products and/or services, as described, into the stream of commerce with the awareness and/or intent that these products and/or services will be purchased or used by consumers in this District. Apple has knowingly and purposefully shipped infringing products into and within this District through an established distribution channel. These infringing products have been and continue to be purchased and used by consumers in this District.

Plaintiff's claim for relief for patent infringement arises directly from the activities of Apple in this District.

On information and belief, Apple, directly and/or through its customers has transacted business in this District and has committed acts of patent infringement in this District. By virtue of its offices in this District, Apple has a regular and established place of business in this District. Thus, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

## PRIOR LITIGATION BETWEEN THE PARTIES

In prior litigation between the parties, Plaintiff have always been denied his Seventh Amendment right to a trial by jury.

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, then according to the rules of the common law." [U.S. CONS'T. 7th Amend.]

Patent infringement claims are issues-of-fact to be tried by a jury under the Seventh Amendment. More than 95% of patent cases are tried by jury. The parties may waive the right to a jury trial and have the court try the case, but such waivers are rare. Prior litigation:

*Golden v. Apple, Inc*. SCDC Case No. 19-2557 filed 01/27/2020: "Dismissed as being duplicative. Plaintiff further objects to the dismissal of his case because he claims that he is barred from bringing a patent infringement case against a private party [contractor who is performing work for the Government with the authorization or consent of the Government] and the Government [under 28 U.S.C. § 1498] in the same court. This objection has no basis in the law and is overruled":

"To the extent Plaintiff argues that the Defendants in the present action are immune from suit in the Court of Federal Claims, has not pointed to, and the Court has been unable to find, any authority to support a theory that these Defendants would be treated differently in this Court."

"In light of the foregoing, this action is DISMISSED without prejudice and without issuance of service of process. The Court finds Plaintiff should not be given a second opportunity to amend his

13

complaint in the instant matter because any amendment would be futile in light of the pending duplicative litigation."

*Golden v. Apple, Inc.* et al CAFC Case No. 22-1229 Dkt. 16 filed 09/08/2022: 09/08/2022: "In the Apple case, the district court dismissed the complaint as frivolous without the issuance of service of process but declined to dismiss with prejudice."

*Golden v. Apple, Inc.* NDC Case No. 22-4152 Dkt. 29 filed 10/20/2022: "The motion to dismiss is granted. The claims asserted in the complaint are frivolous."

*Golden v. Apple, Inc.* CAFC Case No. 23-1161 Dkt. 25 filed 05/12/2023: "The district court properly dismissed the complaint as frivolous" … "dismissing antitrust claims as frivolous" … "dismissing patent infringement claims as frivolous" … "affirming dismissal of patent infringement claims as frivolous" …

The Courts failed to identify any of the following six factors for determining the frivolousness of Plaintiff's complaint, but yet, because the Court ruled Plaintiff's complaint as frivolous, the Court's continued to unjustly dismiss Plaintiff's alleged infringement claims without leave to amend.

*Lack of Legal Basis:* The complaint does not cite any valid patent claims or legal grounds for infringement.

*Absence of Evidence:* There is no supporting evidence to substantiate the claims of infringement.

*Unclear Claims:* The patent claims are vague or poorly defined, making it difficult to determine infringement.

*Prior Art:* The accused product or method is already covered by prior art, negating the patent's validity.

14

*Failure to Notify:* The complainant did not adequately inform the alleged infringer of the patent rights before filing.

*Bad Faith:* The complaint is filed with the intent to harass or extort rather than to protect legitimate patent rights.

Effectively, Apple would have had to convince a judge & jury that Plaintiff's patent infringement contentions were on-their-face frivolous; that no one who took a look at the claims & products could reasonably believe that infringement was legitimate. A judge ruling from the bench without a jury, would have had to be convinced that there were no fact issues of patent infringement, or that there were no patent infringement claims, that are issues-of-facts to be tried by a jury. "Patent infringement claims are issues-of-facts to be tried by a jury [7th Amend.]

Dismissals under res judicata are merit decisions; and a dismissal on the merits is a requirement for dismissing a case under the doctrines of res judicata and Kessler. Dismissals for frivolousness are not merit decisions; which means Plaintiff cannot be barred from making a claim of patent infringement against Apple for allegedly infringing Plaintiff's patented inventions. To understand the difference between *res judicata* and frivolousness, consider these key points:

> *Res judicata* applies to cases that have been decided on their merits, preventing re-litigation. Frivolousness refers to claims that lack legal merit and are dismissed without a substantive decision.
> *Res judicata* requires a final judgment from a competent court to be effective. Frivolous claims can be dismissed at any stage of litigation, often before a trial.
> *Res judicata* promotes judicial efficiency by avoiding repetitive litigation on the same issue. Frivolousness serves to protect the court system from baseless claims that waste resources.

**Patent Eligibility and Mutual Exclusivity**

Plaintiff's patents and patent claims asserted in this complaint that describes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device as a "mobile, consumer, or cellular device that is integrated with, or

15

interconnected to, a CBRNE-H detection capability, have undergone rigorous and extensive examinations and re-examinations at the U.S. Patent and Trademark Office (USPTO) with challenges to Plaintiff's patents and patent claims validity: "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. Anyone challenging the patents validity, must do so on the heightened 'clear and convincing evidence' standard" [35 U.S.C. § 282(a)].

Time after time, over the years, and over several of Plaintiff's patents; when the phase "in, on, upon, or adjacent the monitoring equipment", was used to describe the detection capability is placed either inside or outside the monitoring device, the USPTO have always allowed the phase.

Claims are one sentence descriptions, included in a patent, that describe what aspects of the invention are protected by law. There are independent claims and dependent claims. Dependent claims add details to independent claims and are consequently "narrower" than their parent independent claim. The product manufactured by or for the government need only infringe one claim, independent or dependent, to "infringe the entire patent." See *Johns Hopkins University v. CellPro, Inc.*, 152 F3d 1342 (Fed Cir 1998).

In a precedential decision, the U.S. Court of Appeals for the Federal Circuit in *Vascular Solutions*, along with related Teleflex companies (collectively with Vascular Solutions, "Teleflex") *v. Medtronic*, Inc. defined the concept of "*mutual exclusivity*" in patent claims:

> The Federal Circuit held that the district court erred when it determined the asserted claims were "*mutually exclusive*" and indefinite. The Federal Circuit rejected the notion that claims in a patent cannot vary in how they describe the disclosed subject matter

or that independent claims must be totally consistent with other independent claims.

The Federal Circuit stated: "The district court's conclusion, in effect, means that (1) claims in a patent cannot vary in the way they claim the disclosed subject matter, and (2) independent claims must be totally consistent with other independent claims. Claiming is not restricted in this way." It emphasized that the art of patent claiming often involves drafting claims in various ways to encompass different aspects of the disclosed subject matter, as long as each claim informs those skilled in the art about the scope of the invention with reasonable certainty.

The Federal Circuit instructed the district court to "conduct claim construction on a claim-by-claim basis with the understanding that, at the claim construction stage, the claims are not necessarily '*mutually exclusive*' since each independent claim is a different ordered combination of limitations."

Therefore, when a case is dismissed for preclusion or *Kessler* simply because the same patents was asserted in a previous case, and the individual claims were never examined for infringement, the dismissal is improper "since each independent claim is a different ordered combination of limitations".

In Plaintiff's prior litigation the Courts created a loophole for invalidating Plaintiff's patents without meeting the higher "clear and convincing" evidence standard; without submitting invalidity contentions; without a Markman hearing or claim construction. No law supports this type of loophole creation.

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in

17

their determination: "the accused devices [] required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Apple devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Apple CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Apple CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs. This is not true.

Plaintiff has stated a plausible claim for direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff maintains he has additional factual allegations to support his claims in the form claim charts readily available by order of this Court.

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is when the Apple accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

## PLAINTIFF'S DEMAND FOR A JURY TRIAL

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged throughout this complaint "enough facts to state a claim to relief that is plausible on its face" *Twombly*, 550 U.S. at 570, for Apple's alleged infringement of Plaintiff's

patented process; whereby, infringement under § 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a).

Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully" *Iqbal*, 556 U.S. at 678. The Federal Circuit solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged." The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive determination on its own. [See 35 U.S.C. § 295].

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment [U.S. CONS'T. 7th Amend]. More than 95% of patent cases are tried by jury. The parties may waive the right to a jury trial and have the court try the case, but such waivers are rare.

**Damages**

Plaintiff is demanding damages for Apple's alleged direct infringement under 35 U.S.C. § 271(g) and 35 U.S.C. § 271(a); direct infringement under the doctrine of equivalents, and willful infringement, for the unauthorized act of making, using, selling, or importing inventions (i.e., Apple's central processing unit, operating system, smartphone, camera, and smartwatch) for which patents has been issued with the presumption of validity (35 U.S.C. § 282), per the Patent Act.

Damages are a question of fact; thus, a jury will decide damages. The Western District of Texas (WDT) court judge will decide damages if this case is not before a jury. Plaintiff is demanding a jury trial to determine Apple's alleged patent infringement damages; and, to recover damages adequate to compensate for the alleged patent infringement. A jury can determine damages, but the presiding judge in this Western District of Texas (WDT) court case *Golden v. Apple* will determine damages if the case is not heard by a jury.

Plaintiff's alleged damages must be sufficient to compensate for the alleged patent infringement and at least amount to a reasonable royalty for Apple's alleged use of Plaintiff's patented inventions. Plaintiff allege more consumers start buying Apple's alleged infringing products (i.e., Apple's central processing unit, operating system, smartphone, camera, or smartwatch) because Plaintiff's invention has improved them. Therefore, Plaintiff is entitled to those profits that should have belonged to Plaintiff.

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Apple's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing item (i.e., Apple's central

20

processing unit, operating system, smartphone, camera, or smartwatch) and then multiply that value by the number of items that infringed.

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016). Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Plaintiff believes Apple's conduct to be "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

**Twelve Federal Judges Validates Plaintiff's Infringement Theory**

Upon information and belief, there's no need for this Court to continue litigating claims made against Apple for the alleged infringement of Plaintiff's patents because twelve Federal Judges (three in the district courts; nine at the federal circuit) have determined infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Twelve Federal Judges repeatedly confirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |

21

| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
|---|---|---|---|---|
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that

22

include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there

23

are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

**Twelve Federal Judges Identifies Where on the Inside of the Apple Devices the Detection Capability is Located**

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises

*"through nine "standard sensors" which "can be used as 'biosensors,'"* Appx126.": **[1]**

> In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126."

Samsung admits in the Northern District of California Court in *Golden v. Samsung* Case No. 23-0048; and Google admits in the Northern District of California Court in *Golden v Google* Case No. 22-5246 that Mr. Golden's complaints alleged "***nine standard sensors which can be used as biosensors***".

Samsung & Google also admits the "***nine standard sensors which can be used as biosensors***", is found within each of Samsung's and Google's accused instrumentalities. Samsung and Google further admit, it is making, offering for sell, selling, and purportedly importing the Samsung and Google smartphones that include the "***nine standard sensors which can be used as biosensors***" and performs the accused detector/sensor functionality.

If the Circuit had read Plaintiff's pleadings, the Circuit would have realized the Northern District of California court, and the U.S. Court of Appeals for the Federal Circuit; both determined the *"modified"* cell phones of Samsung and Google

---

**[1]** In *Golden v. Apple, Inc*. NDC Case No. 22-4152 Dkt. 29 filed 10/20/2022, Plaintiff included the same nine standard biosensors but the complaint was dismissed as "frivolous". On appeal, the Circuit in *Golden v. Apple, Inc*. CAFC Case No. 23-1161 Dkt. 25 filed 05/12/2023 "affirming dismissal of patent infringement claims as frivolous".

---

**Apple's Smartphone Biosensors Submitted to the Courts**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

---

that mirrors the *"modified"* cell phones of Apple; include the same "***nine standard sensors which can be used as biosensors***".

**Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Apple Devices**

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Apple camera for CBRNE-H detection; and, an Apple *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Apple watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015.

27

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Following are Plaintiff's patent claims that support his ownership rights to a mobile, consumer, or cellular device (i.e., CMDC device) that is integrated with, or interconnected to [IPR claim construction for the term "built-in, embedded"], a CBRNE-H detection capability.

**U.S. Patent No: 9,096,189**

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device …;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device …;

wherein the only type or types of communication with the transmitter and

28

the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone at least one of a chemical sensor, a biological sensor …

Plaintiff alleges Apple *"modified"* the cell phone to include an internal camera biosensor and an external—to the Apple iPhone smartphone—Apple Watch for chem/bio detection.

Claim 23 of Plaintiff's '439 patent claims both the internal ("at least one of a chemical sensor, a biological sensor … being disposed within") and an external ("the cell phone detection device … capable of being [] adjacent the cell phone"); detection capability. Apple's *"modified"* cell phones are designed to perform these detection functions.

## APPLE "*MODIFIED*" THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY

Apple must admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Apple must also admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling (CMDC) device is infringed when a mobile, consumer, or cellular device is "modified by a third party" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

Apple's argument is: it is not Apple itself who is the party responsible for *"modifying"* the cell phone to function as a CBRNE-H detection device. Apple is accused of "making" the alleged infringing products.

The United States impliedly authorized and consented to Apple *"modifying"* the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Apple was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

> "… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "***The proposed concept should develop a miniaturized sensor, device and system***…" [DHS S&T BAA07-10 Cell-All Ubiquitous Biological and Chemical Sensing]
> Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

30

"[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) … "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)."

Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect



**The Cell-All Demonstration Participants and Program Outline**

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Introduction to "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department: Host location for the demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative: *Phase II* of the *Cell-All* initiative advances the mobile devices (i.e., cell phones, smartphones, or CMDC devices) from devices that include CBRNE sensors "embedded" within the devices (*Phase I*), to mobile devices that include CBRNE detectors and/or sensors remote the mobile devices (i.e., cell phones, smartphones, or CMDC devices). (*Phase II*)

- Dr. Jing Lee, Principal Investigator, NASA Ames Research Center: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a Chem/Bio medical health detection capability". [NASA acquired a license from the medical industry]

- Debra Deininger, Synkera Technologies, Inc.: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability". Previous work, through a Small Business Innovation Research (SBIR) project, for the miniaturization of sensors.

32

- Doug Hoffman, Program Manager, Qualcomm: Qualcomm was awarded the *Cell-All* contract, and designated the prime contractor's position responsible for delivering the improved upon cell phones; that include improved upon CPUs; wireless modems; operating systems; and miniaturized sensors for CBRNE detection.

- Chris Needs, Product & Control Manager, NC4: Middleman service for the for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative responsible for monitoring, identifying location, notifying, alerting, and transmitting data.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Setting the scenario for a live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department and Chris Needs, Product & Control Manager, NC4; narrates the live demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T interviews Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; post the live demonstration.

- Panel assembled for Q&A: Panel participants are: Chief Corey Rose [Location Host]; Los Angeles Fire Department; Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous*

33

*Biological and Chemical Sensing*" initiative; Dr. Jing Lee, Principal Investigator, NASA Ames Research Center; Debra Deininger, Synkera Technologies, Inc.; Doug Hoffman, Program Manager, Qualcomm; and, Chris Needs, Product & Control Manager, NC4.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Closing remarks and thanks to everyone involved in making the live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability" a success.

The government's authorization of or consent to a contractor's infringing activity may be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976).

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

The DHS S&T pursued what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, *Apple*, and Samsung. The written agreements, are designed to bring together a private company and a government agency for a specific project, often to accelerate the commercialization of technology developed for government purposes.

34

Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, three teams: Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology perfected their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station, and technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

"Rhevision Technology, a three-year-old San Diego-based startup, is developing advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of UC San Diego Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" developed by Sailor's group, which are composed of nanoparticles that change color in the presence of certain molecules. Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds."

"Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded "sleeve" for phones—that

will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and *Samsung*—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010). Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

In *Golden v. United States* CFC Case No. 13-307C, Apple was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court notified Apple to make an appearance to protect its interest in the subject matter of the suit. Apple failed to appear, which means a final decision of a dispute between the private parties of Golden v. Apple in the United States Court of Federal Claims, never happened.

In resolving a petition for mandamus, the Federal Circuit held in *In re UUSI, LLC*, that a third party's potential obligation to indemnify the government for any patent infringement liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests." 549 F. App'x 964, 968 (Fed. Cir. 2013), aff'g *UUSI, LLC v. United States*, 110 Fed. Cl. 604 (2013).

While Apple need not have participated in the § 1498 litigation, Apple's failure to appear in response to the notice under Rule 14(b) acts as a waiver of any

later argument that Apple should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed. As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970)

The notice issued by the United States Court of Federal Claims in *Golden v. United States* CFC Case No. 13-307C satisfies the knowledge requirement for a claim of willful infringement.

Apple was given a second chance to protect its interest in *Golden v. Apple, Inc.* NDC Case No. 22-4152; in the subject matter of a lawsuit originally brought against the United States in *Golden v. US* CFC Case No. 13-307C; by claiming the affirmative defense that Apple was authorized, or received the Government's consent, to manufacture for the Government, under 28 U.S.C. § 1498(a), a "modified, or new, improved upon, or useful cell phone; but failed in both Courts to defend against Plaintiff's claim that Apple allegedly infringes Plaintiff's CMDC device (a "modified, or new, improved upon, or useful cell phone). Therefore, Apple should not be given another chance.

## APPLE IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF'S PATENTED PROCESS [35 U.S.C. §§ 154(a)(1) & 271(g)]

In *Syngenta Crop Protection LLC v. Willowood LLC, et al.*, the US Court of Appeals for the Federal Circuit held in a case of first impression that infringement

liability under 35 U.S.C. § 271(g) does not require a single entity to perform all steps of the patented process. *See* No. 2018-1614 (Fed. Cir. Dec. 18, 2019) (*"Syngenta"*). The Federal Circuit's decision strengthens process claims' usefulness against accused infringers (i.e. Apple) who manufacture a patented product [such as the Apple iPhone smartphone] abroad and import it into the US. Sections [154(a)(1) & 271(a) identifies acts that constitute direct infringement, providing that:

**35 U.S.C. § 154(a)(1):**

"Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof."

On March 14, 2012, the Federal Circuit issued in *Zoltek Corp. v. United States*, No. 2009-5135. Acting *en banc*: "With the full court having vacated its *Zoltek III* decision, the panel addressed the narrower question of whether Lockheed's actions in this case created liability under § 1498(a). The panel voted yes. The panel reasoned that, '[i]f a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under [35 U.S.C.] § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.'"

**35 U.S.C. § 271(g):**

"Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent…"

Thus, under section 271(g), a party can be liable for infringement for importing into the United States, or selling or using in the United States, a product made by a patented process, ***regardless of where the process is performed or where the product was ultimately made***. Congress added section 271(g) to increase protection of U.S. technology industries, specifically the pharmaceutical and biotechnology industries. *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**35 U.S.C. § 295**

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds— (1) that a substantial likelihood exists that the product was made by the patented process; and, (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine; the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made."

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

In addition, §§ 271(b) and 271(c) define indirect infringement, creating vicarious liability for those who induce or contribute to acts of direct infringement. Although § 271(a) provided strong protection for patent owners against purely

domestic infringement, the patent laws did not protect against infringing acts occurring outside of the US. (See § 271(a) ("within the United States").

This gap in protection was highlighted in the US Supreme Court's *Deepsouth Packing Co. v. Laitram Corp.* decision, which held that exporting components of a patented product for assembly abroad did not constitute direct infringement, reasoning that a patented system is made only after final assembly. *See* 406 U.S. 518, 529- 32 (1972). Since final assembly was performed abroad, there could be no infringement under § 271(a).

As world trade and globalization continued to expand in the 1980s and 1990s, it became clear that patent owners in the US were more vulnerable than ever to infringers abroad. In response, US Congress broadened the scope of infringing activities through legislative amendments to the Patent Act, adding §§ 271(f) in 1984 and 271(g) in 1998. *See Kastenmier*, "Section-By-Section Analysis of H.R. 6286, Patent Law Amendments Act of 1984," Congressional Record of October 1, 1984 at H10525 to H10529. Section 271(g) provides that:

> "[w]hoever without authority imports into the United States or offers
> to sell, sells, or uses within the United States a product which is made
> by a process patented in the United States shall be liable as an
> infringer."

Thus, anyone who imports into the US, or sells or uses in the US, a product made by a patented process – regardless of where the process was performed or where the product was assembled – is liable for infringement.

The district court rejected Syngenta's § 271(g) claims, finding that § 271(g) requires that all steps of the patented process be performed by a single entity. This requirement limits direct infringement liability only to circumstances "where all steps of a claimed method are performed by or attributable to a single entity." The

40

district court believed that the single-entity requirement present for method claims under §§ 271(a) and (b) under cases such as *Limelight* and *BMC* carried over to § 271(g). *See Akamai Techs. v., Limelight Networks, Inc.*, 572 U.S. 915, 921-22 (2014) ("Limelight"); *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed. Cir. 2007)

The Federal Circuit reversed. First, the court interpreted § 271(g) as written, explaining that "nothing in this statutory language suggests that liability arises from practicing the patented process abroad. Rather, the focus is only on acts with respect to products resulting from the patented process." *Syngenta* at *23. Accordingly, whether that process is practiced by a single entity is immaterial to the analysis.

Second, the court held that comparison to the language of other parts of § 271 supported its conclusion. The court rejected *Willowood's* extension argument based on § 271(a) and the *Limelight* decision because, as noted above, infringement under § 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a) to method claims. The court also applied the same logic to distinguish §271(f) from § 271(g), stating that if Congress had wanted to require a single-entity requirement under 271(g) they "knew how to do so" given the single-entity requirement under 271(a) and 271(f).

Third, the Federal Circuit noted that the legislative history demonstrates that Congress did not enact § 271(g) to provide for identical rights to those enjoyed by patentees under § 271(a) with respect to process patents. Rather, Congress made clear that § 271(g) "is prompted by the use of patented processes in other countries followed by the importation of the resulting products into this country" and simply "extend[s] protection to the products" made by such a process.

Therefore, in *Syngenta*, the Federal Circuit further solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction

or control of a single entity before infringement liability attaches. <u>As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process</u>.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of <u>Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product</u> if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive determination on its own. See 35 U.S.C. § 295. The court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process." [*Syngenta*]

In *Bayer AG v. Housey Pharmaceuticals, Inc.*, the defining case for § 271(g) jurisprudence, the Federal Circuit held that to have a claim under § 271(g), an imported product must be physical and tangible *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). The Federal Circuit in *Bayer* required that an imported product made by a process patented in the U.S. must be physical and tangible to be eligible for an infringement claim under § 271(g). The Federal Circuit added another requirement in *NTP* that the process patent must describe a production process, not a distribution or transmission process.

42

The subsequent decisions by the district courts of California in *CNET* and *Ormco* remedied the Bayer problem by holding that digital information stored in computer readable media is a physical product covered under § 271(g), thereby circumventing Bayer's physical and tangible requirement and increasing the extraterritorial protection of process claim.

However, they still left uncertainty regarding NTP's production claim requirement. A district court's decision in *Yangaroo* established that the drafters of process claims must be explicit about the intention to create a physical article by describing the recording process.

**Apple's Production Process of Plaintiff's Patented Process under §§ 154(a)(1) & 271(g)**

**Apple's iPhone Design.** Apple's first patent for the iPhone was a design patent. A patent that focuses on how the iPhone is shaped and its size, rather than its functionality. Both the iPhone and the iPhone case, or sleeve, is covered by Plaintiff's patented process:



Figure 1



The second-generation Apple "SatSleeve" iPhone case configuration
will connect to your iPhone using Wi-Fi rather than Bluetooth.

| Apple's 1st Patent for the electronic device (i.e., smartphone) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887) | Golden's Patent for the Detector Case (i.e., CMDC device) ornamental design: USPTO Disclosure Document filed Nov. 17, 2004; (*Doc. No. 565732*) First application filing date is April 5, 2006 (App. # 11/397,118) |
|---|---|
| Electronic Device: "The device (i.e. electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html | CMDC Device: The detector case [CMDC device] includes a power source (battery or electrical) … A cpu 40 is mounted within the [CMDC device] 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case [CMDC device] includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |

| | |
|---|---|
| FIG. 3 is a front view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 4 is a rear view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 7 is a left side view for the electronic device; and, | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 8 is a right-side view for the electronic device | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the claimed design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case [CMDC device]; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e., smartphone) and the cell phone detector case |

45

| | |
|---|---|
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. Examples of an electronic device are a computer, a portable or **hand-held device, a personal digital assistant**, a communication device (e.g., cellular phone), a novelty item, toy, and/or the like. | FIG. 15 is a representative schematic view of… a monitoring PC or computer terminal. It is another objective of the present invention to provide… products grouped together by common features in several product groupings such as design similarity… product grouping strategy has been developed wherein products… having the same or similar design… [i]n addition to grouping products together by features, designs and materials… **FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case** |
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. *Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive* | … [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design… [i]n addition to grouping products together by features, designs and materials… the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include… mobile communication devices… personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)… handhelds |

Apple includes in its production process a case for the iPhone itself that is produced specifically for the iPhone brand or model, and/or a "sleeve" that is specifically for the design of the iPhone brand or model, before importation.

## COUNT I:

### U.S. Patent No: 10,163,287; U.S. Patent No: 10,984,619; U.S. Patent No: 9,589,439; and U.S. Patent No: 9,096,189

1.      Count I incorporate all the pleadings, patents, and attachments of this complaint that precedes this section which alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*

initiative, to allegedly directly infringe Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device.

**2.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability. Plaintiff alleges Apple's *"modified"* cell phone infringes at least Plaintiff's '287, '619, '439, and '189 U.S. Patents.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**3.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple iPhone smartphones that, according to the twelve Federal Judges, include *"nine standard sensors which can be used as biosensors"* that performs the accused detector/sensor functionality.

47

**Apple's Smartphone Biosensors Submitted to the Courts**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

4. Microfluidic cassette: Interchangeable cassettes with varying assays

5. VIS-NIR spectrometer: Food freshness; Melanoma

6. NNAP Electrodes: Toxic metals and Organic pollutants in water

7. Optical Waveguide: Pathogens in water and food

8. Back and front camera: Colorimetric analysis; Image analysis

9. Microphone: Voice recording stress levels

**4.** Upon information and belief, Apple is allegedly infringing Plaintiff's patented CMDC invention claimed in at least Plaintiff's '287, '619, '439, and '189 U.S. Patents. Apple's alleged infringing iPhone smartphone devices include: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

**5.** Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated

with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

6.      Plaintiff believes he have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Apple camera biosensor for CBRNE-H detection; directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device. (In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015).

7.      Plaintiff also believes the alleged direct infringement of Apple; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

8.      Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

49

## COUNT II:

### U.S. Patent No: 10,163,287; U.S. Patent No: 10,984,619; U.S. Patent No: 9,589,439; and U.S. Patent No: 9,096,189

9.     Count II incorporate all the pleadings, patents, and attachments of this complaint that precedes this section which alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, to allegedly directly infringe Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device.

10.     Upon information and belief, Apple is allegedly importing into the United States, selling or using in the United States, the Apple iPhone smartphone; resulting from the manufacture, production, or assembly of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) devices, that allegedly upon importation or shipment, infringing Plaintiff's United States Patent Nos. 10,984,619 ('619 Patent); 10,163,287 ('287 Patent), 9,589,439 ('439 Patent); and the 9,096,189 ('439 Patent) under 35 U.S.C. §§ 154(a)(1) & 271(g).

11.     Upon information and belief, Apple is allegedly infringing Plaintiff's patented process under 35 U.S.C. §§ 271(g) by importing into the United States, selling or using in the United States, the Apple iPhone smartphone that include: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone

16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

12.    Upon information and belief, Plaintiff alleges the patents-in-suit, United States Patent Nos. 10,984,619 ('619 Patent); 10,163,287 ('287 Patent), 9,589,439 ('439 Patent); and the 9,096,189 ('439 Patent), that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the patented process for the communicating, monitoring, detecting, and controlling (CMDC) devices, that is allegedly infringed by Apple upon importation or shipment of the Apple iPhone smartphones into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

13.    Upon information and belief, Apple is allegedly infringing Plaintiff's patented process under 35 U.S.C. §§ 271(g) by importing into the United States, selling or using in the United States, the Apple iPhone smartphone that include certain essential components of Plaintiff's patent process that Plaintiff claim owning the patent rights: Apple's alleged infringing CPU/Chipsets; Apple's alleged infringing iOS operating systems; Apple's alleged infringing megapixel cameras; Apple's alleged infringing GPS for mobile devices; Apple's alleged infringing near-field communication (NFC); Apple's alleged infringing disabling locking mechanisms; Apple's alleged infringing biometric authentication; and Apple's alleged infringing smartwatch; are all essential components included in the production process of the Apple iPhone smartphones. All of the essential components of the Apple iPhone smartphone contribute to the infringement of Plaintiff's patented process when imported into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

14.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility

that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

15.    Plaintiff is therefore not responsible for proving every aspect of what Plaintiff have alleged against Apple under 35 U.S.C. §§ 154(a)(1) & 271(g). Under § 295 the burden shifts to Apple to prove that the patented process was not used in manufacture of Apple iPhone smartphone, where the manufacture occurred abroad.

16.    The Federal Circuit held that "applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product."

**COUNT III:**

**U.S. Patent No: 10,163,287**

17.    Count III incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple's *"modified"* cell phone devices' CPU/Chipsets directly infringes Plaintiff's patented central processing units (CPUs); resulting in Apple allegedly "directly infringing" at least independent claims 4, and 5, of Plaintiff's 10,163,287 ('287) patent.

18.    Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated

with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

19. Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 4, and 5, of Plaintiff's 10,163,287 ('287) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that comprises at least that of the Apple *"modified"* cell phone list CPU/Chipsets.

20. Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 154(a)(1) & 271(a). The Apple A-Series CPU/Chipset include: Apple A10 Fusion (16 nm); Apple A11 Bionic (10 nm); Apple A12 Bionic (7 nm); Apple A13 Bionic (7 nm+); Apple A14 Bionic (5 nm); Apple A15 Bionic (5 nm); Apple A16 Bionic (4 nm); Apple A17 Pro (3 nm); Apple A18 (3 nm); Apple A18 Pro (3 nm); Apple A19 (3 nm); Apple A19 Pro (3 nm); Apple A4 (45 nm); Apple A5 (45 nm); Apple A6 (32 nm); Apple A7 (28 nm); Apple A8 (20 nm); and, Apple A9 (14 nm).

21. Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 154(a)(1) & 271(a). The Apple A-Series CPU/Chipsets are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone

SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

22.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

**COUNT IV:**

**U.S. Patent No: 10,984,619**

23.     Count IV incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple's *"modified"* cell phone devices' CPU/Chipsets directly infringes Plaintiff's patented central processing units (CPUs); resulting in Apple allegedly "directly infringing" at least independent claims 1, and 11, and dependent claims 2-10, and 12-20, of Plaintiff's 10,984,619 ('619) patent.

24.     Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

**25.** Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 1, and 11, and dependent claims 2-10, and 12-20, of Plaintiff's 10,984,619 ('619); have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that comprises at least that of the Apple *"modified"* cell phone list CPU/Chipsets.

**26.** Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 154(a)(1) & 271(a). The Apple A-Series CPU/Chipset include: Apple A10 Fusion (16 nm); Apple A11 Bionic (10 nm); Apple A12 Bionic (7 nm); Apple A13 Bionic (7 nm+); Apple A14 Bionic (5 nm); Apple A15 Bionic (5 nm); Apple A16 Bionic (4 nm); Apple A17 Pro (3 nm); Apple A18 (3 nm); Apple A18 Pro (3 nm); Apple A19 (3 nm); Apple A19 Pro (3 nm); Apple A4 (45 nm); Apple A5 (45 nm); Apple A6 (32 nm); Apple A7 (28 nm); Apple A8 (20 nm); and, Apple A9 (14 nm).

**27.** Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 154(a)(1) & 271(a). The Apple A-Series CPU/Chipsets are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro,

iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

28. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT V:
## U.S. Patent No: 9,589,439

29. Count V incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices; Plaintiff's patented cell phone detection devices; and Plaintiff's patented "transceivers"; resulting in Apple allegedly "directly infringing" and/or infringing under the "doctrine of equivalents" at least independent claims 23, and 19, of Plaintiff's 9,589,439 ('439) patent.

30. Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

56

31.     Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 23, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices of at least that of the Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

32.     Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 23, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple iOS operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Apple iOS operating system(s) include; iOS 1.0, iOS 2.0, iOS, iOS 3.0, iOS 4.0, iOS 5.0, iOS 6.0, iOS 7.0, iOS 8.0, iOS 9.0, iOS 10.0, iOS 11.0, iOS 12.0, iOS 13.0, iOS 14.0, iOS 15.0, iOS 16.0, iOS 17.0, iOS 18, and iOS 26; that are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14

Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

33. Upon information and belief, Apple's iOS operating system, is allegedly infringes Plaintiff's patented "transceiver" because the Apple iOS operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results. ["doctrine of equivalents"]

34. Upon information and belief, Plaintiff's patented multi-sensor detection device for detecting and/or sensing for CBRNE-H; claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple *"modified"* cell phone Megapixel camera(s) for detecting and/or sensing for CBRNE-H. The Megapixel cameras are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

35. Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that are integrated with, or interconnected to, at least that of the Apple Watch for detecting and/or sensing for

CB-H. include: Original Apple Watch (2015); Apple Watch Series 1 (2016); Apple Watch Series 2 (2016); Apple Watch Series 3 (2017); Apple Watch Series 4 (2018); Apple Watch Series 5 (2019); Apple Watch Series 6 (2020); Apple Watch SE (2020); Apple Watch Series 7 (2021); Apple Watch Series 8 (2022); Apple Watch Ultra (2022); Apple Watch SE (2nd Generation, 2022); Apple Watch Series 9 (2023); Apple Watch Ultra 2 (2023); Apple Watch Series 10 (2024); Apple Watch Series 11 (2025).

36.     The alleged direct infringement by Apple; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

37.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT VI:
## U.S. Patent No: 9,096,189

38.     Count VI incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices; Plaintiff's patented cell phone detection devices; and Plaintiff's patented "transceivers"; resulting in Apple allegedly "directly infringing" and/or

infringing under the "doctrine of equivalents" at least independent claims 1, and 7, of Plaintiff's 9,096,189 ('189) patent.

39.    Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

40.    Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 1, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices of at least that of the Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

41.    Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 1, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple iOS operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Apple iOS operating system(s) include; iOS

1.0, iOS 2.0, iOS, iOS 3.0, iOS 4.0, iOS 5.0, iOS 6.0, iOS 7.0, iOS 8.0, iOS 9.0, iOS 10.0, iOS 11.0, iOS 12.0, iOS 13.0, iOS 14.0, iOS 15.0, iOS 16.0, iOS 17.0, iOS 18, and iOS 26; that are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

42.     Upon information and belief, Apple's iOS operating system, is allegedly infringes Plaintiff's patented "transceiver" because the Apple iOS operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results. ["doctrine of equivalents"]

43.     Upon information and belief, Plaintiff's patented multi-sensor detection device for detecting and/or sensing for CBRNE-H; claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple *"modified"* cell phone Megapixel camera(s) for detecting and/or sensing for CBRNE-H. The Megapixel cameras are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone

61

15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

44.    Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that are integrated with, or interconnected to, at least that of the Apple Watch for detecting and/or sensing for CB-H. include: Original Apple Watch (2015); Apple Watch Series 1 (2016); Apple Watch Series 2 (2016); Apple Watch Series 3 (2017); Apple Watch Series 4 (2018); Apple Watch Series 5 (2019); Apple Watch Series 6 (2020); Apple Watch SE (2020); Apple Watch Series 7 (2021); Apple Watch Series 8 (2022); Apple Watch Ultra (2022); Apple Watch SE (2nd Generation, 2022); Apple Watch Series 9 (2023); Apple Watch Ultra 2 (2023); Apple Watch Series 10 (2024); Apple Watch Series 11 (2025).

45.    The alleged direct infringement by Apple; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

46.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT VII:

## Apple's "*modified*" Cell Phones

**47.**    Count VII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

**48.**    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**49.**    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**50.**    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, infringement occurs when the Apple phone is shipped or imported into the United States

**51.**    Upon information, Plaintiff is alleging the Apple *"modified"* cell phone infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone into the United States under 35 U.S.C. § 271(g).

**52.**    Plaintiff alleges Apple's *"modified"* cell phone was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to *"modify"* a common cell phone to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**53.**    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**54.**    Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §

64

271(g) occurs when the Apple *"modified"* cell phones are shipped or imported into the United States.

55.    Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones) into the United States that include "*nine standard sensors that are used as biosensors*".

56.    Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include "*nine standard sensors which can be used as biosensors*" satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

57.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-

made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones." https://news.ycombinator.com/item?id=28423983

58. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone under 35 U.S.C. § 271(g); Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones) into the United States.

59. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone infringes under 35 U.S.C. § 271(g) when the device is shipped or imported into the United States.

60. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Apple's *"modified"* cell phone] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

61. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**62.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**63.**    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple *"modified"* cell phones (i.e., iPhone smartphones): Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone

16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

64. Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones are shipped or imported into the United States.

65. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"".

66. Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

67. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new,

improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

68.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

69.    *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design*

- A cell phone comprising: [claim 23 of the '439 patent]
- the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; [claim 23 of the '439 patent]

- the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; [claim 23 of the '439 patent]

- wherein each cell phone [] includes a recharging cradle or seat, a front side, a top, a bottom, and a pair of opposed sides [claim 10 of the '752 patent]

- wherein the cell phone [] monitor includes standard keypad functions and more specialized system use (ring tone, email, photos, texting) functions as well as viewing screens [claim 12 of the '752 patent]

- monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween [claim 15 of the '752 patent]

- a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone [claim 36 of the '891 patent]

- a communication device that is a cell phone, a smart phone, or a PDA that causes the signal to be sent from the cell phone tower to the vehicle [claim 58 of the '891 patent]

- wherein the communication device is a cell phone or a laptop computer [claim 60 of the '891 patent]

- wherein the communication device monitor includes standard keypad functions and more specialized system use functions that are ring tone, email, photos, and texting; and viewing screens. [claim 13 of the '990 patent]

- wherein the communication device has monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. [claim 17 of the '990 patent]

- at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, a physical interface, or a computer terminal at a monitoring site [claim 33 of the '990 patent]

70

- wherein each cell phone [] includes an internet connection, a GPS connection, a radio frequency (RF) connection, a recharging cradle or seat, a front side, a top, a bottom, a pair of opposed sides and a central processing unit (cpu). [claim 104 of the '990 patent]

- wherein the cell phone; the smart phone; [] includes standard keypad functions and more specialized system use ring tone, email, photos, and texting functions as well as viewing screens. [claim 105 of the '990 patent]

- wherein the cell phone, the smart phone, [] have monitoring equipment comprising a computer, laptop, notebook, PC, and a cell phone for the receipt and transmission of signals therebetween. [claim 109 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 126 of the '990 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 1 of the '189 patent]

- Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: [claim 2 of the '189 patent]

- Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: [claim 3 of the '189 patent]

- comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products,

interconnected to a built-in sensor array or fixed detection device for communication therebetween; [claim 4 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 5 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 6 of the '189 patent]

- monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; [claim 7 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, [claim 8 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 9 of the '189 patent]

- a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD) monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 13 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 13 of the '439 patent]

- Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: [claim 14 of the '439 patent]

- Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: [claim 15 of the '439 patent]

- comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; [claim 16 of the '439 patent]

- monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; [claim 17 of the '439 patent]

- monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone,

personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; [claim 18 of the '439 patent]

- monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; [claim 19 of the '439 patent]

- monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween, [claim 20 of the '439 patent]

- monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween; [claim 21 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: [claim 22 of the '439 patent]

- the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising: [claim 1 of the '287 patent]

- Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for

communication therebetween; the monitoring equipment comprising: [claim 3 of the '287 patent]

- A communication device comprising: [claim 4 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 4 of the '287 patent]

- A monitoring device, comprising: [claim 5 of the '287 patent]

- A monitoring equipment, comprising: [claim 6 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

- A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: [claim 1 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner. [claim 2 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device. [claim 3 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition. [claim 4 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication

75

(NFC). [claim 5 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor. [claim 6 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection. [claim 7 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection. [claim 8 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device. [claim 9 of the '619 patent.

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory. [claim 10 of the '619 patent]

**70.**     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT VIII:

**Apple's Central Processing Unit (CPU) for Apple's "*modified*" Cell Phone**

71.    Count VIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

72.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone that include a central processing unit (CPU) is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

73.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's central processing unit (CPU) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

74.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's central processing unit (CPU), under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's central processing unit (CPU), infringement occurs when the combination is shipped or imported into the United States.

75.    Upon information, Plaintiff is alleging the Apple *"modified"* cell phone, that include Apple's central processing unit (CPU), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's central processing unit (CPU), into the United States under 35 U.S.C. § 271(g).

76.    Plaintiff alleges Apple's *"modified"* cell phone, that include Apple's central processing unit (CPU), was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to *"modify"* a common cell phone, that include Apple's central

77

processing unit (CPU), to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

77.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

78.    Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's central processing unit (CPU), begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's central processing unit (CPU), while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's central

processing unit (CPU), was made abroad to avoid infringement liability under §
271(a) when any part of the patented process was made, or assembled abroad; until
*Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any
part of the patented process is made abroad and assembled abroad; or made abroad
and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff
alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs
when the Apple *"modified"* cell phones, that include Apple's central processing
units (CPUs), are shipped or imported into the United States.

**79.**     Upon information, twelve Federal Judges infer to say; the Apple *"modified"*
cell phones that include Apple's central processing units (CPUs), and include "*nine
standard sensors which can be used as biosensors*", satisfies the patent local rule of
identifying where inside the Apple *"modified"* cell phones the detection capability
is located. Hereto, the alleged manufactured Apple central processing unit (CPU), is
identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

80. Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's central processing units (CPUs), into the United States that include "*nine standard sensors that are used as biosensors*".

81. Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own central processing units (CPUs), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own central processing units (CPUs)] https://news.ycombinator.com/item?id=28423983

82. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple *"modified"* cell phone, that include Apple's central processing unit (CPU), under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's central processing unit (CPU), into the United States.

83. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple *"modified"* cell phone, that include Apple's central processing unit (CPU), infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

**84.**     Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's central processing unit (CPU)] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

**85.**     Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**86.**     Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's central processing unit (CPU)] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

81

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

87.    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's central processing units (CPUs):

88.    Upon information, the Apple A-Series CPU/Chipset include: Apple A10 Fusion (16 nm); Apple A11 Bionic (10 nm); Apple A12 Bionic (7 nm); Apple A13 Bionic (7 nm+); Apple A14 Bionic (5 nm); Apple A15 Bionic (5 nm); Apple A16 Bionic (4 nm); Apple A17 Pro (3 nm); Apple A18 (3 nm); Apple A18 Pro (3 nm); Apple A19 (3 nm); Apple A19 Pro (3 nm); Apple A4 (45 nm); Apple A5 (45 nm); Apple A6 (32 nm); Apple A7 (28 nm); Apple A8 (20 nm); and, Apple A9 (14 nm), is used with the Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

89.    Upon information, Apple's "*modification*" of the cell phone "production process" begins with what is recognized in the industry as the "brains" of the cell phone. The central processing unit (CPU), or combination thereof, is considered the "brains" of the "*modified*" cell phone device. Apple's *modified* cell phone CPUs

carry out the operational and functional instructions of the device's computer program. The Apple *modified* cell phone's CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the Apple *modified* cell phone's CPU and other components, such as memory and input/output devices.

- Apple's *"modified"* cell phone central processing unit (CPU): is considered the "brains" of the mobile device (i.e., smartphone).

- Apple's *"modified"* cell phone central processing unit (CPU): executes instructions from applications and the operating system, performing calculations and data manipulation. The mobile device can run multiple applications simultaneously without significant performance degradation.

- Apple's *"modified"* cell phone central processing unit (CPU): often feature multiple cores, enabling parallel processing and improved multitasking capabilities.

- Apple's *"modified"* cell phone central processing unit (CPU): directs the operation of the processor and coordinates activities between the CPU and other components, such as memory and input/output devices. The Mobile CPU manages data storage and retrieval in RAM, ensuring efficient access to information needed by applications: are designed to optimize power consumption, balancing performance with battery life to enhance user experience in portable devices.

- Apple's *"modified"* cell phone central processing unit (CPU): architecture refers to the design and organization of the core components of a CPU. It encompasses the instruction set architecture

(ISA), microarchitecture, and the physical implementation of the CPU. The ISA defines the set of instructions that the CPU can execute, while the microarchitecture outlines how these instructions are processed. The physical implementation involves the actual manufacturing process and materials used to create the CPU.

Plaintiff is providing below six years of Apple's CPU/Chipset history to illustrate how Apple has continued to produce and manufacture, as a standard component of the Apple iPhone Smartphones [Apple's *modified* cell phone], Plaintiff's patented process for his patented central processing units for mobile devices.

*Apple A14 Bionic:* The Apple A14 Bionic is a 64-bit ARM-based SoC that first appeared in the fourth-generation iPad Air and iPhone 12, released on October 23, 2020. It is the first commercially available 5nm chipset and contains 11.8 billion transistors and a 16-core Neural Engine. It includes the Samsung LPDDR4X DRAM, a 6-core CPU, and a 4-core GPU with real-time machine learning capabilities. It was later used in the tenth-generation iPad, released on October 26, 2022.

*Apple A15 Bionic:* The Apple A15 Bionic is a 64-bit ARM-based SoC that first appeared in the iPhone 13, unveiled on September 14, 2021. The A15 is built on a 5-nanometer manufacturing process with 15 billion transistors. It has 2 high-performance processing cores, 4 high-efficiency cores, a new 5-core graphics for iPhone 13 Pro series (4-core for iPhone 13 and 13 mini) processing unit, and a new 16-core Neural Engine capable of 15.8 trillion operations per second. It is also used in the third-generation iPhone SE, iPhone 14, iPhone 14 Plus, sixth-generation iPad Mini and third generation Apple TV 4K.

*Apple A16 Bionic:* The Apple A16 Bionic is a 64-bit ARM-based SoC that first appeared in the iPhone 14 Pro, unveiled on September 7, 2022. The A16 has 16 billion transistors and is built on TSMC's N4P fabrication process, being touted by Apple as the first 4 nm processor in a smartphone. However, N4 is an enhanced version of N5 technology, a de facto fourth-generation 5 nm manufacturing process. The chip has 2 high-performance processing cores, 4 high-efficiency cores and 5-core graphics. Memory is upgraded to LPDDR5 for 50% higher bandwidth and a 7% faster 16-core Neural Engine capable of 17 trillion operations per second. It was later used in the iPhone 15 and iPhone 15 Plus, as well as the iPad 11-inch, with a 5-core CPU and 4-core GPU.

*Apple A17 Pro:* The Apple A17 Pro is a 64-bit ARM-based SoC that first appeared in the iPhone 15 Pro, unveiled on September 12, 2023. It is Apple's first 3 nm SoC. The chip has 2 high-performance processing cores, 4 high-efficiency cores, a 6-core GPU, and a 16-core Neural Engine capable of 35 trillion operations per second. The GPU was described as their biggest redesign in the history of Apple GPUs, adding hardware accelerated ray tracing and mesh shading support. It is also used in the iPad Mini, with a 5-core GPU.

*Apple A18 and Apple A18 Pro:* The Apple A18 and Apple A18 Pro are 64-bit ARM-based SoCs designed by Apple that first appeared in the iPhone 16 and iPhone 16 Pro respectively, unveiled on September 9, 2024. Both SoCs are built on TSMC's N3E process and have 2 high-performance cores and 4 high-efficiency cores. The A18 has 5-core graphics (4-core for iPhone 16e), while the A18 Pro has 6-core graphics. The A18 and A18 Pro use LPDDR5X for 17% higher memory bandwidth, and the 16-core Neural Engine has the same quoted power as the A17 Pro. The A18 Pro is also used in the MacBook Neo, with a 5-core GPU.

*Apple A19 and Apple A19 Pro:* The Apple A19 and Apple A19 Pro are 64-bit ARM-based SoCs designed by Apple that first appeared in the iPhone 17, iPhone

Air, and iPhone 17 Pro respectively, unveiled on September 9, 2025. Both SoCs are built on TSMC's N3P process and have 2 high-performance cores and 4 high-efficiency cores. The A19 has 5-core graphics (4-core for iPhone 17e), while the A19 Pro has 6-core graphics (5-core for iPhone Air). The A19 and A19 Pro are also used in the Studio Display (2026) and Studio Display XDR.

90. Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's central processing unit (CPU), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple "*modified*" cell phones, that include Apple's central processing units (CPUs) are shipped or imported into the United States.

91. Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's central processing unit (CPU), is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

92. Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

"[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which

86

is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

93.  Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

94.  Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**95.** *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's central processing unit (CPU)*

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 12 of the '990 patent]

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 55 of the '990 patent]

- at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site, and wherein the communication device has a central processing unit (cpu) [claim 125 of the '990 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 1 of the '189 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 2 of the '189 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 13 of the '439 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 14 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the

monitoring equipment and at least one of a multi-sensor detection device, []; [claim 15 of the '439 patent]

• at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices; [claim 22 of the '439 patent]

• wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU). [claim 22 of the '439 patent]

• a central processing unit (CPU) for executing and carrying out the instructions of a computer program; [claim 23 of the '439 patent]

• at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock; [claim 1 of the '287 patent]

• at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock; [claim 3 of the '287 patent]

• at least one central processing unit (CPU); [claim 4 of the '287 patent]

• at least one central processing unit (CPU); [claim 5 of the '287 patent]

• at least one central processing unit (CPU); [claim 6 of the '287 patent]

• A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: [claim 11 of the '619 patent]

• The central processing unit (CPU) [], capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner. [claim 12 of the '619 patent]

• The central processing unit (CPU) [], capable of processing operational instructions to lock, unlock, or disable the lock of the communication device. [claim 13 of the '619 patent] The central processing unit (CPU) [], capable of processing operational instructions of at least

fingerprint recognition, facial recognition, iris recognition, or retina recognition [claim 14 of the '619 patent].

- The central processing unit (CPU) [], capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC). [claim 15 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor. [claim 16 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection. [claim 17 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection. [claim 18 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device. [claim 19 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory. [claim 20 of the '619 patent]

**96.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT IX:**

**Apple's Operating System (iOS) for Apple's "*modified*" Cell Phone**

97.    Count IX incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

98.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include an operating system, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

99.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's operating system (iOS) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

100.    Upon information and belief, Plaintiff alleges Apple's operating system (iOS) performs substantially the same function; in substantially the same way; to achieve substantially the same results, [doctrine of equivalents] as Plaintiff's patented "transceiver". Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605 (1950).

101.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's operating system (iOS), under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's operating system (iOS), infringement occurs when the combination is shipped or imported into the United States.

102.    Upon information, Plaintiff is alleging the Apple *"modified"* cell phone, that include Apple's operating system (iOS), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon

shipment or importation of the *"modified"* cell phone, that include Apple's operating system (iOS), into the United States under 35 U.S.C. § 271(g).

**103.** Plaintiff alleges Apple's *"modified*" cell phone, that include Apple's operating system (iOS), was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to *"modify*" a common cell phone, that include Apple's operating system (iOS), to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**104.** Upon information and belief, Plaintiff alleges Apple's *"modification"* of the cell phone, that include Apple's operating system (iOS), begin abroad and continues to this day. Plaintiff also alleges, Apple *"modified*" the cell phone, that include Apple's operating system (iOS), while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's *"modification"* of the cell phone, that include Apple's operating system (iOS), was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's operating systems (iOS), are shipped or imported into the United States.

**105.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

92

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**106.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's operating systems (iOS), and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple operating system (iOS), is identified and located inside the Apple *"modified"* cell phone.

> **Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:
>
> - Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
> - Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
> - Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
> - Microfluidic cassette: Interchangeable cassettes with varying assays
> - VIS-NIR spectrometer: Food freshness; Melanoma
> - NNAP Electrodes: Toxic metals and Organic pollutants in water
> - Optical Waveguide: Pathogens in water and food
> - Back and front camera: Colorimetric analysis; Image analysis
> - Microphone: Voice recording stress levels

**107.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's operating systems (iOS), into the United States that include "*nine standard sensors that are used as biosensors*".

**108.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own operating systems, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own operating systems] https://news.ycombinator.com/item?id=28423983

**109.** Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's operating system (iOS), under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's operating system (iOS), into the United States.

**110.** Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's operating system

(iOS), infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

**111.**    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's operating system (iOS)] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

**112.**    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**113.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's operating system (iOS) was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**114.** Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's operating system (iOS):

**115.** Upon information, Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple iOS operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Apple iOS operating system(s) include; iOS 1.0, iOS 2.0, iOS, iOS 3.0, iOS 4.0, iOS 5.0, iOS 6.0, iOS 7.0, iOS 8.0, iOS 9.0, iOS 10.0, iOS 11.0, iOS 12.0, iOS 13.0, iOS 14.0, iOS 15.0, iOS 16.0, iOS 17.0, iOS 18, and iOS 26; that are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

**116.**   Upon information, the Apple "*modified*" cell phone operating system manages hardware such as the Apple "*modified*" cell phone central processing unit (CPU). It provides connections such as: cellular, Wi-Fi, Bluetooth, NFC and communication with other devices.

Wi-Fi: enables connection to local networks and internet. Cellular: supports mobile data through 3G, 4G, and 5G networks. Bluetooth: facilitates short-range communication with other devices. NFC: allows for contactless transactions and data exchange.

Upon information, the Apple "*modified*" cell phone operating system, performs substantially the same function; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful "transceiver". In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that a patentee may invoke this doctrine to proceed against the producer of a device if it performs substantially the same function in substantially the same way to obtain the same result.  This is often referred to as the *Graver Tank* "triple identity" test for equivalence.

To better understand the equivalency of the production process, features, and functions of the Apple iOS operating system to the Plaintiff's patented transceiver invention, Plaintiff have provided relative bullet points for the Apple iOS operating system and Plaintiff's patented transceiver, below:

*Apple iOS operating system*

- Apple's A-series processors are custom-designed CPUs that optimize performance and efficiency.

97

- Optimized Architecture: iOS is designed to work seamlessly with Apple's custom ARM-based CPUs, maximizing performance and efficiency.

- Resource Management: The iOS efficiently manages CPU resources, allocating tasks to ensure smooth multitasking and responsiveness.

- Power Efficiency: iOS incorporates power-saving features that help extend battery life while maintaining CPU performance.

- Hardware Integration: Close integration between iOS and hardware allows for optimized performance in graphics, processing, and machine learning tasks.

- Security Features: iOS utilizes hardware-based security features, such as the Secure Enclave, to protect sensitive data processed by the CPU.

- Regular Updates: Apple frequently updates iOS to enhance compatibility and performance with new CPU architectures and features.

- Apple's approach to CPU scheduling plays a critical role in delivering the seamless, high-performance experience that users expect across Apple iOS operating system.

- iOS software is tightly integrated with the CPU architecture to ensure optimal performance and energy efficiency. The CPU architecture in iPhones has significantly evolved over the years.

- iOS is a closed operating system exclusively running on Apple devices with ARM-based processors (CPUs).

- A key feature of the Apple iOS operating system is the Assisted GPS. The iPhone utilizes an inbuilt Assisted GPS chip for location detection. This provides a quick and accurate approximation of the user's location based on satellite information.

*Plaintiff's patented transceiver invention [specifications]*

- 46 is used as a stand-alone scanner … 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40…

- wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver…

- FIG. 19 is a perspective view of [] the present invention illustrating the use of a GPS satellite in conjunction with the [] monitoring equipment to relay commands and signals to the cpu or transceiver…

- a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones…

- A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204…

- GPS satellite 204 locates and communicates [] signal 212 with the CPU or transceiver…

- The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU [] to initiate or execute any commands…

- GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202

iOS is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. See 35 U.S.C. § 271(g). The Apple iOS operating system is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

iOS stands for iPhone Operating System. Apple created this proprietary software specifically to run its line of mobile smartphones.

iOS is Apple's mobile OS designed to power iPhones, iPads, and iPod Touch devices. It is an operating system that manages hardware and software functions, enabling seamless interaction between applications, system components, and connected services.

A mobile operating system acts as the vital bridge connecting physical hardware to digital software. It tells the processor to open an app, commands the battery to allocate power. Without this middleman, your phone would be completely unable to process your requests or run the applications you rely on daily. The company handles all development and updates internally.

An iPhone rarely works in isolation. iOS connects directly to a massive digital marketplace and a broader network of connected devices. This tight integration ensures that managing software, syncing files, and connecting accessories happens with minimal friction.

iOS stands as a highly secure, exceptionally user-friendly operating system that serves as the absolute foundation of the iPhone. It provides a heavily protected environment where millions of people can communicate, work, and manage their daily tasks with confidence. Biometric security measures, such as Face ID and Touch ID, ensure that only you can unlock your device or authorize payments.

iOS is famously designed to communicate flawlessly with other Apple hardware. If you own a Mac, an Apple Watch, or a pair of AirPods, the integration is practically automatic.

117. Beyond simply operating a smartphone, this software connects with watches, tablets, and computers, iOS creates a unified experience that keeps users connected

and completely immersed in the Apple ecosystem. The core features of iOS are a gesture-based user interface that allows connectivity across iPhone, iPad, Mac, and Apple Watch.

118.    Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's operating system (iOS), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's operating system (iOS) are shipped or imported into the United States.

119.    Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's operating system (iOS), is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

120.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or
> offers to sell, sells, or uses within the United States a product which
> is made by a process patented in the United States shall be liable as

an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

121.   Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

122.   Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**123.** *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Operating System (iOS) / ["transceiver"]*

- a communication link is present of at least one of a Wi-Fi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 22 of the '891 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 35 of the '891 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

- wherein the monitoring equipment communicates automatically with the transceiver upon receipt of the signal caused by the distress signal [claim 69 of the '891 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; [claim 1 of the '189 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). [claim 1 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or

103

long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products. [claim 2 of the '189 patent]

• wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

• wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products. [claim 8 of the '189 patent]

• wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; [claim 9 of the '189 patent]

• wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; [claim 13 of the '439 patent]

• wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). [claim 13 of the '439 patent]

• wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF)

104

connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. [claim 14 of the '439 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; [claim 19 of the '439 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). [claim 19 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 4 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical

105

biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

124. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT X:

### Apple's Megapixel Camera for Apple's "*modified*" Cell Phone

125. Count X incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

126. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a megapixel camera, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

127. Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Megapixel Camera begin as

early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

128.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's Megapixel Camera, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's Megapixel Camera, infringement occurs when the combination is shipped or imported into the United States.

129.    Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's Megapixel Camera, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the "*modified*" cell phone, that include Apple's Megapixel Camera, into the United States under 35 U.S.C. § 271(g).

130.    Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's Megapixel Camera, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Megapixel Camera, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

131.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**132.**    Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Megapixel Camera, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Megapixel Camera, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Megapixel Camera, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's Megapixel Cameras, are shipped or imported into the United States.

108

**133.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Megapixel Camera, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple Megapixel Camera, is identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

**134.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Megapixel Cameras, into the United States that include "*nine standard sensors that are used as biosensors*".

**135.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own megapixel cameras, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones

is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own megapixel cameras] https://news.ycombinator.com/item?id=28423983

136. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's operating system (iOS), under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Megapixel Cameras, into the United States.

137. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Megapixel Camera, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

138. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Megapixel Camera] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

139. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was

not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**140.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Megapixel Camera was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**141.**    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple *"modified"* cell phones (i.e., iPhone smartphones) that include Apple's megapixel cameras: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12,

iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

**142.** Upon information, in *Syngenta*, the Federal Circuit solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity (Apple) before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity (Apple), or one-party exercising direction and control over other entities (i.e., Rhevision), was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

The Apple Megapixel camera is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple megapixel camera is native to the manufacture of the Apple iPhone smartphones, and is a standard

112

component of the Apple iPhone smartphone when imported into the United States.

*Phase I* specifications of the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007]; requires Apple modify the cell phone with "internal" sensors for CBRNE-H detection.

Apple entered into an agreement with the Government (DHS S&T) to integrate the CBRNE-H internal sensors that was being developed by at least the awarded third-party contractors of the *Cell-All* initiative: Rhevision; SeaCoast; NASA; Qualcomm; and Synkera.

Upon information and belief, Apple "*modified*" the cell phone with camera(s) equipped to detect for CBRNE-H. Under the *Cell-All* initiative Rhevision developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, [] develop[ed] advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of [] Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" [], which are composed of nanoparticles that change color in the presence of certain molecules. ***Rhevision [] integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.*** Rhevision

uses its system to precisely inspect and measure color changes in the chemical sensor; compare the results with known toxic compounds."

| PHASE I: INTERNAL SENSOR OF THE *CELL-ALL* INITIATIVE | |
|---|---|
| Apple's "Modified" Cell Phone include Camera(s) for CBRNE-H Detection | |
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds. |
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Apple's "*modified*" cell phone devices, have built-in QR scanners in the camera app, so you don't need a separate app. Simply point the camera at the code, and it should work instantly. Apple's "*modified*" cell phone camera QR codes can be integrated with CBRNE (chemical, biological, radiological, nuclear, and explosives) detectors and/or sensors to enhance data sharing and operational efficiency. One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information. Scanning a QR code can simplify the process of retrieving sensor data, making it accessible to personnel without specialized training. QR codes can be printed on CBRNE equipment, allowing quick access to emergency protocols. |

114

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Apple's "*modified*" cell phone-based biosensors are rapidly redefining how the world conducts medical diagnostics, enable precise, real-time detection of biological and chemical agents. Apple's "*modified*" cell phone devices have a platform in biosensing ecosystems: facilitating the proliferation of biosensors that capitalize on Apple's "*modified*" cell phones' camera optics, wireless connectivity, and computational power. Optical biosensors utilize the Apple "*modified*" cell phone cameras and LED flashes to detect visual changes in assays, particularly in colorimetric or fluorescent formats. Images taken by a conventional Apple cell phone camera can be *modified* using deep learning algorithms to improve their spatial resolution, signal-to-noise ratio, and color response. |
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Apple's "*modified*" cell phone cameras megapixel camera, smaller than the head of a pencil eraser captures the image from the array of nanopores in the silicon chip. "The beauty of this technology is that the number of sensors contained in one of our arrays is determined by the pixel resolution of the cell phone camera. With the megapixel resolution found in cell phone cameras today, we can easily probe a million different spots on our silicon sensor simultaneously. So, we don't need to wire up a million individual sensors," Sailor said. "We only need one. This greatly simplifies the manufacturing process because it allows us to piggyback on all the technology development that has gone into making cell phone cameras lighter, smaller, and cheaper." |
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Radiation incidents on Apple's "*modified*" cell phone camera's Complementary Metal Oxide Semiconductor (CMOS) sensor creates a signal which can be isolated from a visible light signal to turn the "*modified*" cell phone into a radiation detector. Apple's "*modified*" cell phone have CMOS cameras that have been widely adopted throughout the world, which makes them potentially useful as tools for monitoring radiation exposure while traveling in an aircraft. Apple's "*modified*" cell phone cameras have advanced features, such as accelerated camera pixel intensity, higher image quality, and greater rapidity. These features allow Apple's "*modified*" cell phone to be especially useful in detecting radiation |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Apple's "*modified*" cell phone camera sensors: Apple's "*modified*" cell phone cameras can capture high-resolution images, which can be analyzed for specific biomarker detection. Various applications utilize machine learning and image processing to identify biomarkers in biological samples, such as blood or saliva. Glucose Monitoring: Apple's "*modified*" cell phone apps can analyze images of blood samples to estimate glucose levels. Skin Analysis: Apple's "*modified*" cell phone cameras can detect skin conditions or changes that may indicate health issues, such as dehydration or vitamin deficiencies. Apple's "Apple" cell phone can diagnose diseases by analyzing images of bodily fluids or tissues. |
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | David Breslauer is a graduate student at the University of California, Berkeley, and has developed a fluorescence microscope for portable diagnostics using a cell phone with a built-in camera. Cell phone with built-in camera. The cell phone that you use should at least be able to zoom in and out manually and focus. Using cell phones *modified* as inexpensive microscopes. |

Twelve Federal Judges identifies where on the inside of the Apple devices the front and back camera biosensors are located

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises "***through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126.": "In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126."

**143.** Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Megapixel Camera, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Megapixel Camera are shipped or imported into the United States.

**144.** Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Megapixel Camera, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

**145.** Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**146.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new,

improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

147.   Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

148.   *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Megapixel Camera [cell phone detection device / one of the nine standard biosensors]*

- a multi sensor detection system with a plurality of [] integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection

systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; [claim 1 of the '280 patent]

• a cell phone detection system with a plurality of [] integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site [claim 1 of the '280 patent]

• a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone [claim 36 of the '891 patent]

• wherein the communication device has a plurality of sensors for detecting the chemical, biological, [] compounds which is capable of being disposed within each communication device. [claim 26 of the '990 patent]

• wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

• wherein the multi sensor detection device is interconnected with a camera; light and video sensors to allow the user to view the environment from a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site. [claim 102 of the '990 patent]

• wherein the cell phone, the smart phone, [] have a plurality of indicator lights [] corresponding to one chemical, biological, [] agent [] capable of being disposed within the cell phone, the smart phone [claim 119 of the '990 patent]

• a built-in, embedded multi sensor detection system for monitoring products with a plurality integrable sensors detecting for at least one of chemical, biological, []; [claim 145 of the '990 patent]

• a cell phone; cell phone detection system for monitoring with a plurality [] integrable sensors detecting for at least one of chemical, biological, []; [claim 145 of the '990 patent]

• further including a camera, light and video sensor to allow the user to access, review and respond to network multi sensor detection systems and view the environment from at least one

119

of a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a workstation or monitoring site. [claim 146 of the '990 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, [] human, [] agents; [claim 4 of the '189 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [], a human sensor, [] [claim 4 of the '189 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, [], comprising: [claim 5 of the '189 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [] a human sensor, []; [claim 5 of the '189 patent]

- wherein the built-in, multi sensor detection device is built in [] monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); [claim 6 of the '189 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, [], a human sensor, []; [claim 6 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 8 of the '189 patent]

- interconnected with a camera; light and video sensors to allow the user to view the environment from at least one of a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site. [claim 12 of the '189 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a

120

chemical sensor, a biological sensor, [] a human sensor, []; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]
- at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; [claim 5 of the '287 patent]

149. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XI:

### Apple's Global Positioning System (GPS) for Apple's "*modified*" Cell Phone

150. Count X1 incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

151. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a GPS Receiver, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

152. Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's GPS Receiver begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

153. Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple "*modified*" cell phone,

that include Apple's GPS Receiver, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's GPS Receiver, infringement occurs when the combination is shipped or imported into the United States.

154.    Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's GPS Receiver, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's GPS Receiver, into the United States under 35 U.S.C. § 271(g).

155.    Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's GPS Receiver, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's GPS Receiver, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

156.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |

123

| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
|---|---|---|---|---|
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**157.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's GPS Receiver, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's GPS Receiver, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's GPS Receiver, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's GPS Receivers, are shipped or imported into the United States.

**158.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's GPS Receivers, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where

124

inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's GPS Receiver, is identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

159.   Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's GPS Receivers, into the United States that include "*nine standard sensors that are used as biosensors*".

160.   Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Global Positioning System (GPS), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn,

125

that Apple does to assemble its [smart]phones", [that include their own Global Positioning System (GPS)] https://news.ycombinator.com/item?id=28423983

161.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's GPS Receiver, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's GPS Receiver, into the United States.

162.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's GPS Receiver, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

163.   Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's GPS Receiver] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

164.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**165.** Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's GPS Receiver was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**166.** Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple *"modified"* cell phones (i.e., iPhone smartphones) that include Apple's GPS Receiver: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone

15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

**167.** Upon information, Plaintiff describes the Global Positioning System, as:



The satellite-based navigation system made up of a network of 24 satellites placed into orbit by the U.S. Department of Defense. GPS was originally intended for military applications, but in the 1980s, the government made the system available for civilian use.

GPS satellites circle the earth twice a day in a very precise orbit and transmit signal information to earth. GPS receivers take this information and use triangulation to calculate the user's exact location. Essentially, the GPS receiver compares the time a signal was transmitted by a satellite with the time it was received. The time difference tells the GPS receiver how far away the satellite is. Now, with distance measurements from a few more satellites, the receiver can determine the user's position and display it on the unit's electronic map.

GPS receivers used to be standalone devices, but now they are built into the most basic of Apple's smartphones and

smartwatches. The iPhone 3G and all subsequently released iPhone models use A-GPS -- or "Assisted GPS" -- which in basic terms accesses an intermediary server when it is not possible to connect directly via satellite -- indoors, for example -- and this server provides the nearest satellite with additional information to make it possible to more accurately determine a user's position.

Apple explains that the iPhone 3G and all later models also use "wi-fi hotspots and cellular towers to get the most accurate location fast" when GPS is not the most convenient method of location detection. The iPhone 3GS and later iPhone models additionally have an integrated digital compass to also provide the direction one is facing, which is quite useful when combined with mapping software. Likewise, with the exception of the original iPhone, iPhone models can provide real-time navigation assistance, too.

168. Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's GPS Receiver, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's GPS Receiver are shipped or imported into the United States.

169. Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's GPS Receiver, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is

placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

**170.**    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**171.**    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**172.**    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the

130

individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**173.** *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's GPS Locating and Tracking*

- can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite. [claim 45 of the '891 patent]

- further including a global positioning system (GPS) receiver adapted for communication with at least one satellite [claim 64 of the '891 patent]

- wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver on the vehicle [claim 65 of the '891 patent]

- wherein the distress signal is a signal that gives the location of the vehicle. [claim 70 of the '891 patent]

- wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component. [claim 78 of the '990 patent]

- wherein the multi sensor detection device is capable of transmitting identification data, location data, speed data, environment data, power data, and sensor data. [claim 95 of the '990 patent]

131

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- [t]he multi sensor detection security systems [] including a global positioning system (GPS) receiver adapted for communication with at least one satellite. [claim 152 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 7 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 8 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 9 of the '189 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 13 of the '439 patent]

- at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; [claim 19 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-

range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; [claim 19 of the '439 patent]

- at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; [claim 20 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; [claim 20 of the '439 patent]

- at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; [claim 21 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF)

133

connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**174.**    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

134

## COUNT XII:

### Apple's Biometric Authentication for Apple's "*modified*" Cell Phone

175.  Count XII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

176.  Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include biometric authentication, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

177.  Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's biometric authentication begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

178.  Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's biometric authentication, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's biometric authentication, infringement occurs when the combination is shipped or imported into the United States.

179.  Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's biometric authentication, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's biometric authentication, into the United States under 35 U.S.C. § 271(g).

180.  Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's biometric authentication, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to

"*modify*" a common cell phone, that include Apple's biometric authentication, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**181.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**182.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's biometric authentication, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's biometric authentication, while performing work under a

136

government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's biometric authentication, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's biometric authentication, are shipped or imported into the United States.

**183.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's biometric authentication, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's biometric authentication, is identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

184.    Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's biometric authentication, into the United States that include *"nine standard sensors that are used as biosensors"*.

185.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own biometric authentication, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own biometric authentication] https://news.ycombinator.com/item?id=28423983

186.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple *"modified"* cell phone, that include Apple's biometric authentication, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's biometric authentication, into the United States.

187.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple *"modified"* cell phone, that include Apple's biometric authentication, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

**188.**    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's biometric authentication] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

**189.**    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**190.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's biometric authentication was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

191. Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's biometric authentication: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

192. Upon information, Plaintiff alleges, Apple's biometric security measures, such as Face ID and Touch ID, ensure that only an authorized user can unlock the smartphone device. As smartphones began to dominate the market, in 2013 Apple sought innovative ways to enhance the security of its *"modified"* cell phone. Apple has long been a pioneer in biometric security, introducing technologies like Touch ID, Face ID, and now Optic ID (for Vision Pro). These systems are designed to make access seamless while maintaining robust privacy and data protection.

| Feature | Introduced | Method | Stored In | Devices | Primary Use |
|---------|-----------|--------|-----------|---------|-------------|
| **Touch ID** | 2013 | Fingerprint | Secure Enclave | iPhone SE, older models | Unlock, Apple Pay |

| Feature | Introduced | Method | Stored In | Devices | Primary Use |
|---|---|---|---|---|---|
| **Face ID** | 2017 | 3D Face Mapping | Secure Enclave | iPhone X and later | Unlock, App Auth |
| **Optic ID** | 2024 | Iris Scan | Secure Enclave | Vision Pro (future iPhones?) | Unlock, Payments |

Fingerprint scanning technology revolutionized mobile security, moving beyond traditional PIN numbers and patterns. The ability to unlock smartphones with the touch of a finger not only provided a convenient method of access but also enhanced security measures. Biometrics, primarily through fingerprint scanning, has engaged consumers looking for more secure mobile experiences.

While the technology behind fingerprint scanning has been around for decades, its incorporation into smartphones was somewhat late to bloom. Apple played pivotal role in making fingerprint recognition a mainstream feature.

As smartphones began to dominate the market, manufacturers sought innovative ways to enhance their security. As early as 2010, before large-scale adoption, companies started experimenting with various biometric methods, including facial recognition and voice authentication. However, the most effective and reliable method proved to be fingerprint scanning technology.

> *Plaintiff's patent specifications: "the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature."*

Apple, known for its focus on user experience and cutting-edge technology, was one of the first major players to integrate a

fingerprint scanner into a mobile device. Apple made its first significant leap into fingerprint technology with the launch of the iPhone 5S on September 20, 2013. This new model not only featured a state-of-the-art 64-bit A7 chip but also came equipped with the innovative Touch ID sensor embedded in the home button.

The Touch ID utilizes capacitive sensors that read the unique patterns of an individual's fingerprint. The sensor captures and encrypts the fingerprint data, allowing users to unlock their phones, make payments via Apple Pay, and even log into various apps. The implementation of Touch ID not only raised the stakes for mobile security but also set a new benchmark for user convenience.

When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of Biometric Authentication to enhance security measures.

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a biometric fingerprint identifier to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

193. Plaintiff alleges, Apple's biometric fingerprint scanner is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple

142

biometric fingerprint scanner is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**194.** Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's biometric authentication, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's biometric authentication are shipped or imported into the United States.

**195.** Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's GPS Receiver, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

**196.** Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or
> offers to sell, sells, or uses within the United States a product which
> is made by a process patented in the United States shall be liable as

an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

197. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

198. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**199.** *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Biometric Authentication*

- wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals [claim 34 of the '752 patent]

- wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals [claim 30 of the '990 patent]

- wherein the multi sensor detection device is capable of transmitting biometric and authentication data including, but is not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature. [claim 99 of the '990 patent]

- wherein the cell phone, the smart phone, [] designed to be used with biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. [claim 122 of the '990 patent]

- further including biometrics of at least one of, but not limited to fingerprints, iris, signature and voice to prevent entry or exit of unauthorized persons. [claim 147 of the '990 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 1 of the '189 patent]

145

- wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 7 of the '189 patent]

- capable of transmitting biometric and authentication data include, but is not limited to, at least one of fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature. [claim 10 of the '189 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 13 of the '439 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 16 of the '439 patent]

- wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 19 of the '439 patent]

- the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; [claim 22 of the '439 patent]

- wherein the cell phone is equipped with a biometric lock disabler that incorporates at least

146

one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 23 of the '439 patent]

- at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; [claim 1 of the '287 patent]
- at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; [claim 3 of the '287 patent]
- at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; [claim 4 of the '287 patent]
- at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; [claim 5 of the '287 patent]
- at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; [claim 6 of the '287 patent]

200. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XIII:

**Apple's Disabling Locking Mechanism for Apple's "*modified*" Cell Phone**

201. Count XIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

202. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a disabling lock, is

*"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

203.   Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's disabling locking mechanism begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

204.   Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's disabling locking mechanism, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's disabling locking mechanism, infringement occurs when the combination is shipped or imported into the United States.

205.   Upon information, Plaintiff is alleging the Apple *"modified"* cell phone, that include Apple's disabling locking mechanism, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's disabling locking mechanism, into the United States under 35 U.S.C. § 271(g).

206.   Plaintiff alleges Apple's *"modified"* cell phone, that include Apple's disabling locking mechanism, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to *"modify"* a common cell phone, that include Apple's disabling locking mechanism, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**207.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**208.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's disabling locking mechanism, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's disabling locking mechanism, is identified and located inside the Apple *"modified"* cell phone.

149

> **Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:
>
> - Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
> - Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
> - Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
> - Microfluidic cassette: Interchangeable cassettes with varying assays
> - VIS-NIR spectrometer: Food freshness; Melanoma
> - NNAP Electrodes: Toxic metals and Organic pollutants in water
> - Optical Waveguide: Pathogens in water and food
> - Back and front camera: Colorimetric analysis; Image analysis
> - Microphone: Voice recording stress levels

**209.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's disabling locking mechanism, into the United States that include "*nine standard sensors that are used as biosensors*".

**210.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's disabling locking mechanism, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's biometric authentication, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's disabling locking mechanism, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs

150

when the Apple *"modified"* cell phones, that include Apple's disabling locking mechanism, are shipped or imported into the United States.

211. Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own disabling lock, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own disabling lock] https://news.ycombinator.com/item?id=28423983

212. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's disabling locking mechanism, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's disabling locking mechanism, into the United States.

213. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's disabling locking mechanism, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

214. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue

evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's disabling locking mechanism] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

215.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

216.   Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's disabling locking mechanism was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden
of establishing that the product was not made by the process shall
be on the party asserting that it was not so made." [35 U.S.C. § 295]

**217.** Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's disabling locking mechanism: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

**218.** Upon information, Plaintiff alleges, unlocking an iPhone can sometimes be tricky, especially if you forget your passcode. You have 10 attempts to enter your passcode before your iPhone is disabled. This is a critical step to know because exceeding these attempts will lock your device, requiring further steps to regain access.

iPhones come with multiple security features to protect user data. If you fail to unlock your iPhone five times using Face ID or Touch ID, your device will ask for a passcode instead. This adds a layer of protection but can catch users off guard if they aren't aware of the limits.

Knowing these security measures ensures you don't get locked out of your own device. By understanding how many failed attempts you have, you can avoid frustration and enjoy the peace of mind that comes with knowing how to access your iPhone safely.

If you've ever entered the wrong passcode on your iPhone too many times, you've likely seen the message "iPhone Unavailable" or "iPhone Disabled." This is Apple's built-in security system designed to protect your data from unauthorized access. Retrieved from: https://computercity.com/phones/iphone/how-many-attempts-to-unlock-iphone

Apple uses a progressive lockout system to deter brute-force attacks. Each incorrect passcode attempt increases the waiting time before you can try again. After a certain number of failed attempts, your iPhone will lock completely and may even erase all data (if that setting is enabled).

If you have Erase Data enabled under Settings → Face ID & Passcode → Erase Data, your iPhone will automatically erase all data after 10 failed attempts.

| Attempts | Lockout Duration | Outcome |
|---|---|---|
| 1–4 | None | Retry immediately |
| 5 | 1 minute | Temporary lock |
| 6 | 5 minutes | Temporary lock |
| 7–8 | 15 minutes | Temporary lock |
| 9 | 60 minutes | Temporary lock |
| 10 | Permanent lock | Must erase and restore |

If your iPhone says "iPhone Unavailable" or "iPhone Disabled," you'll need to erase and restore it through Erase iPhone, iTunes/Finder, or iCloud. This system applies to all Face ID and Touch ID models, including iPhones running iOS 17, iOS 18, and later. Retrieved from: https://computercity.com/phones/iphone/how-many-attempts-to-unlock-iphone

When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a Disabling Locking Mechanism to enhance security measures.

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732*) claiming a CMDC device that included a Disabling Locking Mechanism to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

219.  Plaintiff alleges, Apple's Disabling Locking Mechanism is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple Disabling Locking Mechanism is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

220.  Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's disabling locking mechanism, into a new, improved upon, or useful

device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple "*modified*" cell phones, that include Apple's disabling locking mechanism are shipped or imported into the United States.

221.    Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's disabling locking mechanism, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

222.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

223.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new,

156

improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**224.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**225.** *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Disabling Locking Mechanism*

- an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals [claim 1 of the '497 patent]

- an automatic/mechanical lock disabler interconnected to the cpu and that is mounted to a lock on a product for receiving signal transmissions from the cpu to lock or disable the lock on the product thereby preventing access to the product by unauthorized, untrained, and unequipped individuals [claim 7 of the '497 patent]

- an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving a signal transmission from the cpu to lock or disable the lock on the product thereby preventing access to the product by unauthorized, untrained, and unequipped individuals [claim 13 of the '497 patent]

- wherein the communication device is designed to be equipped with a radio frequency (RF) chip for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 23 of the '990 patent]

- a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 2 of the '189 patent]

- wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 8 of the '189 patent]

- capable of sending signals thereto and receiving signals therefrom to engage (lock), disengage (unlock) and disable (make unavailable) a lock after a specific number of tries that is interconnected to the multi sensor detection system or monitoring equipment. [claim 9 of the '189 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by

158

maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 14 of the '439 patent]

• wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 20 of the '439 patent]

• a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries; [claim 1 of the '287 patent]

• the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 1 of the '287 patent]

• a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries; [claim 3 of the '287 patent]

• at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 4 of the '287 patent]

• at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 5 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 6 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

226.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

### COUNT XIV:

### Apple's Near-Field Communication (NFC) for Apple's "*modified*" Cell Phone

227.    Count XIV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

228.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include NFC, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

229.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Near-Field Communication

(NFC) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**230.** Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's Near-Field Communication (NFC), under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's Near-Field Communication (NFC), infringement occurs when the combination is shipped or imported into the United States.

**231.** Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's Near-Field Communication (NFC), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Near-Field Communication (NFC), into the United States under 35 U.S.C. § 271(g).

**232.** Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's Near-Field Communication (NFC), was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Near-Field Communication (NFC), to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**233.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

161

Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**234.** Thus, under section 271(g), a party can be liable for infringement for importing into the United States, [], a product made by a patented process, ***regardless of where the process is performed or where the product was ultimately made***. Congress added section 271(g) to increase protection of U.S. technology industries, [] *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**235.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Near-Field Communication (NFC), and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Near-Field Communication (NFC), is identified and located inside the Apple *"modified"* cell phone.

162

> **Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:
>
> - Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
> - Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
> - Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
> - Microfluidic cassette: Interchangeable cassettes with varying assays
> - VIS-NIR spectrometer: Food freshness; Melanoma
> - NNAP Electrodes: Toxic metals and Organic pollutants in water
> - Optical Waveguide: Pathogens in water and food
> - Back and front camera: Colorimetric analysis; Image analysis
> - Microphone: Voice recording stress levels

**236.**    Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Near-Field Communication (NFC), into the United States that include "*nine standard sensors that are used as biosensors*".

**237.**    Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Near-Field Communication (NFC), begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Near-Field Communication (NFC), while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Near-Field Communication (NFC), was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs

when the Apple *"modified"* cell phones, that include Apple's Near-Field Communication (NFC), are shipped or imported into the United States.

238.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own NFC, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own NFC] https://news.ycombinator.com/item?id=28423983

239.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Near-Field Communication (NFC), under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Near-Field Communication (NFC), into the United States.

240.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Near-Field Communication (NFC), infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

241.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue

164

evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Near-Field Communication (NFC)] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

242.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

243.   Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Near-Field Communication (NFC) was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden

of establishing that the product was not made by the process shall

be on the party asserting that it was not so made." [35 U.S.C. § 295]

244.  Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's Near-Field Communication (NFC): Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

245.  Upon information, Plaintiff alleges, Apple iPhones with NFC capability utilize electromagnetic induction to enable communication between devices within close proximity, typically within 4 centimeters. This technology represents a subset of Radio Frequency Identification (RFID) systems, operating specifically at 13.56 MHz frequency. Unlike traditional RFID systems that primarily support one-way communication, NFC enables bidirectional data exchange, making it ideal for interactive applications.

NFC is based on the RFID protocols. The main difference to

RFID is that an NFC device can act not only as a reader, but also as

a tag (card emulation mode). In peer-to-peer mode, it is also possible

to transfer information between two NFC devices. Because of the

short-read range limitations, NFC devices have to be in very close proximity - usually no more than a few centimeters. That's why NFC is often used for secure communications. Below is an article that explains why Plaintiff chose NFC over that of RFID for his patented CMDC device:

RFID Signals can Detonate Bombs in Cargo Containers: But How Serious is the Vulnerability? August 10, 2011 Homeland Security Today

"In the fall of 2007, a handful of officials from the Department of Homeland Security (DHS) were invited to attend a live demonstration of how a bomb hidden inside a commercial cargo container could be detonated by a homemade radio frequency identification (RFID) container tracking tag operating at a frequency that was mandated by the federal government for cargo containers within US port environments.

A cargo container RFID electronic tag, or seal, contains an electronic reader that receives a port's RFID signal that prompts the container's RFID tag to transmit to port authorities' data regarding the cargo that's been encoded on its RFID tag. But as the demonstration showed, it also can be used to close an electronic circuit when it receives a corresponding RF from a port RFID sender/receiver, thereby detonating the bomb.

Indeed. In the November, 2007 test, an RF receiver tuned to pick up a required US port RFID reader frequency triggered the small explosive that had been placed inside the empty container.

What's important about the demonstration is that the homemade RF receiver was operating at a frequency that not only was mandated to be used within port environs, but also was mandated to be made public despite the fact that "the process of selecting a frequency for container security was contentious," Homeland Security Today was told by Powers Global Holdings, Inc. Chairman, a former FBI agent who worked with CBP on border related security issues while in Laredo, Texas."

Healthcare organizations leverage Apple iPhones with NFC capability for patient identification and medical device tracking. The technology enables secure, contactless access to patient records while maintaining HIPAA compliance through encrypted data transmission.

Point-of-care testing (POCT) devices play a crucial role as tools for disease diagnostics, and the integration of biorecognition elements with electronic components into these devices widens their functionalities and facilitates the development of complex quantitative assays. Unfortunately, biosensors that exploit large conventional IgG antibodies to capture relevant biomarkers are often limited in terms of sensitivity, selectivity, and storage stability, considerably restricting the use of POCT in real-world applications. Therefore, we used nanobodies as they are more suitable for fabricating electrochemical biosensors with near-field communication (NFC) technology. Moreover, a flow-through microfluidic device was implemented in this system for the detection of C-reactive protein (CRP), an inflammation biomarker.

In recent years, near-field communication (NFC) technology has become widespread in the field of electrochemical sensors, enhancing their functionality and ease of use since enables wireless communication and data transfer at close proximity, simplifying sensor setup, calibration, and data retrieval. This technology allows seamless data exchange between sensors and mobile devices, providing users with an effective way to collect and analyze electrochemical data in real time. Herein, we present a smartphone-controlled NFC potentiostat integrated with a flow-through

electrochemical microfluidic device via wireless communication and with the data-display conversion on Apple smartphones.

The trajectory of phones with NFC capability continues toward greater integration and expanded functionality. iOS 18.1's open-source programming capabilities represent a pivotal moment for NFC technology adoption, enabling developers to create more sophisticated and customized solutions.

Emerging applications include smart home automation, where NFC tags trigger complex device interactions, and enhanced supply chain management systems that provide real-time tracking and authentication capabilities.

The combination of Apple's robust development framework, expanding device compatibility, and growing ecosystem of NFC-enabled applications creates unprecedented opportunities for businesses and developers. As Apple iPhones with NFC capability become increasingly sophisticated, the potential for creating meaningful, contactless experiences continues to grow.

Apple *"modified"* the cell phones to include an NFC reader/writer built-in, which allows the user to tap the back of the phone to another NFC-enabled device, be that a payment terminal, door lock, Bluetooth device, or a simple NFC tag.

Radio-frequency near-field communication have 'written description' in Plaintiff's patent specifications. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a short-range

169

wireless technology 'near-field communication' to enhance security measures.

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a short-range wireless technology 'near-field communication' to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

246.   Apple's short-range wireless technology 'near-field communication' is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple short-range wireless technology 'near-field communication' is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

247.   Plaintiff alleges, Apple's Near-Field Communication (NFC) is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Near-Field Communication (NFC) is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

248.   Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Near-Field Communication (NFC), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g)

when the Apple "*modified*" cell phones, that include Apple's Near-Field Communication (NFC) are shipped or imported into the United States.

249.    Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Near-Field Communication (NFC), is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

250.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

251.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

171

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**252.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**253.** *Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Near-field Communication (NFC) [short-range RF]*

- wherein the cell phone detector case has a [] Radio Frequency connection, [], all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) [claim 72 of the '891 patent]

- wherein the communication device includes telecommunication, telematics, long and short-range radio frequency communication means [claim 14 of the '990 patent]

- wherein the communication device is designed as readers for barcodes will allow a reader to scan a barcode of a product or object and get more information about it [claim 24 of the '990 patent]

- wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component. [claim 78 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 3 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 6 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal

173

to be sent to the monitoring equipment that includes location data and sensor data; [claim 8 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 9 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows [] (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment. [claim 15 of the '439 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. [claim 18 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; [claim 20 of the '439 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being capable of wireless near-field communication (NFC)

174

which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in

175

communication with the at least one CPU; [claim 6 of the '287 patent]

254.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XV:

### Apple's Watch Series for Apple's "*modified*" Cell Phones

255.    Count XV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

256.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Apple's Watch Series, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

257.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Watch Series, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

258.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's Watch Series, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple "*modified*" cell phone, that include Apple's Watch Series, infringement occurs when the combination is shipped or imported into the United States.

While Apple designs and engineers the Apple Watch in Cupertino, California, the actual manufacturing process is distributed across several countries. Predominantly, assembly occurs in Asia, leveraging the established infrastructure and manufacturing expertise of the region.

The prevailing narrative points to China as the primary location for final assembly. However, attributing the entire manufacturing process to a single location oversimplifies the reality. The Apple Watch supply chain is a globally distributed network, with components sourced from various suppliers worldwide and assembled in multiple locations.

The Apple Watch supply chain operates as a tiered system. Apple directly manages relationships with Tier 1 suppliers, who in turn, manage their own Tier 2 and Tier 3 suppliers. This complex web of suppliers and manufacturers creates a highly efficient, but also intricate, production ecosystem.

Tier 1 Suppliers: These companies have a direct contractual relationship with Apple and are responsible for delivering major components or providing final assembly services. Examples include Foxconn, Compal, and Luxshare Precision. https://www.clrn.org/where-is-the-apple-watch-manufactured/

259.    Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's Watch Series, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Watch Series, into the United States under 35 U.S.C. § 271(g).

260.    Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's Watch Series, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Watch Series, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for

177

the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**261.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**262.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Watch Series, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple Watch Series, is identified and located inside the Apple *"modified"* cell phone.

178

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

**263.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Watch Series, into the United States that include "*nine standard sensors that are used as biosensors*".

**264.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Watch Series, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Watch Series, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Watch Series, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell

phones, that include Apple's Watch Series, are shipped or imported into the United States.

265.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Watch Series, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Watch Series] https://news.ycombinator.com/item?id=28423983

266.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Watch Series, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Watch Series, into the United States.

267.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Watch Series, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

268.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of

180

Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Watch Series] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

269.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

270.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Watch Series was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**271.** Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones): Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max. that include Apple's Watch Series: Original Apple Watch (2015), Apple Watch Series 1 (2016), Apple Watch Series 2 (2016), Apple Watch Series 3 (2017), Apple Watch Series 4 (2018), Apple Watch Series 5 (2019), Apple Watch Series 6 (2020), Apple Watch SE (2020), Apple Watch Series 7 (2021), Apple Watch Series 8 (2022), Apple Watch Ultra (2022), Apple Watch SE (2nd Generation, 2022), Apple Watch Series 9 (2023), Apple Watch Ultra 2 (2023), Apple Watch Series 10 (2024), Apple Watch Series 11 (2025)

**272.** Upon information, Plaintiff alleges, the United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) they construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Apple camera for CBRNE-H detection; and, an Apple *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Apple watch for CBRNE-H detection; allegedly infringes the patented process of Plaintiff's invention. [§ 271(g)]

The Apple Watch is a component of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device, that Apple allegedly infringes when Apple manufacture, produce, and assemble for shipment; and then imports the patented process into the United States. [§ 271(g)]

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Plaintiff claims the Apple Watch is Apple's version of a detection capability that is "built in, embedded"; included within; incorporated into, disposed within; affixed to; connected to; or mounted to another device, such that it is an integral part of the [communication] device, or [monitoring equipment]". This theory

183

aligns with Plaintiff's patent specifications—placed "in, on, upon, or adjacent" the device.

"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

Draper's iOS Tactical Assault Kit (iTAK) Chemical, Biological, Radiological, and Nuclear (CBRN) plug-ins. iTAK can connect to sensors on many platforms (e.g., smartwatches) and has many plugins that warfighters can download … iTAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate). https://www.dvidshub.net/news/printable/367459

---

### PHASE II
### EXTERNAL DECTECTOR UNDER *CELL-ALL*

**Apple's Cell Phone Integration with an "External" CBRNE-H Detection Device**

---

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system. During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). |
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | |
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010). |
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | Smartwatches have several sensors and integrated apps that may track vital indicators, identify hazardous chemicals, and provide emergency notifications The smartwatches' built-in sensors and monitoring features enable them to detect possible hazards like excessive levels of poisonous gasses. |

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | Smartwatches can detect subtle physiological changes — such as temperature shifts and heart rate variations — that may indicate early infection before symptoms appear. Smartwatch features that measure heart rates, oxygen levels, fitness levels and sleep quality have been marketed as valuable tools for people who are eager to monitor their health. Smartwatches' health apps and sensors provide enough information to accurately predict when a person has become infected with a disease like COVID-19 or the flu. Here are the sensors Apple lists, and their function: The Apple Watch include an accelerometer, gyroscope, and barometer, which are used to determine device orientation, user movement, and altitude. The back of all Apple Watches is equipped with a Heart Rate Monitor, which projects infrared and green light from light-emitting diodes (LEDs) onto the user's skin and photodiodes measure the varying amount of light reflected. Because blood absorbs green light and reflects red light, the amounts of each type of reflected light are compared to determine heart rate. The Apple Watch adjusts the sampling rate and LED brightness as needed. Starting with the Series 4, Apple added electrical sensors to the Digital Crown and back, allowing the Apple Watch to take electrocardiogram (ECG) readings; the device won FDA clearance in October 2018, becoming the first consumer device capable of taking an ECG. A blood oxygen monitor was added with the Series 6 in 2020, albeit as a "wellness" device not capable of diagnosing a medical condition. The blood oxygen monitor added red LEDs to the back, allowing the watch to determine oxygen levels by measuring blood color. The Apple Watch SE reverted to the capabilities of the Series 3, dropping the electrical sensors and blood oxygen monitor. |
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". |

| | |
|---|---|
| *"Phase II"* – External Detection<br><br>Apple's *"modified"* cell phone integrated with an "external" cell phone detection device | Apple watches connect to Apple's *"modified"* cell phones primarily to enhance functionality and user experience. Apple's watches receive alerts for calls, messages, and app notifications, allowing users to stay informed without checking their phones. Apple watches monitor health metrics (e.g., heart rate, steps) and sync this data with smartphone apps for comprehensive health tracking. Apple's watches use the *"modified"* cell phone's GPS for accurate location tracking and navigation assistance. Apps on Apple's *"modified"* cell phones have corresponding Apple's watch versions, enabling seamless access to features like fitness tracking. Bluetooth Connectivity: Most Apple watches connect via Bluetooth, allowing for a low-energy, stable connection to the smartphones. Apple's watches require a companion app on the Samsung *"modified"* cell phone for setup and to manage settings and updates. This connection significantly expands the capabilities of both devices, making them more useful together than separately. |

273. Plaintiff alleges, Apple's Watch Series is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Watch Series is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

274. Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Watch Series, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Watch Series are shipped or imported into the United States.

275. Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Watch Series, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes

Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

276.   Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or
> offers to sell, sells, or uses within the United States a product which
> is made by a process patented in the United States shall be liable as
> an infringer, if the importation, offer to sell, sale, or use of the
> product occurs during the term of such process patent" [271(g)]

277.   Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor"; [§ 101]

278.   Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple *"modified"* cell phone, was examined and allowed by the United States Patent and

188

Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

279. Upon information, three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included an Apple Watch that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

280. Plaintiff alleges, the Apple Watch Series that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

281. Plaintiff alleges, the Apple Watch Series that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Apple iPhone smartphones,

and is a standard component of the Apple iPhone smartphone when imported into the United States. The PTAB determined the Apple Watch to be a standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Apple "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Watch Series for External CBRNE-H Detection*

- a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector [claim 1 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and which is capable of being disposed within the detector case [claim 7 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and that is capable of being disposed within the detector case [claim 13 of the '497 patent]

- wherein the communication device is designed to be used as a standalone detection system for the detection of [] at least one of the human vitals sensors of; a heart sensor, a nerve sensor, a perspiration sensor, an inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 31 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- The multi-sensor detection system [] wherein the cell phone, the smart phone, [] is designed to be used as a standalone detection system for the detection of [] human vitals sensors of: a heart sensor, a nerve sensor, a perspiration sensor, a inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 123 of the '990 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 8 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 9 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 9 of the '189 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 13 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; [claim 14 of the '439 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological

191

sensor; [claim 17 of the '439 patent]

• A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

• A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: [claim 18 of the '439 patent]

• a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 18 of the '439 patent]

• A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: [claim 19 of the '439 patent]

• a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 19 of the '439 patent]

• A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

• a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

• A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

• a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of

192

detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [claim 5 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 6 of the '287 patent]

**282.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XVI:

### Apple's Wi-Fi Chips for connecting Apple's "*modified*" Cell Phones

**283.** Count XVI incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

**284.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Apple's Wi-Fi Chip, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

285.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Wi-Fi Chip, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

286.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wi-Fi Chip, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wi-Fi Chip, infringement occurs when the combination is shipped or imported into the United States.

287.    Upon information, Plaintiff is alleging the Apple *"modified"* cell phone, that include Apple's Wi-Fi Chip, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Wi-Fi Chip, into the United States under 35 U.S.C. § 271(g).

288.    Plaintiff alleges Apple's *"modified"* cell phone, that include Apple's Wi-Fi Chip, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to *"modify"* a common cell phone, that include Apple's Wi-Fi Chip, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

289.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

194

Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**290.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Wi-Fi Chip, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's Wi-Fi Chip, is identified and located inside the Apple *"modified"* cell phone.

**291.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wi-Fi Chip, into the United States that include "*nine standard sensors that are used as biosensors*".

**292.** Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wi-Fi Chip,

infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

**293.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Wi-Fi Chip, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Wi-Fi Chip, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Wi-Fi Chip, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple "*modified*" cell phones, that include Apple's Wi-Fi Chip, are shipped or imported into the United States.

196

**294.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wi-Fi Chip, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wi-Fi Chip] https://news.ycombinator.com/item?id=28423983

**295.** Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wi-Fi Chip, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wi-Fi Chip, into the United States.

**296.** Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Wi-Fi Chip] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

197

297.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

298.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Wi-Fi Chip was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

299.    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple *"modified"* cell phones (i.e., iPhone smartphones) that include Apple's Wi-Fi Chip: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE,

iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

Upon information, Plaintiff alleges

Upon information, Apple's latest iPhones introduced a significant shift in the company's approach to wireless connectivity. For the first time, Apple replaced third-party Wi-Fi and Bluetooth chips – previously sourced from Broadcom – with its own custom silicon, the Apple N1. This move marks a new phase in Apple's push to control every aspect of its hardware, extending its in-house chip design beyond processors and modems to local wireless communication. The N1 chip is built to handle Wi-Fi 7, Bluetooth 6, and the Thread smart home protocol.

iPhone Wi-Fi capabilities have evolved significantly over the years. Each new model brings improvements in speed, range, and connectivity. Wi-Fi specifications vary across iPhone models. Older versions like the iPhone SE (2nd generation) support Wi-Fi 6, while newer models like the iPhone 15 series are compatible with Wi-Fi 6E.

Apple's focus on enhancing Wi-Fi technology in iPhones aims to improve user experience. Faster connection speeds and better network stability contribute to overall internet usage on these devices.

Different iPhone models support different Wi-Fi standards. This means some iPhones can connect to faster and more advanced Wi-Fi networks than others. Generally, newer iPhone models support the latest Wi-Fi standards. Knowing the Wi-Fi standard of your iPhone helps you understand its potential connection speeds.

**Table: iPhone Wi-Fi Specifications**

| iPhone Model | Wi-Fi Standard | Maximum Speed |
|---|---|---|
| iPhone 16 Pro Max, iPhone 16 Pro | Wi-Fi 7 (802.11be) | Up to 4.8 Gbps |
| iPhone 16 Plus, iPhone 16 | Wi-Fi 6E (802.11ax) | Up to 2.4 Gbps |
| iPhone 15 Pro Max, iPhone 15 Pro | Wi-Fi 6E (802.11ax) | Up to 2.4 Gbps |
| iPhone 15 Plus, iPhone 15 | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |
| iPhone 14 Pro Max, iPhone 14 Pro | Wi-Fi 6E (802.11ax) | Up to 1.2 Gbps |
| iPhone 14 Plus, iPhone 14 | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |
| iPhone 13 Pro Max, iPhone 13 Pro, iPhone 13, iPhone 13 mini | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |
| iPhone 12 Pro Max, iPhone 12 Pro, iPhone 12, iPhone 12 mini | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |
| iPhone 11 Pro Max, iPhone 11 Pro, iPhone 11 | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |
| iPhone SE (3rd generation) | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |
| iPhone SE (2nd generation) | Wi-Fi 6 (802.11ax) | Up to 1.2 Gbps |

| iPhone Model | Wi-Fi Standard | Maximum Speed |
|---|---|---|
| Older iPhone models (e.g., iPhone X, iPhone 8) | Wi-Fi 5 (802.11ac) | Up to 866 Mbps |

Newer iPhones have better Wi-Fi chips. This means faster speeds and more stable connections. Older models may struggle more in crowded areas or with high-bandwidth tasks like 4K streaming.

Simply put, Wi-Fi is a wireless network between devices, using short range radio waves. Devices that connect to a Wi-Fi network contain antennas and components that can both transmit radio signals and receive them, with the radio messages consisting of packets of data.

Many people associate Wi-Fi with Internet access, but Wi-Fi isn't the Internet connection itself. Wi-Fi is one of the ways that a device can establish a connection to other computers or devices, like a router, which has a connection to the Internet that it shares.

Knowing that Apple's current range of hardware supports the faster Wi-Fi networking standards is comforting, as you can be assured that your iPhone, iPad, or Mac will get decent speeds across both the network and from the network's Internet connection.

Even though the terms Wi-Fi and internet are often used interchangeably, the terms refer to two different types of connection. The word internet refers to "wide area network" (WAN). The internet is a globally connected network that links devices worldwide.

Wi-Fi, on the other hand, is a way of connecting devices on a local area network (LAN). Before the days of Wi-Fi, the only way to connect devices to the internet was through individual cables, which was often inconvenient. By creating an individual Wi-Fi network, you can connect laptops, phones, smart devices, and any other enabled devices both to each other and the internet within a home or office using a secure network.

If you see a device that has "with Wi-Fi" on it – or "Wi-Fi only," it means it can connect to the internet through a Wi-Fi network, and only through a Wi-Fi network. On the other hand, if you see "Wi-Fi + Cellular", it means the device can connect to the internet via both Wi-Fi and cellular networks.

This distinction is important for devices like tablets and smart hotspots. For instance, an iPad labeled "Wi-Fi + Cellular" can access the internet anywhere there's cellular coverage, while a "Wi-Fi only" iPad requires a Wi-Fi network to connect.

The most effective way to use the Apple "*modified*" cell phone (i.e., Apple iPhone) for Carbon Monoxide (CO) detection is by employing smart CO detectors. These Apple "*modified*" cell phone (i.e., Apple iPhone) devices connect to the Wi-Fi network and can send notifications to an Apple "*modified*" cell phone (i.e., Apple iPhone) through a dedicated app. Steps for enabling the CO detector.

- Purchase a Smart CO Detector: Research and select a smart CO detector compatible with your iPhone. Consider factors like battery life, range, and app features. Popular brands include Nest Protect, First Alert Onelink, and Kidde RemoteLync.

- Install the Smart CO Detector: Follow the manufacturer's instructions to install the detector in a central location within your home, ideally near bedrooms.

- Download and Install the Companion App: Download the CO detector's companion app from the Apple App Store onto your iPhone.

- Connect the Detector to Your Wi-Fi Network: Use the app to connect the detector to your home's Wi-Fi network. This allows the detector to communicate with your iPhone.

- Configure Notifications: Set up notifications within the app to receive alerts when the detector senses elevated CO levels. Customize notification settings to your preferences.

Integrating your iPhone into your CO detection system through the Wi-Fi network offers several benefits:

- Remote Monitoring: Receive alerts on your iPhone [Apple's "*modified*" cell phone] regardless of your location.

- Immediate Notifications: Be instantly notified of elevated CO levels, giving you critical response time.

- Data Logging: Some systems record CO levels over time, allowing you to identify patterns or potential sources of leaks.

- Integration with Smart Home Systems: Connect your CO detection to other smart home devices for automated responses, such as turning off appliances or opening windows.

- Convenience: Manage and monitor your CO detectors directly from your iPhone.

203

300.   Plaintiff alleges, Apple's Wi-Fi Chip is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Wi-Fi Chip is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

301.   Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Wi-Fi Chip, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Wi-Fi Chip are shipped or imported into the United States.

302.   Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Wi-Fi Chip, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

303.   Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

"[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as

204

an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**304.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**305.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**306.**    Upon information, three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC devices that included Wi-Fi Chips that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**307.**    Plaintiff alleges, Apple's Wi-Fi Chip that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**308.**    Plaintiff alleges, Apple's Wi-Fi Chip that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States. The PTAB determined the Wi-Fi Chip to be a standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Apple "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Wi-Fi Chip for connecting Apple's "modified" Cell Phone*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband

207

connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

• wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

• at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

• at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

• at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

• at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

• at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

208

309.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XVII:

### Apple's Wireless Communication Protocols [Bluetooth, cellular, and Wi-Fi] for connecting the Apple Watch Series

310.    Count XVII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

311.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Apple's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

312.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

313.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wireless Communication

Protocols, infringement occurs when the combination is shipped or imported into the United States.

**314.**    Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Wireless Communication Protocols, into the United States under 35 U.S.C. § 271(g).

**315.**    Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**316.**    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |

| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**317.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Wireless Communication Protocols, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's Wireless Communication Protocols, is identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

318.    Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wireless Communication, into the United States that include *"nine standard sensors that are used as biosensors"*.

319.    Upon information and belief, Plaintiff alleges Apple's *"modification"* of the cell phone, that include Apple's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Apple *"modified"* the cell phone, that include Apple's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's *"modification"* of the cell phone, that include Apple's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's Wireless Communication Protocols, are shipped or imported into the United States.

320.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/.  "Samsung uses the same company to make its

212

[smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

321.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wireless Communication Protocols, into the United States.

322.   Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

323.   Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

324.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that

the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

325.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

326.    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple *"modified"* cell phones (i.e., iPhone smartphones) that include Apple's Wireless Communication Protocols: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE

214

(Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

**327.**   Upon information, Plaintiff alleges, the Apple Watch Series connects through Wi-Fi, Bluetooth, and cellular to communicate with Apple's "*modified*" cell phone:

> Learn about Bluetooth and Wi-Fi for your Apple Watch and how your watch uses both. And learn how cellular on GPS + Cellular models fits in.
>
> To enjoy every feature on your Apple Watch, you need to turn on Wi-Fi and Bluetooth on your paired iPhone. Open Control Center on your iPhone; make sure that Wi-Fi and Bluetooth are on.
>
> Your Apple Watch uses Wi-Fi and Bluetooth to communicate with your paired iPhone. If you have cellular, your watch can also stay connected through a cellular network. Your watch switches between these intelligently to choose the most power-efficient connection. Here's how:
>
> - Our Apple Watch uses Bluetooth when your iPhone is near, which conserves power.
> - If Bluetooth isn't available, your Apple Watch will try to use Wi-Fi. For example, if compatible Wi-Fi is available and your iPhone isn't in Bluetooth range, your Apple Watch uses Wi-Fi.
> - If Bluetooth and Wi-Fi aren't available, and you set up a cellular plan, cellular models of Apple Watch can connect to cellular networks.

Your Apple Watch can connect to a Wi-Fi network:

- If your iPhone, while connected to your watch with Bluetooth, has connected to the network before.

- If the Wi-Fi network is 802.11b/g/n 2.4GHz or 5GHz (Apple Watch Series 5 and earlier, and Apple Watch SE, support 2.4GHz only).

- When your Apple Watch connects to a compatible Wi-Fi network instead of your iPhone connection, the Wi-Fi icon appears in Control Center.

Press the side button to open Control Center. Tap the Wi-Fi icon. The icon dims and your device disconnects from any network that you're connected to. Only Apple Watch GPS + Cellular models can disconnect from Wi-Fi networks. After you disconnect, your Apple Watch won't automatically re-join the Wi-Fi network that you disconnected from.

Apple Watch GPS + Cellular models can connect to cellular. With a cellular connection, you can make calls and use data or apps when you don't have your iPhone or Wi-Fi. Learn how to add your Apple Watch to your cellular plan.

Check the connection between your iPhone and Apple Watch. Check your watch face. If you see the red Disconnected icon or the red X icon on the watch face, you don't have a connection.

Check Control Center by pressing the side button (for watchOS 9 or earlier, touch and hold the bottom of the screen, then swipe up). If you see the red Disconnected icon or the red X icon, you don'' have a connection. Tap the iPhone icon in Control Center.

> If your devices are connected, your iPhone should make a "ping" sound. https://support.apple.com/en-us/109319

**328.** Plaintiff alleges, Apple's Wireless Communication Protocols is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Wireless Communication Protocols are native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**329.** Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

**330.** Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

**331.** Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**332.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**333.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

334.   Upon information, three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

335.   Plaintiff alleges, Apple's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

336.   Plaintiff alleges, Apple's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Apple "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Wireless Communication Protocols [Bluetooth, cellular, and Wi-Fi] for connecting the Apple Watch Series*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- [t]he multi sensor detection security systems [] receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to [] activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; [claim 1 of the '189 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; [claim 2 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite,

220

Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

• monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

• wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

• wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

337. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

222

## COUNT XVIII:

## Apple's Wireless Communication Protocols [Bluetooth, GPS, cellular, and Wi-Fi] for connecting Apple's "Find My"

338.    Count XVIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

339.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Apple's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

340.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

341.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

342.    Upon information, Plaintiff is alleging the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Wireless Communication Protocols, into the United States under 35 U.S.C. § 271(g).

**343.** Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**344.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

224

**345.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Wireless Communication Protocols, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's Wireless Communication Protocols, is identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

**346.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wireless Communication Protocols, into the United States that include *"nine standard sensors that are used as biosensors"*.

**347.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Wireless Communication Protocols, while performing work under

a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's Wireless Communication Protocols, are shipped or imported into the United States.

348.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

349.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process;

226

or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wireless Communication Protocols, into the United States.

350.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

351.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

352.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

353.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

> (1) that a substantial likelihood exists that the product was made by the patented process, and

> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**354.**    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's Wireless Communication Protocols: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

**355.**    Upon information, Plaintiff alleges, the "Find My" app is one of the most important security tools Apple offers, helping users locate lost devices, protect

personal data, and stay connected to people and items that matter, even when devices are offline.

The Find My app sits quietly on every iPhone, but it becomes essential the moment something goes wrong. Whether a device is misplaced at home, left behind during travel, or stolen, Find My provides tools that go far beyond simple location tracking. It *connects devices*, people, and accessories into a single security network designed to protect both hardware and personal data.

Find My combines three core functions into one system: locating devices, tracking personal items, and sharing locations with trusted contacts. It uses Apple's Find My network, which leverages millions of nearby Apple devices to help locate items even when they are offline or out of battery range.

Bluetooth plays a major role in how accurately Find My tracks the iPhone—especially when it's offline. Apple's Find My network uses Bluetooth to detect nearby Apple devices. Thanks to this, other nearby devices can anonymously report the phone's location, even if the iPhone isn't online. That's why it's important to keep Bluetooth on, especially when the device is offline, as that may help improve the accuracy of Find My.

Turning on Wi-Fi or cellular data also helps to improve the accuracy of Find My. *Find My uses a combination of GPS, Wi-Fi, cellular towers, and Bluetooth signals* to help pinpoint the exact location of the iPhone.

Wi-Fi plays a crucial role in location accuracy, particularly indoors or in areas where GPS signals are weak or obstructed by buildings. Cellular data provides triangulation using cell towers,

supplementing GPS and Wi-Fi signals to refine the iPhone's location accuracy.

But most importantly, for Find My to track the iPhone in real-time, the device needs to be connected to the internet, either through Wi-Fi or cellular data.

Without an active connection, the iPhone can't send location updates or communicate with the Find My network effectively, thus affecting the accuracy of location data you see in the Find My app.

For better accuracy, ensure your device is always connected to the internet. Connect to Wi-Fi if possible; if you're away from Wi-Fi, use your cellular data.

Apple effectively utilizes the wireless communication means of Bluetooth, GPS, cellular, and Wi-Fi to maximize the benefits of Apple's "Find My" that is pre-installed in the Apple "*modified*" cell phone prior to shipment or importation of the Apple "*modified*" cell phone into the United States. The wireless communication means of Bluetooth, GPS, cellular, and Wi-Fi are all "native" to the manufacture of Apple's "modified" cell phones, and uses Plaintiff's patented process.

**356.** Plaintiff alleges, Apple's Wireless Communication Protocols is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Wireless Communication Protocols are native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**357.** Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

**358.** Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

**359.** Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

231

**360.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**361.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**362.** Upon information, three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that

included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

363.   Plaintiff alleges, Apple's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

364.   Plaintiff alleges, Apple's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Apple "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Communication Means for connecting Apple's "Find My"*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long

and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

234

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

365.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged

"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT XIX:**

**Apple's Wireless Communication Protocols [Bluetooth, and Wi-Fi] for connecting Apple's "Car Key" and UAVs—Drones**

366.    Count XIX incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

367.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Apple's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

368.    Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

369.    Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

**370.**    Upon information, Plaintiff is alleging the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Wireless Communication Protocols, into the United States under 35 U.S.C. § 271(g).

**371.**    Plaintiff alleges Apple's "*modified*" cell phone, that include Apple's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**372.**    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |

| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
|---|---|---|---|---|
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**373.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Wireless Communication Protocols, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's Wireless Communication Protocols, is identified and located inside the Apple *"modified"* cell phone.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

- Microfluidic cassette: Interchangeable cassettes with varying assays

- VIS-NIR spectrometer: Food freshness; Melanoma

- NNAP Electrodes: Toxic metals and Organic pollutants in water

- Optical Waveguide: Pathogens in water and food

- Back and front camera: Colorimetric analysis; Image analysis

- Microphone: Voice recording stress levels

---

**374.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wireless Communication Protocols, into the United States that include "*nine standard sensors that are used as biosensors*".

**375.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's Wireless Communication Protocols, are shipped or imported into the United States.

**376.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its

[smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

377. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Wireless Communication Protocols, into the United States.

378. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Wireless Communication Protocols, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

379. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

380. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that

the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

381.   Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

382.   Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple *"modified"* cell phones (i.e., iPhone smartphones) that include Apple's Wireless Communication Protocols: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE

(Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

**383.**   Upon information, Plaintiff alleges, Apple's "modified" cell phone include the standard Wi-Fi and Bluetooth sensors for controlling a vehicle's lock, unlock, and start; and an unmanned aerial vehicle—Drone.

### What is Apple car key?

This feature lets users add their car key to the Wallet app, then use the wallet app to lock, unlock, and start their car. While specific implementations vary depending on the carmaker, there are a few different ways Apple's car key feature can be used:

*Passive entry*: Approach your car with your device, it unlocks, start your car when inside, and walk away from your car with your device, it locks.

*Proximity*: Lock, unlock, and start the car by holding your device close to the door handle or key reader.

*Remotely*: You can use your device to remote lock and unlock your car, and use other features.

The car key feature also includes support for Express Mode. This feature allows you to use your car key without unlocking your device, or authenticating with Face ID, Touch ID, or a passcode. The Wallet app also supports sharing your car key using things like Messages, Mail, and Airdrop. And if your iPhone dies? You can still use it as a car key for up to five hours after the fact.

You can add your eligible digital car key to the Wallet app, and use your iPhone or Apple Watch to lock, unlock, and start your car.

To add and use a car key on your iPhone or Apple Watch, you need a compatible car. iPhone XS or later, or iPhone SE (2nd generation), with the latest version of iOS, or Apple Watch Series 5 or later, or Apple Watch SE, with the latest version of watchOS.

The Wallet app on your iPhone or iPad is pre-installed on Apple operating system (iOS) devices.

**Lock, unlock, and start your car with passive entry:**

With some cars, you can use passive entry to lock, unlock, or start your car with your device. Depending on your car's configuration, it will either unlock automatically as you approach with your device in your pocket or bag, or it will unlock only when you pull the door handle while carrying your device. Once inside, you can start your car.

If your car supports automatic locking, it will lock automatically when you walk away with your device. If your car supports Wallet notifications, you will receive a lock or unlock notification on your device, in addition to any visual or audible confirmations from your car.

To use passive entry on compatible cars, you need an iPhone 11 or later (excluding iPhone SE 2nd and 3rd generation and iPhone 16e). Or an Apple Watch Series 6 or later.

**Lock, unlock, and start your car by proximity:**

With some cars, you lock, unlock, and start the car by holding your device close to the door handle or key reader. To lock or unlock your car, hold your device near the car's door handle.

To start your car, place your iPhone in the car's key reader or hold your Apple Watch near the reader. Then, press the car's start button. To use remote entry on compatible cars, you need iPhone 11 or later, or Apple Watch Series 6 or later. You also need to be within *Bluetooth* range of your car.

**Drones for Apple iPhones**

Drones are UAVs that are equipped with a variety of sensors, cameras, and GPS systems, allowing them to fly autonomously or be controlled remotely. The majority of drones on the market are quadcopters, which use four rotors to generate lift and propulsion. Drones can be controlled using a variety of methods, including:

*Remote controllers*: These are handheld devices that use radio frequency (RF) signals to communicate with the drone.

*Smartphones*: Many drones can be controlled using a smartphone app, which connects to the drone via *Wi-Fi* or *Bluetooth*.

*Tablets*: Some drones can be controlled using a tablet, which provides a larger screen and more precise control.

Do drones work with iPhones? The answer is yes; many drones are compatible with iPhones. In fact, some of the most popular drone manufacturers, such as DJI and Parrot, offer iPhone-compatible drones.

To control a drone using an iPhone, you'll need to download the drone's app from the App Store. The app will connect to the drone via Wi-Fi or Bluetooth, allowing you to control the drone's movements, adjust camera settings, and access other features. Some popular iPhone-compatible drones include:

*DJI Spark*: This compact drone is designed for beginners and can be controlled using the DJI GO app.

*Parrot Anafi*: This foldable drone is equipped with a 4K camera and can be controlled using the FreeFlight 6 app.

*Holy Stone HS100*: This GPS-enabled drone is designed for outdoor use and can be controlled using the Holy Stone app.



Using an iPhone with a drone offers several benefits, including:

*Convenience*: Controlling a drone using an iPhone is convenient and easy, as you can use the touchscreen interface to adjust settings and control the drone's movements.

*Portability*: iPhones are portable and can be taken anywhere, making it easy to control a drone on the go.

*High-quality display*: iPhones have high-quality displays that provide a clear and detailed view of the drone's camera feed.

**384.**    Plaintiff alleges, Apple's Wireless Communication Protocols is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Wireless Communication Protocols are native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**385.**    Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

**386.**    Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

**387.**    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

"[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**388.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**389.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims

247

shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

390.   Upon information, three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

391.   Plaintiff alleges, Apple's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

392.   Plaintiff alleges, Apple's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Apple "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Apple's Wireless Communication Protocols [Bluetooth, and Wi-Fi] for connecting Apple's "Car Key" and UAVs—Drones*

- wherein the cell phone detector case includes telecommunication and radio communication means that are interactive with any type of motive vehicle that includes but is not limited to

cars, trucks, vans, SUVs, trains, subways, boats, ships, UAVs, UGVs, and airplanes [claim 13 of the '752 patent]

• a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

• wherein the communication device is designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 22 of the '990 patent]

• internal or external automatic/mechanical lock [] device which is mounted, embedded, affixed, or attached to a product for receiving transmission from the communication device to lock, unlock or disable the lock [claim 33 of the '990 patent]

• wherein the cell phone the smart phone, and the cell phone detector case are capable of sending signals to a vehicle's operating equipment systems comprising at least one of an ignition for starting and stopping, a lock for unlocking and locking [claim 107 of the '990 patent]

• wherein the cell phone, the smart phone, [] are designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of containers, vehicles, houses and businesses through the use of a smart phone, cell phone, PDA, laptop or desktop. [claim 114 of the '990 patent]

• wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

• wherein a communication device, that of a cell phone, smart phone or handheld; capable of sending signals to a vehicle's operating equipment systems of at least one of, but not limited to, [] a lock for unlocking and locking, [] capable of receiving data and diagnostic information of the vehicle's operating equipment systems. [claim 134 of the '990 patent]

• whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security

249

systems, [], or to activate or deactivate cell phone detection systems; [claim 13 of the '439 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, [] [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or

250

manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 3 of the '287 patent]

• at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

• at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

• at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

• at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

• processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; [Claim 1 of the '898 Patent]

• stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; [Claim 2 of the '898 Patent]

**393.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XX:

### Apple's Nine "Standard Biosensors" for
### Apple's "*modified*" Cell Phone

**394.** Count XX incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. § 271(g).

**395.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Apple's Standard Biosensors, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**396.** Upon information, Plaintiff alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device that include Apple's Standard Biosensors, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**397.** Upon information and belief, Plaintiff alleges Apple is using Plaintiff's patented process to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Standard Biosensors, under 35 U.S.C. § 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Apple *"modified"* cell phone, that include Apple's Standard Biosensors, infringement occurs when the combination is shipped or imported into the United States.

**398.** Upon information, Plaintiff is alleging the Apple *"modified"* cell phone, that include Apple's Standard Biosensors, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Apple's Standard Biosensors, into the United States under 35 U.S.C. § 271(g).

**399.** Plaintiff alleges Apple's *"modified"* cell phone, that include Apple's Standard Biosensors, was first manufactured or produced using Plaintiff's patented process in

response to a government request. Apple performed work for the Government to "*modify*" a common cell phone, that include Apple's Standard Biosensors, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Apple, as a third-party contractor, could not be sued for infringement.

**400.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. § 271(g) could not be brought against Apple before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

**401.** Upon information, twelve Federal Judges infer to say; the Apple *"modified"* cell phones that include Apple's Standard Biosensors, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Apple *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Apple's Standard Biosensors, is identified and located inside the Apple *"modified"* cell phone.

**402.** Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Standard Biosensors, into the United States that include "*nine standard sensors that are used as biosensors*".

**403.** Upon information and belief, Plaintiff alleges Apple's "*modification*" of the cell phone, that include Apple's Standard Biosensors, begin abroad and continues to this day. Plaintiff also alleges, Apple "*modified*" the cell phone, that include Apple's Standard Biosensors, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Apple's "*modification*" of the cell phone, that include Apple's Standard Biosensors, was

made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. § 271(g) occurs when the Apple *"modified"* cell phones, that include Apple's Standard Biosensors, are shipped or imported into the United States.

**404.**    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Standard Biosensors, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Standard Biosensors] https://news.ycombinator.com/item?id=28423983

**405.**    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Apple] is accused of using Plaintiff's patented process to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Standard Biosensors, under 35 U.S.C. § 271(g). Apple is tasked with presenting evidence to a jury that Apple is (1) not using Plaintiff's patented process; or (2) Apple is using Plaintiff's patented process but is not shipping or importing the Apple *"modified"* cell phones (i.e., iPhone smartphones), that include Apple's Standard Biosensors, into the United States.

**406.**    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Apple "*modified*" cell phone, that include Apple's Standard Biosensors, infringes under 35 U.S.C. § 271(g) when the combination is shipped or imported into the United States.

**407.**    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Apple's *"modified"* cell phone that include Apple's Standard Biosensors] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

**408.**    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**409.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Apple *"modified"* cell phone that include Apple's Standard Biosensors was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the
> importation, sale, offer for sale, or use of a product which is made
> from a process patented in the United States, if the court finds—

255

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

410.    Upon information and belief, Apple is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Apple "*modified*" cell phones (i.e., iPhone smartphones) that include Apple's Standard Biosensors: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, and iPhone 17 Pro Max.

411.    Upon information and belief, Plaintiff claims Twelve Federal Judges "infer to say", (i.e., drawing a conclusion based on indirect evidence and reasoning, rather than explicit statements), that Apple's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, allegedly infringes Plaintiff's patented invention of a communicating, monitoring, detecting, and controlling (CMDC) device.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit

Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

258

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is

259

integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

Upon information and belief, Plaintiff alleges that Apple's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, begin as early as 2007 and continuous through this day 16, May, 2016.

Upon information and belief, Plaintiff alleges that Apple's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, include nine "*standard sensors*" which can be used as biosensors.

---

**Apple's "*nine*" Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

Upon information, twelve Federal Judges "infer to say"; (i.e., arriving at a conclusion by reasoning from evidence), that Apple's infringement of Plaintiff's CMDC device occurs when Apple's "*modified*" cell phone is integrated with, or interconnected to, nine of Apple's standard sensors for the "*modified*" cell phone, and are used as biosensors.

Plaintiff alleges, that Apple's nine standard sensors for the "*modified*" cell phone, which are used as biosensors, are "*built-in, embedded*", in accordance with the PTAB's claim term construction of "*built-in, embedded*", and satisfies the NDC local rule 3-1(c) for identifying where in the *modified* cell phone the biosensors are found.

Upon information, Plaintiff alleges the Apple "*modified*" cell phone infringes Plaintiff's patented CMDC device; because the detection capability that is placed 'in, on, upon, or adjacent' the monitoring device. [Patent specifications]. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute*, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

The Patent Trials and Appeals Board (PTAB) construed "built-in, embedded", as: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device", [the Apple "*modified*" cell phone].

Plaintiff alleges, the Apple "*modified*" cell phone device, and, the **nine "standard sensors" which "can be used as 'biosensors** are included in Apple's manufacture of Plaintiff's patented process abroad for a "*modified cell phone*" that is imported into the United States under 35 U.S.C. § 154(a)(1), and 35 U.S.C. § 271(g).

262

**412.** Plaintiff alleges, Apple's Standard Biosensors is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Apple's Standard Biosensors are native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**413.** Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone, that include Apple's Standard Biosensors, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g) when the Apple *"modified"* cell phones, that include Apple's Standard Biosensors, are shipped or imported into the United States.

**414.** Plaintiff also alleges that when the Apple *"modified"* cell phone, that include Apple's Standard Biosensors, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

**415.** Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Apple to manufacture the Apple *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which

263

is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

416.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

417.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Apple "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**418.** Upon information, three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Standard Biosensors that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**419.** Plaintiff alleges, Apple's Standard Biosensors that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**420.** Plaintiff alleges, Apple's Standard Biosensors that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States. The PTAB determined the Apple's Standard Biosensors to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Apple "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Apple "modified" Cell Phone Design that include Nine "Standard Sensors" which are used as Biosensors*

- a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector [claim 1 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and which is capable of being disposed within the detector case [claim 7 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and that is capable of being disposed within the detector case [claim 13 of the '497 patent]

- wherein the communication device is designed to be used as a standalone detection system for the detection of [] at least one of the human vitals sensors of; a heart sensor, a nerve sensor, a perspiration sensor, an inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 31 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- The multi-sensor detection system [] wherein the cell phone, the smart phone, [] is designed to be used as a standalone detection system for the detection of [] human vitals sensors of: a heart sensor, a nerve sensor, a perspiration sensor, a inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 123 of the '990 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 8 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 9 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 9 of the '189 patent]

266

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 13 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; [claim 14 of the '439 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: [claim 18 of the '439 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 18 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband,

267

chemical, biological, human, radiological agent, or compound, comprising: [claim 19 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 19 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [claim 5 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 6 of the '287 patent]

**421.**   Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT

**Willful Infringement Requires a Finding of Direct Infringement First**

In the above section Plaintiff outlined Apple's alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g); also, Apple's alleged direct infringement under 35 U.S.C. § 271(a); and the alleged infringement under the doctrine of equivalents under 35 U.S.C. § 271(a). Plaintiff believes Apple is liable for the misconduct alleged.

**Knowledge requirement for Willful Patent Infringement**

**Under Rule 14(b):** In *Golden v. United States* CFC Case No. 13-307C, Apple was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court notified Apple to make an appearance to protect its interest in the subject matter of the suit. Although Apple failed to appear, the notice *(Exhibit E)* filed on 03/31/21 establishes a beginning timeline for Apple's knowledge of Plaintiff's patented inventions.

**Correspondence:** Plaintiff sent and received from Apple correspondence relating to licensing, cease and desist, etc. See *(Exhibit E)*

**Service of Complaint:** Apple admits a complaint was served in *Golden v. Apple, Inc*. SCDC Case No. 19-2557 in year 2019; and Apple admits a complaint was served in *Golden v. Apple, Inc*. NDC Case No. 22-4152 in year 2022. See

"Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct … and sufficiently plead a post-filing/post-suit willful infringement claim." *Motion Offense, LLC v. Dropbox, Inc*., No. 6:23-CV-303-ADA, 2024 BL 297370, at *3 (W.D. Tex. Aug. 26, 2024) ("*Motion Offense* sufficiently pleaded post-suit willful infringement because the facts pleaded in the FAC satisfy the three Parity factors.

As the W.D. Tex. court held in *BillJco*, '[s]erving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim.'") (internal citations omitted); *see Textile Comput. Sys. v. Broadway Nat'l Bank*, 620 F. Supp. 3d 557, 568 (W.D. Tex. 2022); *see BillJco, LLC*, 2022 U.S. Dist. LEXIS 17605, 2022 WL 299733, at *9-10 ("Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim."); *see* e.g., *Atlas Glob. Techs., LLC v. Sercomm Corp.*, 638 F. Supp. 3d 721, 728 (W.D. Tex. 2022)

Patent infringement claims that carry with them knowledge requirements, are fact issues to be decided by a jury [U.S. CONS'T. 7th Amend.] on whether Apple had a sufficient amount of knowledge of Plaintiff's patents and patented inventions before, and while Apple continued its allegedly infringing conduct.

**Plaintiff's Demand for a Jury Trial to Decide Willfulness**

Patent infringement claims are issues-of-facts to be decided by a jury [U.S. CONS'T. 7th Amend.] In this case a jury must decide whether Apple's alleged willful infringement claims are "wanton, malicious, and bad-faith behavior"; deliberate or intentional; or, that there's no willful infringement at all.

Recently, the Federal Circuit, in *SRI Int'l v. Cisco Sys.*, 2020-1685 (Fed. Cir. Sep. 28, 2021), clarified the confusion caused by an earlier remand to the district court, in which the Federal Circuit instructed the district court to determine whether the infringer's conduct met the "wanton, malicious, and bad-faith behavior required for willful infringement." The district court, surprised by this instruction (as was the patent bar), nevertheless proceeded and found the infringer's conduct insufficient to meet this new, heightened standard.

On appeal for the second time, the case returned to the same three-member panel of the Federal Circuit, which clarified that it was not their intent to create a heightened requirement for willful infringement and reiterated the standard for willful infringement summarized last year in *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc., 946 F.3d 1367 (Fed. Cir. 2020)*: "willfulness requires a jury to find no more than deliberate or intentional infringement."

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016).

Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Apple's conduct is allegedly "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Apple's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing acts (alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g); also, Apple's alleged direct infringement under 35 U.S.C. § 271(a); and the alleged infringement under the doctrine of equivalents under 35 U.S.C. § 271(a).

## CONCLUSION

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused original cell phone devices of Apple required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Apple devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Apple CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Apple CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs. This is not true.

Plaintiff has stated a plausible claim for infringement upon import, direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique

272

function as Plaintiff 's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is when the Apple accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015), the PTAB construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or "dispose within", a *"modified"* Apple camera for CBRNE-H detection; and Apple's *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* by Apple Watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

> In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below."

273

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

Also noted, throughout this document a third-party other than Apple cannot "modify" the Apple devices without Apple's consent and a license to do so. Apple also control the upgrades and updates to the its operating systems that keeps the devices functioning as a CBRNE-H sensing device.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.    A judgement in favor of Golden that the Defendant's modification of the cell phone to include a CBRNE-H detection capability infringes Golden patented inventions and the asserted patents-in-suit.

B.    A judgement affirming the decision of twelve federal judges when they determined "infringement of Golden's patents occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability".

274

C.    A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 154(a)(1) & 271(g) by manufacturing Plaintiff's patented process abroad and importing the alleged infringing products into the United States.

D.    A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 154(a)(1) & 271(g) the patented process of the asserted patents as aforesaid; and grant Plaintiff his request for damages.

E.    A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from joint and/or direct infringement of the asserted patents as aforesaid pursuant to 35 U.S.C. § 283;

F.    A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

G.    As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing *modified* cell phone devices that have at a minimum, directly and/or infringed under the doctrine of equivalents, the asserted patents.

H.    According to twelve federal judges, the Defendant is liable for infringement of the patented process of the asserted patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

I.    Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the United States Constitution.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## **VERIFICATION**

### **Pursuant to 28 U.S.C. § 1746**


I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 18th day of May, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Amended Complaint as a Matter of Course".


s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of May, 2026, a true and correct copy of the foregoing "Plaintiff's Amended Complaint as a Matter of Course", was served upon the following Defendant via express mail:

John M. Desmarais

DESMARAIS, LLP

230 Park Avenue, 26th Floor

New York, NY 10169

Phone: 212-351-3400

Email: jdesmarais@desmaraisllp.com

Email: colsheski@desmaraisllp.com

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104