# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS – WACO DIVISION

**FILED**

June 25, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ cap

DEPUTY

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN, <br><br> Plaintiff, <br><br> V. <br><br> SAMSUNG ELECTRONICS AMERICA, INC. <br><br> Defendant. | CASE NO: 6:25-cv-00596-DAE <br><br> **JURY TRIAL DEMANDED** <br><br> **Infringement of a Patented Process under 35 U.S.C. § 154(a)(1) & 35 U.S.C. § 271(g); Shifting of Burden under 35 U.S.C. § 295; Collecting a Reasonable Royalty under 35 U.S.C. § 284; and, Willful Patent Infringement (Direct** <br><br> June 25, 2026 |

## PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT UNDER 35.U.S.C. §§ 154(a)(1) and 271(g)

In Plaintiff's pending cases against Google, Apple, and Samsung, Plaintiff alleges the cases are substantially the same. Plaintiff alleged Google, Apple, and Samsung, all used Plaintiff's patented process abroad to manufacture or produce the "*modified*" cell phones that Plaintiff alleges infringes his patented process for his CMDC invention, when the "*modified*" cell phones are shipped into the U.S.

Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones are manufactured and assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with

headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones." https://news.ycombinator.com/item?id=28423983

Plaintiff alleges in [all] the pending cases, the burden of proof shifts [§ 295] when the Defendant is accused of using Plaintiff's patented process to manufacture and/or assemble at least the Samsung "*modified*" cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones) into the United States.

Below is a quick summary of the counts Golden alleged against Google, Apple, and Samsung. An amended complaint in the cases of Apple and Google has been filed in this case. Golden was granted leave to file an amended complaint that aligns with the counts presented below:

**Allegations against Apple, Google, and Samsung are Substantially the Same**

| Fourteen Counts of Alleged Infringement against Apple under §§ 154(a)(1) & 271(g) in *Golden v. Apple* WDTC Case No. 26-0224-AM-DNM | Fifteen Counts of Alleged Infringement against Google under §§ 154(a)(1) & 271(g) in *Golden v. Google* NDC Case No. 26-0831-LJC | Fifteen Counts of Alleged Infringement against Samsung under §§ 154(a)(1) & 271(g) in *Golden v. Samsung* WDT Case No. 25-0596-DAE |
|---|---|---|
| COUNT VII: Apple's "*modified*" Cell Phones | COUNT I: Google's "*modified*" Cell Phones | COUNT I: Samsung's "*modified*" Cell Phones |
| COUNT VIII: Apple's CPU for Apple's "*modified*" Cell Phone | COUNT II: Google's CPU for Google's "*modified*" Cell Phone | COUNT II: Samsung's CPU for Samsung's "*modified*" Cell Phone |

| COUNT IX:<br>Apple's iOS for Apple's<br>"*modified*" Cell Phone | COUNT III:<br>Google's Android OS for Google's<br>"*modified*" Cell Phone | COUNT III:<br>Samsung's Android OS for<br>Samsung's "*modified*" Cell Phone* |
|---|---|---|
| COUNT X:<br>Apple's Megapixel Camera for<br>Apple's "*modified*" Cell Phone | COUNT IV:<br>Google's Megapixel Camera for<br>Google's "*modified*" Cell Phone | COUNT IV:<br>Samsung's Megapixel Camera for<br>Samsung's "*modified*" Cell Phone |
| COUNT XI:<br>Apple's GPS for Apple's<br>"*modified*" Cell Phone | COUNT V:<br>Google's GPS for Google's<br>"*modified*" Cell Phone | COUNT V:<br>Samsung's GPS for Samsung's<br>"*modified*" Cell Phone |
| COUNT XII:<br>Apple's Biometric ID for Apple's<br>"*modified*" Cell Phone | COUNT VI:<br>Google's Biometric ID for Google's<br>"*modified*" Cell Phone | COUNT VI:<br>Samsung's Biometric ID for<br>Samsung's "*modified*" Cell Phone |
| COUNT XIII:<br>Apple's Disabling Lock for Apple's<br>"*modified*" Cell Phone | COUNT VII:<br>Google's Disabling Lock for<br>Google's "*modified*" Cell Phone | COUNT VII:<br>Samsung's Disabling Lock for<br>Samsung's "*modified*" Cell Phone |
| COUNT XIV:<br>Apple's NFC for Apple's<br>"*modified*" Cell Phone | COUNT VIII:<br>Google's NFC for Google's<br>"*modified*" Cell Phone | COUNT VIII:<br>Samsung's NFC for Samsung's<br>"*modified*" Cell Phone |
| COUNT XV:<br>Apple's Watch Series for Apple's<br>"*modified*" Cell Phones | COUNT IX:<br>Google's Watch Series for Google's<br>"*modified*" Cell Phones | COUNT IX:<br>Samsung's Watch Series for<br>Samsung's "*modified*" Cell Phones |
| COUNT XVI:<br>Apple's Wi-Fi Chips for connecting<br>Apple's "*modified*" Cell Phones | COUNT X:<br>Google's Wi-Fi Chips for<br>connecting Google's<br>"*modified*" Cell Phones | COUNT X:<br>Samsung's Wi-Fi Chips for<br>connecting Samsung's<br>"*modified*" Cell Phones |
| COUNT XVII:<br>Apple's Wireless Protocols for<br>connecting the Apple Watch Series | COUNT XI:<br>Google's Wireless Protocols<br>for connecting the Google<br>Watch Series | COUNT XI:<br>Samsung's Wireless Protocols<br>for connecting the Samsung<br>Watch Series |
| COUNT XVIII:<br>Apple's Wireless Protocols for<br>connecting Apple's "Find My" | COUNT XII:<br>Google's Wireless Protocols<br>for connecting Google's<br>"Find My Device" | COUNT XII:<br>Samsung's Wireless Protocols<br>for connecting Samsung's<br>"Find My Mobile" ** |
| COUNT XIX:<br>Apple's Wireless Protocols<br>for connecting Apple's<br>"Car Key" & Drones | COUNT XIII:<br>Google's Wireless Protocols<br>for connecting Google's<br>"Android Digital Car Key" | COUNT XIII:<br>Samsung's Wireless Protocols<br>for connecting Samsung's<br>"Digital Car Key" *** |
| COUNT XX:<br>Apple's Nine "Standard<br>Biosensors" for Apple's<br>"*modified*" Cell Phone | COUNT XIV:<br>Google's Nine "Standard<br>Biosensors" for Google's<br>"*modified*" Cell Phone | COUNT XIV:<br>Samsung's Nine "Standard<br>Biosensors" for Samsung's<br>"*modified*" Cell Phone |

3

| | | |
|---|---|---|
| X | COUNT XV:<br>Google's Wireless Protocols<br>for connecting Waymo's<br>Self-Driving Cars | COUNT XV:<br>Samsung's Wireless Protocols<br>for connecting Waymo's<br>Self-Driving Cars **** |

\* Samsung's Android OS is built on Google's "Open-Source" Operating System Platform

\*\* Samsung's "SmartThings Find" and "Find My Mobile" in addition to the service "Find my Google device"

\*\*\* Use a Digital Key with Samsung Wallet

\*\*\*\* Samsung is making self-driving car chips for Google's Waymo

At the end of each Count, for each of the Google, Apple, and Samsung amended complaints, Plaintiff assembled from Plaintiff's U.S. Patents: [7,385,497]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; [10,163,287]; [10,984,619]; and [11,645,898]; claim limitations that cover Plaintiff's patented processes. All the claim limitations were examined and allowed by the United States Patent and Trademark Office (USPTO).

Each claim limitation support and claim the specific components that enables the modification of the Samsung cell phone before the Samsung "*modified*" cell phone is shipped or imported into the United States.

Each claim limitation describes a specific component of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device (i.e., "*modified*" cell phone).

To invalidate a specific component of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device (i.e., "*modified*" cell phone), each claim limitation for the specific component—*Samsung's CPU for Samsung's "modified" cell phone*—of the patented process must be proven invalid on the heightened "clear and convincing" evidence standard. To invalidate the patented process for a "*modified*" cell phone as a whole; all claim limitations that supports each specific component must be invalidated.

4

## CONTENTS

**Page**

| | |
|---|---|
| 8 | CAUSES OF ACTIONS |
| 8 | 35 U.S.C. § 154(a)(1) |
| 9 | 35 U.S.C. § 271(g) |
| 9 | 35 U.S.C. § 295 |
| 10 | 35 U.S.C. § 284 |
| 10 | Willful Patent Infringement |
| 11 | COMPLAINT FOR PATENT INFRINGEMENT |
| 11 | PARTIES |
| 15 | STANDARD FOR REVIEW |
| 15 | JURISDICTION AND VENUE |
| 16 | PATENT ELIGIBILITY AND MUTUAL EXCLUSIVITY |
| 19 | PLAINTIFF'S DEMAND FOR A JURY TRIAL |
| 20 | Damages |
| 22 | Twelve Federal Judges Validates Plaintiff's Infringement Theory |
| 26 | Twelve Federal Judges Identifies Where on the Inside of the Samsung Devices the Detection Capability is Located |
| 27 | Samsung's Smartphone Biosensors Submitted to the Courts |
| 28 | Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Samsung Devices |
| 30 | SAMSUNG *"MODIFIED"* THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY |

| | |
|---|---|
| 32 | The Cell-All Demonstration Participants and Program Outline |
| 36 | SAMSUNG IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF PATENTED PROCESS §§ 154(a)(1) & 271(g) |
| 39 | INFRINGEMENT DIFFERENCES BETWEEN SECTIONS 271(a) & 271(g) |
| 42 | SAMSUNG ANDROID ECOSYSTEM |
| 45 | SAMSUNG ELECTRONIC-MECHANICS IS HEADQUARTERED IN SOUTH KOREA |
| 50 | COUNT I: Samsung's "*modified*" Cell Phones |
| 64 | COUNT II: Samsung's CPU for Samsung's "*modified*" Cell Phone |
| 79 | COUNT III: Samsung's Android (OS) for Samsung's "*modified*" Cell Phone |
| 95 | COUNT IV: Samsung's Megapixel Camera for Samsung's "*modified*" Cell Phone |
| 112 | COUNT V: Samsung's GPS for Samsung's "*modified*" Cell Phone |
| 125 | COUNT VI: Samsung's Biometric ID for Samsung's "*modified*" Cell Phone |
| 138 | COUNT VII: Samsung's Disabling Lock for Samsung's "*modified*" Cell Phone |
| 151 | COUNT VIII: Samsung's NFC for Samsung's "*modified*" Cell Phone |
| 168 | COUNT IX: Samsung's Watch Series for Samsung's "*modified*" Cell Phones |
| 187 | COUNT X: Samsung's Wi-Fi Chips for connecting Samsung's "*modified*" Cell Phones |

| | |
|---|---|
| 202 | COUNT XI:<br>Samsung's Wireless Protocols for connecting the Samsung Watch Series |
| 217 | COUNT XII:<br>Samsung's Wireless Protocols for connecting Samsung's<br>"Find My Mobile" |
| 230 | COUNT XIII:<br>Samsung's Wireless Protocols for connecting Samsung's<br>"Digital Car Key" |
| 245 | COUNT XIV:<br>Samsung's Nine "Standard Biosensors" for Samsung's "*modified*"<br>Cell Phone |
| 263 | COUNT XV:<br>Samsung's Wireless Protocols for connecting<br>Waymo's Self-Driving Cars |
| 280 | PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT |
| 280 | Willful Infringement Requires a Finding of Direct Infringement |
| 281 | Knowledge requirement for Willful Patent Infringement |
| 281 | Under Rule 14(b) |
| 281 | Correspondence and Service of Complaints |
| 282 | Plaintiff's Demand for a Jury Trial to Decide Willfulness |
| 283 | CONCLUSION |
| 285 | PRAYER FOR RELIEF |
| 287 | DEMAND FOR JURY TRIAL |

## CAUSES OF ACTIONS

Plaintiff's amended complaint is made to clarify for the Court, and especially for the Defense the lawful contentions Plaintiff has put forth in this complaint, and to debunk the misdirected and misguided defenses the Defense has filed with this Court in its motion to dismiss. Following are Plaintiff's causes of action; none, of which the Defense have addressed or denied:

- Infringement of a Patented Process under 35 U.S.C. § 154(a)(1);
- Infringement of a Patented Process under 35 U.S.C. § 271(g);
- Shifting of Burden under 35 U.S.C. § 295;
- Collecting a Reasonable Royalty under & 35 U.S.C. § 284; and,
- Willful Patent Infringement.

**35 U.S.C. § 154(a)(1):**
"Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof."

On March 14, 2012, the Federal Circuit issued in *Zoltek Corp. v. United States*, No. 2009-5135. Acting *en banc*: "With the full court having vacated its *Zoltek III* decision, the panel addressed the narrower question of whether Lockheed's actions in this case created liability under § 1498(a). The panel voted yes. The panel reasoned that, '[i]f a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under 35 U.S.C. § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.'"

8

**35 U.S.C. § 271(g):**

"Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent…"

Thus, under section 271(g), a party can be liable for infringement for importing into the United States, or selling or using in the United States, a product made by a patented process, *regardless of where the process is performed or where the product was ultimately made*. Congress added section 271(g) to increase protection of U.S. technology industries, specifically the pharmaceutical and biotechnology industries. *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**35 U.S.C. § 295**

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds— (1) that a substantial likelihood exists that the product was made by the patented process; and, (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine; the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made."

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the

burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

**35 U.S.C. § 284**

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred; or came to the conclusion: "infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability". The twelve federal judges were also *CORRECT* in their determination: "the accused devices [] required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery has revealed the defendant Samsung is responsible for the *"modification"* of a common cell phone to include a CBRNE-H detection capability, and is therefore liable for the misconduct alleged." See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

**Willful Patent Infringement**

For patents, the Supreme Court set the current standard in its 2016 decision in *Halo Electronics, Inc. v. Pulse Electronics, Inc*. The Court described enhanced damages as a "punitive" or "vindictive" sanction reserved for "egregious cases of culpable behavior," using words like "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."

*Note*: None of the causes of actions listed above have ever been litigated before, therefore a "motion to dismiss" under the doctrines of preclusion is not relevant.

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff alleges the following:

- Infringement of a Patented Process under 35 U.S.C. § 154(a)(1);

- Infringement of a Patented Process under 35 U.S.C. § 271(g);

- Shifting of Burden under 35 U.S.C. § 295;

- Collecting a Reasonable Royalty under & 35 U.S.C. § 284; and,

- Willful Patent Infringement.

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement upon shipment or importation of the alleged Google "*modified*" cell phones' described as the "patented process" of Plaintiff's U.S. Patents: [7,385,497]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; [10,163,287]; [10,984,619]; and [11,645,898]

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff currently has three cases pending, alleging the following Defendants used Plaintiff's patented process to manufacture or produce a "*modified*" cell phone:

- *Golden v. Samsung Electronics America, Inc*. WDT Case No. 25-0596-DAE

- *Golden v. Apple, Inc*. WDT Case No. 26-0224-AM-DNM

- *Golden v. Google*, LLC NDC Case No. 26-0831-LJC

On information and belief, Defendant is a corporation organized and existing under the laws of Delaware. Defendant has a regular and established place of business at 12100 Samsung Blvd., Austin, TX 78754. Defendant can be served through its registered agent, The Corporation Trust Company, Corporation Trust

11

Center, 1209 Orange Street, Wilmington, Delaware 19808, at its place of business, or anywhere else it may be found.

On information and belief, Defendant uses Plaintiff's patented process to manufacture or produce a "*modified*" cell phone abroad. Plaintiff alleges the Defendant is infringing Plaintiff patented process for a communicating, monitoring, detecting, and controlling (CMDC) device (i.e., plaintiff's modified cell phone—claim 23 of plaintiff's '439 patent), under 35 U.S.C. §§ 154(a)(1) and 271(g); when the "*modified*" cell phone(s) is shipped or imported into the United States.

Plaintiff alleges the Defendant distributes, markets, offers to sell and/or sells the imported "*modified*" cell phones and services in the United States, including in the Western District of Texas, and otherwise profits from the infringing activities to this District in connection with its products and services.

Plaintiff alleges the following Samsung "*modified*" cell phones were shipped or imported into the United States: [Model and Release Date]

| | |
|---|---|
| Samsung Galaxy A14 5G | January, 2023 |
| Samsung Galaxy A23 5G UW | March, 2023 |
| Samsung Galaxy A34 5G | March, 2023 |
| Samsung Galaxy A54 5G | March, 2023 |
| Samsung Galaxy A24 4G | April, 2023 |
| Samsung Galaxy A05 | October, 2023 |
| Samsung Galaxy A05s | October, 2023 |
| Samsung Galaxy A15 5G | December, 2023 |
| Samsung Galaxy A25 5G | December, 2023 |
| Samsung Galaxy A35 5G | March, 2024 |
| Samsung Galaxy A55 5G | March, 2024 |
| Samsung Galaxy A06 | August, 2024 |

| | |
|---|---|
| Samsung Galaxy A16 5G | October, 2024 |
| Samsung Galaxy A16 4G | November, 2024 |
| Samsung Galaxy A26 5G | March, 2025 |
| Samsung Galaxy A36 5G | March, 2025 |
| Samsung Galaxy A56 5G | March, 2025 |
| Samsung Galaxy A17 5G | August, 2025 |
| Samsung Galaxy A07 4G | August, 2025 |
| Samsung Galaxy A17 4G | September, 2025 |
| Samsung Galaxy A07 5G | January, 2026 |
| Samsung Galaxy A37 5G | April, 2026 |
| Samsung Galaxy A57 5G | April, 2026 |
| Samsung Galaxy F04 | January, 2023 |
| Samsung Galaxy F14 5G | March, 2023 |
| Samsung Galaxy F54 5G | June, 2023 |
| Samsung Galaxy F34 5G | August, 2023 |
| Samsung Galaxy F15 5G | March, 2024 |
| Samsung Galaxy F55 5G | May, 2024 |
| Samsung Galaxy F05 | September, 2024 |
| Samsung Galaxy Z Fold5 5G | August, 2023 |
| Samsung Galaxy Z Fold6 5G | July, 2024 |
| Samsung Galaxy Z Fold7 | July, 2025 |
| Samsung Galaxy Z Tri-Fold | December, 2025 |
| Samsung Galaxy M14 5G | March, 2023 |
| Samsung Galaxy M54 5G | March, 2023 |
| Samsung Galaxy M34 5G | July, 2023 |

| | |
|---|---|
| Samsung Galaxy M14 4G | March, 2024 |
| Samsung Galaxy M15 5G | March, 2024 |
| Samsung Galaxy M55 5G | March, 2024 |
| Samsung Galaxy M35 5G | May, 2024 |
| Samsung Galaxy M05 | September, 2024 |
| Samsung Galaxy S23 5G | February, 2023 |
| Samsung Galaxy S23 Plus 5G | February, 2023 |
| Samsung Galaxy S23 Ultra 5G | February, 2023 |
| Samsung Galaxy S23 FE 5G | October, 2023 |
| Samsung Galaxy S24 5G | January, 2024 |
| Samsung Galaxy S24 Plus 5G | January, 2024 |
| Samsung Galaxy S24 Ultra 5G | January, 2024 |
| Samsung Galaxy S24 FE 5G | October, 2024 |
| Samsung Galaxy S25 | January, 2025 |
| Samsung Galaxy S25 Plus | January, 2025 |
| Samsung Galaxy S25 Ultra | January, 2025 |
| Samsung Galaxy S25 Edge | May, 2025 |
| Samsung Galaxy S25 FE | September, 2025 |
| Samsung Galaxy S26 | March, 2026 |
| Samsung Galaxy S26 Plus | March, 2026 |
| Samsung Galaxy S26 Ultra | March, 2026 |
| Samsung Galaxy Z Flip5 5G | August, 2023 |
| Samsung Galaxy Z Flip6 5G | July, 2024 |
| Samsung Galaxy Z Flip7 | July, 2025 |
| Samsung Galaxy Z Flip7 FE | July, 2025 |

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. Thereby, allegedly infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device; but only when Samsung modifies the Samsung "*modified*" cell phone's Android Operating System's connectivity protocols i.e., software apps, Bluetooth, NFC, cellular, internet, GPS, WiFi, etc. of the Samsung device, in order for the Samsung "*modified*" cell phone to function as a sensing device for CBRNE-H detection.

Plaintiff has stated a plausible claim for infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented processes. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under the causes of actions of: 35 U.S.C. § 154(a)(1); 35 U.S.C. § 271(g); 35 U.S.C. § 295; 35 U.S.C. § 284; and, Willful patent infringement.

## JURISDICTION AND VENUE

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides,

15

or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

## PATENT ELIGIBILITY AND MUTUAL EXCLUSIVITY

Plaintiff's patents and patent claims asserted in this complaint that describes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device as a "mobile, consumer, or cellular device that is integrated with, or interconnected to, a CBRNE-H detection capability, have undergone rigorous and extensive examinations and re-examinations:

In 2006, Plaintiff's patent application's subject matter and patent claims were examined under the "secrecy" provisions ordered by the United States Department of Defense (DOD).

In 2010 – 2013, Plaintiff's patent application's subject matter and patent claims were re-examined under the "reissue" provisions of the United States Patent and Trademark Office (USPTO).

In 2014 – 2015, Plaintiff's patent application's subject matter and patent claims were challenged by the United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ), in an *Inter Partes Review* (IPR) at the United States Patent Trials and Appeals Board (PTAB), of the United States Patent and Trademark Office (USPTO).

In 2013 – 2021, Plaintiff's patent applications' subject matter, patents' claims, and patents' validity were challenged by the United States Department of Justice (DOJ) in the case of *Golden v. US* CFC Case No. 13-307C.

In 2013 – 2021, Samsung, who performed work for the Government under an implied "authorization or consent", to provide a modified cell phone capable of CBRNE-H detection, was given eight (8) years to appear in the case to protect its interest by failed to do so. Samsung is "collateral estoppel" from challenging Plaintiff's patents.

In 2022 – 2025, Samsung failed to adhere to the PTAB's claim term construction of "*built-in, embedded*"; which the PTAB construed as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Samsung, instead, replaced the PTAB's claim term construction of "*built-in, embedded*" with "modification". Samsung failed again to inform the Court that Samsung is allegedly the modifier of the Samsung "*modified*" cell phone.

In 2026, although Samsung is "collateral estoppel" from challenging Plaintiff's patents; and especially "collateral estoppel" from challenging Plaintiff's patents on the lower standard of evidence (i.e., preponderance of evidence standard); Samsung filed a motion to dismiss in this case that was nothing more than another challenge to the validity of Plaintiff's patents under 35 U.S.C. § 101.

"[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. Anyone challenging the patents validity, must do so on the heightened 'clear and convincing evidence' standard". § 282(a)

Time after time, over the years, and over several of Plaintiff's patents; when the phase "in, on, upon, or adjacent the monitoring equipment", was used to describe the detection capability is placed either inside or outside the monitoring device, the USPTO have always allowed the phase.

Claims are one sentence descriptions, included in a patent, that describe what aspects of the invention are protected by law. There are independent claims and dependent claims. Dependent claims add details to independent claims and are consequently "narrower" than their parent independent claim. The product manufactured by or for the government need only infringe one claim, independent or dependent, to "infringe the entire patent." See *Johns Hopkins University v. CellPro, Inc.*, 152 F3d 1342 (Fed Cir 1998).

In a precedential decision, the U.S. Court of Appeals for the Federal Circuit in *Vascular Solutions*, along with related Teleflex companies (collectively with Vascular Solutions, "Teleflex") *v. Medtronic*, Inc. defined the concept of "*mutual exclusivity*" in patent claims:

> The Federal Circuit held that the district court erred when it determined the asserted claims were "*mutually exclusive*" and indefinite. The Federal Circuit rejected the notion that claims in a patent cannot vary in how they describe the disclosed subject matter or that independent claims must be totally consistent with other independent claims.

The Federal Circuit stated: "The district court's conclusion, in effect, means that (1) claims in a patent cannot vary in the way they claim the disclosed subject matter, and (2) independent claims must be totally consistent with other independent claims. Claiming is not restricted in this way." It emphasized that the art of patent claiming often involves drafting claims in various ways to encompass different aspects of the disclosed subject matter, as long as each claim informs those skilled in the art about the scope of the invention with reasonable certainty.

The Federal Circuit instructed the district court to "conduct claim construction on a claim-by-claim basis with the understanding that, at the claim construction stage, the claims are not necessarily '*mutually exclusive*' since each independent claim is a different ordered combination of limitations."

Therefore, when a case is dismissed for preclusion or *Kessler* simply because the same patents was asserted in a previous case, and the individual claims were never examined for infringement, the dismissal is improper "since each independent claim is a different ordered combination of limitations".

In Plaintiff's prior litigation the Courts created a loophole for invalidating Plaintiff's patents without meeting the higher "clear and convincing" evidence standard; without submitting invalidity contentions; without a Markman hearing or claim construction. No law supports this type of loophole creation.

## PLAINTIFF'S DEMAND FOR A JURY TRIAL

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged throughout this complaint "enough facts to state a claim to relief that is plausible on its face" *Twombly*, 550 U.S. at 570, for Samsung's alleged infringement of Plaintiff's patented process; whereby, infringement under §§ 154(a)(1) & 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a).

Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully" *Iqbal*, 556 U.S. at 678. The Federal Circuit solidified the reach of protection under §§ 154(a)(1) & 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under

19

§ 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged." The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive determination on its own. [See 35 U.S.C. § 295].

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment [U.S. CONS'T. 7th Amend]. More than 95% of patent cases are tried by jury. The parties may waive the right to a jury trial and have the court try the case, but such waivers are rare.

**Damages**

Plaintiff is demanding damages for Samsung's alleged infringement under 35 U.S.C. §§ 154(a)(1) & 271(g); direct infringement of Plaintiff's patented "transceiver" under the doctrine of equivalents, and willful infringement, for the unauthorized act of making, using, selling, or importing inventions (i.e., Samsung's central processing unit, operating system, smartphone, camera, and smartwatch) for Plaintiff's patents that  is issued with the presumption of validity (Patent Act § 282).

Damages are a question of fact; thus, a jury will decide damages. The Western District of Texas court judge will decide damages if this case is not before a jury. Plaintiff is demanding a jury trial to determine Samsung's alleged patent infringement damages; and, to recover damages adequate to compensate for the alleged patent infringement. A jury can determine damages, but the presiding judge in this Western District of Texas (WDT) court case *Golden v. Samsung* will determine damages if the case is not heard by a jury.

Plaintiff's alleged damages must be sufficient to compensate for the alleged patent infringement and at least amount to a reasonable royalty for Samsung's alleged use of Plaintiff's patented processes. Plaintiff allege more consumers start buying Samsung's alleged infringing products (i.e., Samsung's central processing unit, operating system, smartphone, camera, or smartwatch) because Plaintiff's patented process has improved them. Therefore, Plaintiff is entitled to those profits that should have belonged to Plaintiff.

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Samsung's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing item (i.e., Samsung's central processing unit, operating system, smartphone, camera, or smartwatch) and then multiply that value by the number of items that infringed.

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016). Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Plaintiff believes Samsung's conduct to be "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

21

**Twelve Federal Judges Validates Plaintiff's Infringement Theory**

Upon information and belief, there's no need for this Court to continue litigating claims made against Samsung for the alleged infringement of Plaintiff's patents because twelve Federal Judges (three in the district courts; nine at the federal circuit) have determined infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Twelve Federal Judges repeatedly confirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| Judges | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court **again** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

24

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or

interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

**Twelve Federal Judges Identifies Where on the Inside of the Samsung Devices the Detection Capability is Located**

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises "***through nine "standard sensors" which "can be used as 'biosensors,'***" Appx126.":

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'***" Appx126."

26

Samsung admits in the Northern District of California Court in *Golden v. Samsung* Case No. 23-0048; and Google admits in the Northern District of California Court in *Golden v Google* Case No. 22-5246 that Mr. Golden's complaints alleged "***nine standard sensors which can be used as biosensors***".

Samsung also admits the "***nine standard sensors which can be used as biosensors***", is found within each of Samsung's accused instrumentalities. Samsung further admit, it manufactures Plaintiff's patented process abroad; offer for sell and sell, the purportedly imported Samsung "*modified*" cell phones (i.e., smartphones) that include the "***nine standard sensors which can be used as biosensors***" and performs the accused detector/sensor functionality.

In Plaintiff's pleadings, the WDT court should realize the Northern District of California court, and the U.S. Court of Appeals for the Federal Circuit; both determined the Samsung *"modified"* cell phones (i.e., smartphones) include, upon

---

**Samsung's Smartphone Biosensors Submitted to the Courts**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

---

import, "***nine standard sensors which can be used as biosensors***".

**Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Samsung Devices**

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Samsung's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Samsung camera for CBRNE-H detection; and, a Samsung *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Samsung watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015.

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Following are Plaintiff's patent claims that support his ownership rights to a mobile, consumer, or cellular device (i.e., CMDC device) that is integrated with, or interconnected to [IPR claim construction for the term "built-in, embedded"], a CBRNE-H detection capability.

**U.S. Patent No: 9,096,189**

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device …;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device …;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

> whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone at least one of a chemical sensor, a biological sensor …

Plaintiff alleges Samsung *"modified"* the cell phone to include an internal camera biosensor and an external—to the Samsung smartphone—Samsung Watch for chem/bio detection.

> Claim 23 of Plaintiff's '439 patent claims both the internal ("at least one of a chemical sensor, a biological sensor … being disposed within") and an external ("the cell phone detection device … capable of being [] adjacent the cell phone"); detection capability.  Samsung's *"modified"* cell phones are designed to perform these detection functions.

## SAMSUNG *"MODIFIED"* THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY

Samsung must admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Samsung must also admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling (CMDC) device is infringed when a mobile, consumer, or cellular device is "modified by Samsung" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

Samsung's argument is: it is not Samsung itself who is the party responsible for *"modifying"* the cell phone to function as a CBRNE-H detection device. Samsung is accused of "making" the alleged infringing *"modified"* cell phone products.

The United States impliedly authorized and consented to Samsung *"modifying"* the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Samsung was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

"… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "***The proposed concept should develop a miniaturized sensor, device and system***…" [DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*] "Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks – ScienceDirect"

"[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) … "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)."



**The Cell-All Demonstration Participants and Program Outline**

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Introduction to "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department: Host location for the demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative: *Phase II*

32

of the *Cell-All* initiative advances the mobile devices (i.e., cell phones, smartphones, or CMDC devices) from devices that include CBRNE sensors "embedded" within the devices (*Phase I*), to mobile devices that include CBRNE detectors and/or sensors remote the mobile devices (i.e., cell phones, smartphones, or CMDC devices). (*Phase II*)

- Dr. Jing Lee, Principal Investigator, NASA Ames Research Center: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a Chem/Bio medical health detection capability". [NASA acquired a license from the medical industry]

- Debra Deininger, Synkera Technologies, Inc.: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability". Previous work, through a Small Business Innovation Research (SBIR) project, for the miniaturization of sensors.

- Doug Hoffman, Program Manager, Qualcomm: Qualcomm was awarded the *Cell-All* contract, and designated the prime contractor's position responsible for delivering the improved upon cell phones; that include improved upon CPUs; wireless modems; operating systems; and miniaturized sensors for CBRNE detection.

- Chris Needs, Product & Control Manager, NC4: Middleman service for the for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative responsible for monitoring, identifying location, notifying, alerting, and transmitting data.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Setting the scenario for a live demonstration of "mobile devices (i.e., cell phones,

smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department and Chris Needs, Product & Control Manager, NC4; narrates the live demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T interviews Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; post the live demonstration.

- Panel assembled for Q&A: Panel participants are: Chief Corey Rose [Location Host]; Los Angeles Fire Department; Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; Dr. Jing Lee, Principal Investigator, NASA Ames Research Center; Debra Deininger, Synkera Technologies, Inc.; Doug Hoffman, Program Manager, Qualcomm; and, Chris Needs, Product & Control Manager, NC4.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Closing remarks and thanks to everyone involved in making the live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability" a success.

The government's authorization of or consent to a contractor's infringing activity may be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060

34

(Fed. Cir. 1986); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976).

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

The DHS S&T pursued what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. The written agreements, are designed to bring together a private company and a government agency for a specific project, often to accelerate the commercialization of technology developed for government purposes.

Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, three teams: Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology perfected their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station, and technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, a three-year-old San Diego-based
> startup, is developing advanced optical technology that Rhevision
> founder Yu-Hwa Lo invented in his optics laboratory at UC San

35

Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of UC San Diego Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" developed by Sailor's group, which are composed of nanoparticles that change color in the presence of certain molecules. <u>Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.</u> Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds."

"Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones—that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010).

**SAMSUNG IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF'S PATENTED PROCESS [35 U.S.C. §§ 154(a)(1) & 271(g)]**

Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own central processing units (CPUs), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own central processing units (CPUs)] https://news.ycombinator.com/item?id=28423983

In *Syngenta Crop Protection LLC v. Willowood LLC, et al.*, the US Court of Appeals for the Federal Circuit held in a case of first impression that infringement liability under 35 U.S.C. § 271(g) does not require a single entity to perform all steps of the patented process. *See* No. 2018-1614 (Fed. Cir. Dec. 18, 2019) (*"Syngenta"*). The Federal Circuit's decision strengthens process claims' usefulness against accused infringers (i.e. Samsung) who manufacture a patented product [such as the Samsung smartphone] abroad and import it into the US. Sections 154(a)(1) & 271(g) identifies acts of infringement use of a patented process:

*35 U.S.C. § 154(a)(1):*
> "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof."

On March 14, 2012, the Federal Circuit issued in *Zoltek Corp. v. United States*, No. 2009-5135. Acting *en banc*: "With the full court having vacated its *Zoltek*

37

*III* decision, the panel addressed the narrower question of whether Lockheed's actions in this case created liability under § 1498(a). The panel voted yes. The panel reasoned that, '[i]f a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under [35 U.S.C.] § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.'"

*35 U.S.C. § 271(g):*
> "Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent…"

Thus, under section 271(g), a party can be liable for infringement for importing into the United States, or selling or using in the United States, a product made by a patented process, ***regardless of where the process is performed or where the product was ultimately made***. Congress added section 271(g) to increase protection of U.S. technology industries, specifically the pharmaceutical and biotechnology industries. *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

*35 U.S.C. § 295*
> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds— (1) that a substantial likelihood exists that the product was made by the patented process; and, (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine; the product shall be presumed to have been so made, and the burden of establishing that the

product was not made by the process shall be on the party asserting that it was not so made."

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

## INFRINGEMENT DIFFERENCES BETWEEN SECTIONS 271(a) & 271(g)

In addition, §§ 271(b) and 271(c) define indirect infringement, creating vicarious liability for those who induce or contribute to acts of direct infringement. Although § 271(a) provide strong protection for patent owners against purely domestic infringement, the patent laws did not protect against infringing acts occurring outside of the US. (See § 271(a) ("within the United States").

This gap in protection was highlighted in the US Supreme Court's *Deepsouth Packing Co. v. Laitram Corp.* decision, which held that exporting components of a patented product for assembly abroad did not constitute direct infringement, reasoning that a patented system is made only after final assembly. *See* 406 U.S. 518, 529- 32 (1972). Since final assembly was performed abroad, there could be no infringement under § 271(a).

As world trade and globalization continued to expand in the 1980s and 1990s, it became clear that patent owners in the US were more vulnerable than ever to infringers abroad. In response, US Congress broadened the scope of infringing activities through legislative amendments to the Patent Act, adding §§ 271(f) in 1984 and 271(g) in 1998. *See Kastenmier*, "Section-By-Section Analysis of H.R. 6286,

Patent Law Amendments Act of 1984," Congressional Record of October 1, 1984 at H10525 to H10529. Section 271(g) provides that:

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer."

Thus, anyone who imports into the US, or sells or uses in the US, a product made by a patented process – regardless of where the process was performed or where the product was assembled – is liable for infringement.

The district court rejected Syngenta's § 271(g) claims, finding that § 271(g) requires that all steps of the patented process be performed by a single entity. This requirement limits direct infringement liability only to circumstances "where all steps of a claimed method are performed by or attributable to a single entity." The district court believed that the single-entity requirement present for method claims under §§ 271(a) and (b) under cases such as *Limelight* and *BMC* carried over to § 271(g). *See Akamai Techs. v., Limelight Networks, Inc.*, 572 U.S. 915, 921-22 (2014) ("Limelight"); *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed. Cir. 2007)

The Federal Circuit reversed. First, the court interpreted § 271(g) as written, explaining that "nothing in this statutory language suggests that liability arises from practicing the patented process abroad. Rather, the focus is only on acts with respect to products resulting from the patented process." *Syngenta* at *23. Accordingly, whether that process is practiced by a single entity is immaterial to the analysis.

Second, the court held that comparison to the language of other parts of § 271 supported its conclusion. The court rejected *Willowood's* extension argument based on § 271(a) and the *Limelight* decision because, as noted above, infringement under

§ 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a) to method claims. The court also applied the same logic to distinguish §271(f) from § 271(g), stating that if Congress had wanted to require a single-entity requirement under 271(g) they "knew how to do so" given the single-entity requirement under 271(a) and 271(f).

Third, the Federal Circuit noted that the legislative history demonstrates that Congress did not enact § 271(g) to provide for identical rights to those enjoyed by patentees under § 271(a) with respect to process patents. Rather, Congress made clear that § 271(g) "is prompted by the use of patented processes in other countries followed by the importation of the resulting products into this country" and simply "extend[s] protection to the products" made by such a process.

Therefore, in *Syngenta*, the Federal Circuit further solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. <u>As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process</u>.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of <u>Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product</u> if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive

determination on its own. See 35 U.S.C. § 295. The court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process." [*Syngenta*]

In *Bayer AG v. Housey Pharmaceuticals, Inc.*, the defining case for § 271(g) jurisprudence, the Federal Circuit held that to have a claim under § 271(g), an imported product must be physical and tangible *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). The Federal Circuit in *Bayer* required that an imported product made by a process patented in the U.S. must be physical and tangible to be eligible for an infringement claim under § 271(g). The Federal Circuit added another requirement in *NTP* that the process patent must describe a production process, not a distribution or transmission process.

The subsequent decisions by the district courts of California in *CNET* and *Ormco* remedied the Bayer problem by holding that digital information stored in computer readable media is a physical product covered under § 271(g), thereby circumventing Bayer's physical and tangible requirement and increasing the extraterritorial protection of process claim.

## SAMSUNG ANDROID ECOSYSTEM

"One of Android's greatest strengths, and source of occasional frustrations, is its wide variety of software variations. Samsung's One UI and even Google's Pixel UI offer their own spin on the core Android experience, introducing their own unique features and ideas to improve on the basic software below. This is all made possible thanks to a common base operating system (OS) that provides the core functionality. That's right, all of the Android OS variants that you know and love are based on AOSP, or the Android Open-Source Project. Put simply, AOSP is an open-source

42

operating system development project maintained by Google. Since it's open-source, anyone is free to review and contribute code and fixes to the project repository. However, Google oversees its general direction and has the final say in the bulk of its development. The AOSP receives regular bug fixes, which get packaged and delivered to Android smartphones in the form of monthly security patches. Google also unveils major new features each year at its I/O developer conference, with yearly releases like Android 16. https://www.androidauthority.com/aosp-explained-1093505/

All Samsung Galaxy phones (i.e., Samsung "*modified*" cell phones) run on Android, but not all Android phones are Samsung Galaxy smartphones (i.e., Samsung "*modified*" cell phones). Samsung makes phones under the "Samsung Galaxy" branding. These "*modified*" cell phones run One UI, a layer of extensive modification on top of stock Android. Samsung has added a ton of features and customizations to help Samsung Galaxy smartphones (i.e., Samsung "*modified*" cell phones) stand out from the crowd of Android smartphones in the market.

Samsung is a multinational company based in South Korea, and it runs multiple businesses under its umbrella. One of them is Samsung Electronics, a sub-company that manufactures smartphones under the "Samsung Galaxy" branding. So, when you refer to a phone as a "Samsung," you actually mean a Samsung Galaxy smartphone (i.e., Samsung "*modified*" cell phone), like the Galaxy S24.

Android is an operating system (OS) that powers smartphones. It is the broad layer of software on a phone. Google developed Android, but it is an open-source OS. Other companies can take this open-source OS, make changes to it, and then use that changed OS as the layer of software on their own phones. This is what Samsung does.

All Samsung Galaxy phones (i.e., Samsung "*modified*" cell phones) are Android ("*modified*") phones, but all Android phones are not Samsung Galaxy

43

phones. All smartphones sold under the "Samsung Galaxy" branding run on Android. Samsung has made plenty of modifications to Android, and these modifications are collectively called "One UI." One UI is the name of Samsung's modified software skin that lives on top of Android. So, when using a Samsung "*modified*" cell phone, you use One UI, which is still Android under the hood.

One UI, especially in its One UI 6.1 avatar, looks very different from other Android skins from other companies. Google's Pixel smartphones have their own Pixel UI skin, OnePlus phones have Oxygen OS skin, and so on. All of these skins look different from each other and also function differently. But they are all Android skins, where Android forms the base layer, and the skin forms the top layer of modifications by the phone maker.

On Samsung "*modified*" cell phones, you can use Android apps without any issues. Android is open-source, meaning its source code is available for all of us to read, use, and distribute. You can run this source code on a compatible phone. This open-source Android, called AOSP (Android Open-Source Project), represents the bare shell of the Android experience.

Source Code: Instructions written in a programming language that make up a software program. It is the actual code that developers write and maintain; allowing developers to modify, and enhance the application; requires access to modify or understand the software's inner workings; sed for developing, maintaining, and customizing software applications. Everything that Samsung undertakes, is considered a commercial endeavor, so no code released under a license that restricts it to non-commercial uses. Once open sourced with an accompanying LICENSE, the project must use the LICENSE in the package and any external contributions must sign a License Agreement.

Samsung's One UI includes modifications that Samsung made on top of stock Android. In fact, One UI makes some of the most extensive changes (modifications) to stock Android, so you may find it challenging to recognize the base Android version on any version of One UI.

The Samsung "*modified*" cell phone operating system manages hardware such as the Samsung "*modified*" cell phone central processing unit (CPU). It provides connections such as: cellular, Wi-Fi, Bluetooth, NFC and communication with other devices.

Wi-Fi: enables connection to local networks and internet. Cellular: supports mobile data through 3G, 4G, and 5G networks. Bluetooth: facilitates short-range communication with other devices. NFC: allows for contactless transactions and data exchange.

Upon information, the Samsung "*modified*" cell phone operating system, performs substantially the same function; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful "transceiver".

## SAMSUNG ELECTRO-MECHANICS IS HEADQUARTERED IN SOUTH KOREA

Autonomous cars will not only be an alternative mode of transportation, but it will transform our lives in a wide range of areas. Self-driving cars can provide a convenient means of transportation for people who aren't able to drive or cannot drive well. Passengers can reclaim the time they had spent driving on the road, and we can see the proliferation of an economy based on sharing rather than on possessing. Autonomous cars will bring about a fascinating life change. Samsung Electro-Mechanics will be at the center of it all.

Samsung Electro-Mechanics' high-quality automotive MLCC supports the stable operations of the electronics control system within the vehicle. Samsung Electro-Mechanics is demonstrating its global leadership in automotive passive components by supplying high-performance and high-reliability products.

**Samsung Electro-Mechanics' MLCC Enabling Automotive**



| Driving Assistance & Safety | |
|---|---|
|  | **MLCC**: Samsung Electro-Mechanics' Camera Module for individuals, leading a safe shift in autonomous driving. Samsung Electro-Mechanics offers a wide range of automotive MLCC for a variety of applications, including safety and infotainment. These MLCC has exceptional electrical characteristics and ensures high credibility. *xEV *ADAS & Safety *Body & Chassis *Infotainment & Comfort |

| | |
|---|---|
|  | *Viewing Camera*: Samsung Electro-Mechanics' viewing cameras—available in VGA, HD and full HD versions—are uniquely suited for all automotive applications. Tested for automotive specifications, the cameras demonstrate excellent optical performance customized for our customers' preferred specifications. *Surround View *Rear View *Park Assist *Mirror Replacement |
|  | *Sensing Camera*: Samsung Electro-Mechanics' sensing camera is optimized for accurate machine vision applications providing longer and wider sensing capability while allowing for superior heat dissipation within the camera and ECU housing. Samsung Electro-Mechanics can work with several image sensor companies and offer flexible form factor options to suit OEM/Tier 1 requirements. Automatic Emergency Braking. *Lane Departure Warning *Forward Collision Warning *Adaptive Cruise Control Traffic Sign Recognition *Blind Spot Detection |
|  | *Interior Camera*: Samsung Electro-Mechanics interior cameras, while offering superior optical performance are also uniquely suited for automotive applications due to their miniaturized form factor, making them almost unnoticeable to car passengers. Our in-house optical design capabilities adapt cameras to wide-range of applications to accommodate different driver seating positions and body profiles. *Driver Monitoring *Passenger Identification *Video Conferencing |

Samsung Electro-Mechanics will mass supply silicon capacitors, its new business focus, to Samsung Electronics' new foldable smartphone Galaxy Z Flip7. While the silicon capacitor market has been dominated by Japanese component giants such as Murata, Samsung Electro-Mechanics is expected to continue expanding its presence, using this first incorporation into Galaxy as a stepping stone.

According to industry sources, Samsung Electro-Mechanics' silicon capacitors will be incorporated into the new foldable smartphone that Samsung Electronics will unveil on July 9.

Samsung Electronics' Mobile Experience (MX) division plans to produce approximately 2.2 million units of Flip7 and the budget model Z Flip7 FE from this month to September. It is reported that Samsung Electro-Mechanics will supply a significant quantity of silicon capacitors along with Japanese companies. A Samsung Electro-Mechanics official stated, "We cannot confirm customer information."

Silicon capacitors are capacitors made using silicon wafers. Capacitors act as a "dam" managing the flow of electricity in semiconductor chips or substrates. They are installed alongside multi-layer ceramic capacitors (MLCC), which have similar functions. While smaller and thinner in form than MLCCs, they control electricity much faster, making them suitable for high-performance semiconductors or substrates.

Samsung Electro-Mechanics is a multinational electronic component company headquartered in Suwon, Gyeonggi Province, South Korea. It is a subsidiary of the Samsung Group. The company produces chip parts such as Multi-Layer Ceramic Capacitors (MLCC), Inductors, Resistors, IC Substrate, semiconductor substrates, camera modules, network modules and printed circuit boards. The company is headquartered in Suwon, South Korea, with additional manufacturing facilities in Sejong and Busan and overseas in Calamba, Laguna, Philippines and Thailand.

48

Samsung Electronics, the tech giant behind the Galaxy series, operates on a global scale. Its manufacturing facilities span across several countries, each contributing unique expertise and resources. While some components are produced in-house at Samsung's factories, others are sourced from third-party suppliers around the world. Samsung operates numerous manufacturing plants worldwide. Here's a closer look at where Samsung Galaxy smartphones are predominantly made.

> South Korea: Samsung's home country remains a pivotal site for the production of critical components such as semiconductor chips and displays. The company's factory in Giheung produces many of the chips used in Galaxy devices.
> Vietnam: In recent years, Vietnam has emerged as a key player in Samsung's manufacturing strategy, housing extensive assembly plants for Galaxy smartphones. This location benefits from lower labor costs and a growing tech-savvy workforce.
> China: Historically, China has played a significant role in Samsung's manufacturing processes. Many components, including camera modules and various electronic parts, are still sourced from Chinese suppliers.

"When you ask where is the Samsung Galaxy made, you're not just inquiring about the physical assembly of the device. You're diving into a complex global system that combines innovation, sustainability, and adaptability. From South Korea's cutting-edge semiconductor factories to the bustling assembly lines in Vietnam, Samsung Galaxy smartphones are truly a product of international collaboration. As the company navigates challenges and embraces the future, consumers can expect even more exciting developments in the Galaxy series. The rich tapestry of global manufacturing is a testament to Samsung's commitment to quality and excellence, ensuring the Galaxy brand remains synonymous with technological innovation." https://nerdytechblog.com/where-is-samsung-galaxy-made/

## COUNT I:

### Samsung's "*modified*" Cell Phones

1. Count I incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for the causes of actions under sections §§ 154(a)(1) & 271(g).

2. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

3. Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy phone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

4. Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, infringement occurs when the Samsung phone is shipped or imported into the United States.

5. Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

6. Plaintiff alleges Samsung's "*modified*" cell phone was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing

work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

7.      Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed – Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 – *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 – *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 – *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 – *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 – *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 – *06/25/2025* |

8.      Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone while performing work under a government contract was to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled

abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones are shipped or imported into the United States.

9.     Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones) into the United States that include "*nine standard sensors that are used as biosensors*".

10.     Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include "*nine standard sensors which can be used as biosensors*" satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

11.     Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational    electronics contract    manufacturer established    in    1974    with

headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/.  "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones." https://news.ycombinator.com/item?id=28423983

12.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g); Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones) into the United States.

13.     Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the device is shipped or imported into the United States.

14.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Samsung's *"modified"* cell phone] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

15.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that

53

the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**16.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**17.**    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Samsung *"modified"* cell phones (i.e., Galaxy smartphones): Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17

5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**18.** Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented process for a communication, monitoring, detecting, and controlling (CMDC) device, under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones are shipped or imported into the United States.

**19.** Plaintiff also alleges that when the Samsung *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented process. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and

Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

20.    Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g).

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

21.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

22.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the

patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**23.**    *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone*

- A cell phone comprising: [claim 23 of the '439 patent]

- the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; [claim 23 of the '439 patent]

- the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; [claim 23 of the '439 patent]

- wherein each cell phone [] includes a recharging cradle or seat, a front side, a top, a bottom, and a pair of opposed sides [claim 10 of the '752 patent]

- wherein the cell phone [] monitor includes standard keypad functions and more specialized system use (ring tone, email, photos, texting) functions as well as viewing screens [claim 12 of the '752 patent]

- monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween [claim 15 of the '752 patent]

- a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband;

camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone [claim 36 of the '891 patent]

- a communication device that is a cell phone, a smart phone, or a PDA that causes the signal to be sent from the cell phone tower to the vehicle [claim 58 of the '891 patent]

- wherein the communication device is a cell phone or a laptop computer [claim 60 of the '891 patent]

- wherein the communication device monitor includes standard keypad functions and more specialized system use functions that are ring tone, email, photos, and texting; and viewing screens. [claim 13 of the '990 patent]

- wherein the communication device has monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. [claim 17 of the '990 patent]

- at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, a physical interface, or a computer terminal at a monitoring site [claim 33 of the '990 patent]

- wherein each cell phone [] includes an internet connection, a GPS connection, a radio frequency (RF) connection, a recharging cradle or seat, a front side, a top, a bottom, a pair of opposed sides and a central processing unit (cpu). [claim 104 of the '990 patent]

- wherein the cell phone; the smart phone; [] includes standard keypad functions and more specialized system use ring tone, email, photos, and texting functions as well as viewing screens. [claim 105 of the '990 patent]

- wherein the cell phone, the smart phone, [] have monitoring equipment comprising a computer, laptop, notebook, PC, and a cell phone for the receipt and transmission of signals therebetween. [claim 109 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 126 of the '990 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 1 of the '189 patent]

- Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: [claim 2 of the '189 patent]

- Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: [claim 3 of the '189 patent]

- comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; [claim 4 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 5 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 6 of the '189 patent]

- monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; [claim 7 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, [claim 8 of the '189 patent]

- monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 9 of the '189 patent]

- a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD) monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 13 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 13 of the '439 patent]

- Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: [claim 14 of the '439 patent]

60

- Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: [claim 15 of the '439 patent]

- comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; [claim 16 of the '439 patent]

- monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; [claim 17 of the '439 patent]

- monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; [claim 18 of the '439 patent]

- monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; [claim 19 of the '439 patent]

- monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween, [claim 20 of the '439 patent]

- monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of

signals therebetween; [claim 21 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: [claim 22 of the '439 patent]

- the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising: [claim 1 of the '287 patent]

- Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising: [claim 3 of the '287 patent]

- A communication device comprising: [claim 4 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 4 of the '287 patent]

- A monitoring device, comprising: [claim 5 of the '287 patent]

- A monitoring equipment, comprising: [claim 6 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals

to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

- A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: [claim 1 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner. [claim 2 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device. [claim 3 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition. [claim 4 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC). [claim 5 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor. [claim 6 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection. [claim 7 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection. [claim 8 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device. [claim 9 of

the '619 patent.

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory. [claim 10 of the '619 patent]

24.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT II:

### Samsung's Central Processing Unit (CPU) for
### Samsung's "*modified*" Cell Phone

25.    Count II incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

26.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone that include a central processing unit (CPU) is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

27.    Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's central processing unit

(CPU) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

28.    Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's central processing unit (CPU), under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's central processing unit (CPU), infringement occurs when the combination is shipped or imported into the United States.

29.    Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's central processing unit (CPU), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's central processing unit (CPU), into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

30.    Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's central processing unit (CPU), was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's central processing unit (CPU), and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

31.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve

federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**32.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's central processing unit (CPU), begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's central processing unit (CPU), while performing work under a government contract is to avoid infringement liability here in the United States under §§ 154(a)(1) & 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's central processing unit (CPU), was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process

under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's central processing units (CPUs), are shipped or imported into the United States.

33.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own central processing units (CPUs), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own central processing units (CPUs)] https://news.ycombinator.com/item?id=28423983

34.    Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's central processing units (CPUs), and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung central processing unit (CPU), is identified and located inside the Samsung *"modified"* cell phone.

35.    Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's central processing units (CPUs), into the United States that also include "*nine standard sensors that are used as biosensors*", to satisfy the detection capability requirement of the asserted claims.

67

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

36.     Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's central processing unit (CPU), under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung "*modified*" cell phones (i.e., Galaxy smartphones), that include Samsung's central processing unit (CPU), into the United States.

37.     Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's central processing unit (CPU), infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

38.     Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the

68

great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Samsung's *"modified"* cell phone that include Samsung's central processing unit] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

39.     Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

40.     Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's central processing unit (CPU)] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**41.**　Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's central processing units (CPUs):

**42.**　Upon information, the Samsung CPU/Chipset Series include: The first Samsung Exynos flagship chipset in history (i.e. without a retroactive name change) was actually the Exynos 4210 Dual, debuting inside 2011's Galaxy S2. And it was part of the first wave of dual-core smartphone processors, delivering a 1.2GHz Cortex-A9 CPU. from the first Hummingbird to the ambitious 2nm Exynos 2600, paints a picture of a processor family that has had its ups and downs but is now once again at the forefront of the industry: Chips with 10-core CPUs, Xclipse GPUs with Ray Tracing, NPUs capable of running generative AI locally, advanced ISPs with VPS and DVNR, and a clear focus on thermal efficiency; and, is used with the Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung

Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**43.**    Upon information, Samsung's "*modification*" of the cell phone "production process" begins with what is recognized in the industry as the "brains" of the cell phone. The central processing unit (CPU), or combination thereof, is considered the "brains" of the "*modified*" cell phone device. Samsung's *modified* cell phone CPUs carry out the operational and functional instructions of the device's computer program. The Samsung *modified* cell phone's CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the Samsung *modified* cell phone's CPU and other components, such as memory and input/output devices.

- Samsung Exynos history starts with Samsung's first Galaxy S smartphone, which launched in 2010, and was powered by an in-house chipset from the get-go. This wasn't the debut of Exynos though, as the chipset was actually called the Hummingbird.

- The 45nm Hummingbird was retroactively renamed the Exynos 3 Single, and it was a pretty capable chipset for the time. Samsung's in-house processor sported a 1GHz single-core Cortex-A8 CPU at a time when 1GHz mobile CPUs were a rarity. In fact, the manufacturer said it was the industry's first 1GHz processor at the time of its 2009 unveiling.

- The first Samsung Exynos flagship chipset in history (i.e. without a retroactive name change) was actually the Exynos 4210 Dual, debuting inside 2011's Galaxy

71

S2. And it was part of the first wave of dual-core smartphone processors, delivering a 1.2GHz Cortex-A9 CPU.

- 2012's biggest mobile silicon trend was the shift to quad-core CPUs, and Samsung was a part of this trend by offering the Exynos 4412. The new chipset debuted inside the Galaxy S3 but also appeared in the Galaxy Note 2 in the second half of the year, albeit with a slight CPU clock speed boost.

- Samsung got a quad-core Cortex-A9 CPU which doubled the number of cores seen in the previous year's flagship SoC. It's still based on the same Cortex-A9 CPU, but the quad-core arrangement was welcomed due to Android and various third-party apps embracing multi-core support.

- The smartphone industry quickly moved from single-core CPUs to dual-core and then quad-core processors in just a few years. But 2013 marked the first time Samsung adopted an octa-core processor in its high-end phones. The 28nm Exynos 5410 debuted inside the Galaxy S4 and delivered what looked like a big. LITTLE design. That meant a cluster of four high-powered Cortex-A15 CPU cores and a cluster of four lightweight Cortex-A7 cores.

- The 20nm Exynos 5433 was the flagship Samsung processor for 2014, and it actually beat Qualcomm to the 64-bit post. Yes, the new chipset had an octa-core CPU featuring Arm's first 64-bit CPU cores. That means Samsung got four Cortex-A57 cores for complex tasks and four Cortex-A53 cores for less advanced activities.

- The Exynos 7420 maintained the same octa-core CPU as its predecessor, featuring four Cortex-A57 cores and four Cortex-A53 cores. But the chipset introduced a small, 14nm design, 4K display resolutions (4,096 x 2,160, 3,840 x 2,400), LPDDR4 RAM support, and support for UFS 2.0 storage.

- Samsung had been relying on Arm CPUs for all of its Exynos processors up until this point. But 2016's Exynos 8890 marked a major change, as it used Samsung's first-generation Mongoose CPU. More specifically, Samsung had four Mongoose M1 cores paired with four Arm Cortex-A53 cores.

- The Exynos 8895 was Samsung's flagship processor for 2017, and the small number tweak belied a few major changes. The company's new processor was built on a 10nm process, delivering notable space and power savings on paper. It also used an octa-core CPU design featuring four Mongoose M2 cores and four Cortex-A53 cores, sticking with custom cores for the heavyweight CPU core.

- 2018's Exynos 9810 was more of an iterative upgrade over the Exynos 8895 than a game-changing revolution. Samsung definitely saw two notable upgrades in the CPU and GPU categories. In the case of the CPU, Samsung maintain a two-cluster octa-core design but with all-new CPU cores. This time, we had four third-generation Mongoose CPU cores paired with four Cortex-A55 cores. And the A55 cores remain in Samsung's Exynos flagship processors as of 2021.

- The 5nm Exynos 2100 makes a strong argument for being one of the best Samsung Exynos chipsets in recent history. We've got a tri-cluster CPU that's virtually identical to the rival Snapdragon 888 SoC, featuring a powerful Cortex-X1 CPU, three Cortex-A78 CPU cores, and four Cortex-A55 cores.

- In 2022, Samsung has also gone all-in on Arm CPUs, so it stands to reason that the firm's next flagship chipset will continue this trend by offering one Cortex-X2 core, three Cortex-A710 cores, and four Cortex-A510 cores.

- Samsung has presented the Exynos 2500 as its new high-end processor. With a strong emphasis on artificial intelligence running directly on the mobile device, this SoC, manufactured using an improved 3nm process, is designed to compete head-to-head with Qualcomm and Apple in the premium segment. The Exynos

2500 It features a 10-core CPU and an Xclipse 950 GPU based on AMD technology.

- The Exynos 2600 is Samsung's real game-changer. This is the first commercial chip manufactured on a 2nm node with GAA (Gate-All-Around) technology, ahead of the 3nm processes used by TSMC, Qualcomm and Google in their high-end solutions. At the CPU level, the Exynos 2600 uses a 10-core configuration with ARMv9.3 architecture in a 1+3+6 scheme.

- From the first Hummingbird to the ambitious 2nm Exynos 2600, paints a picture of a processor family that has had its ups and downs but is now once again at the forefront of the industry: Chips with 10-core CPUs, Xclipse GPUs with Ray Tracing, NPUs capable of running generative AI locally, advanced ISPs with VPS and DVNR, and a clear focus on thermal efficiency.

**44.** Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's central processing unit (CPU), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's central processing units (CPUs) are shipped or imported into the United States.

**45.** Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's central processing unit (CPU), is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented processes. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals

Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

46.  Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

47.  Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

48.  Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the

patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**49.**    *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's central processing unit (CPU)*

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 12 of the '990 patent]

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 55 of the '990 patent]

- at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site, and wherein the communication device has a central processing unit (cpu) [claim 125 of the '990 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 1 of the '189 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 2 of the '189 patent]

76

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 13 of the '439 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 14 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, []; [claim 15 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices; [claim 22 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU). [claim 22 of the '439 patent]

- a central processing unit (CPU) for executing and carrying out the instructions of a computer program; [claim 23 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock; [claim 1 of the '287 patent]

- at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock; [claim 3 of the '287 patent]

- at least one central processing unit (CPU); [claim 4 of the '287 patent]

- at least one central processing unit (CPU); [claim 5 of the '287 patent]

77

- at least one central processing unit (CPU); [claim 6 of the '287 patent]

- A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: [claim 11 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner. [claim 12 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions to lock, unlock, or disable the lock of the communication device. [claim 13 of the '619 patent] The central processing unit (CPU) [], capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition [claim 14 of the '619 patent].

- The central processing unit (CPU) [], capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC). [claim 15 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor. [claim 16 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection. [claim 17 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection. [claim 18 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device. [claim 19 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory. [claim 20 of the '619 patent]

50.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT III:

## Samsung's Operating System for Samsung's "*modified*" Cell Phone

51.     Count III incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

52.     Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include an operating system, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

53.     Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's android operating system begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

54.     Upon information and belief, Plaintiff alleges Samsung's android operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results, [doctrine of equivalents] as Plaintiff's patented "transceiver". Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605 (1950).

55.     Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's android operating system, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's android operating system, infringement occurs when the combination is imported into the U.S.

56.     Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's android operating system, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's android operating system, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

57.     Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's android operating system, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's android operating system, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

58.     Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's android operating system, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's android operating system, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's android operating system, was made abroad to avoid infringement liability under §

271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's android operating systems, are shipped or imported into the United States.

**59.**　Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**60.**　Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's android operating systems, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the

detection capability is located. Hereto, the alleged manufactured Samsung android operating system, is identified and located inside the Samsung *"modified"* cell phone.

> **Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:
>
> Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
>
> Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
>
> Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
>
> Microfluidic cassette: Interchangeable cassettes with varying assays
>
> VIS-NIR spectrometer: Food freshness; Melanoma
>
> NNAP Electrodes: Toxic metals and Organic pollutants in water
>
> Optical Waveguide: Pathogens in water and food
>
> Back and front camera: Colorimetric analysis; Image analysis
>
> Microphone: Voice recording stress levels

**61.**    Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's android operating systems, into the United States that include "*nine standard sensors that are used as biosensors*".

**62.**    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own operating systems, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/.  "Samsung uses the same company to make its [smart]phones, Foxconn,

that Apple does to assemble its [smart]phones", [that include their own operating systems] https://news.ycombinator.com/item?id=28423983

63.     Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's android operating system, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung "*modified*" cell phones (i.e., Galaxy smartphones), that include Samsung's android operating system, into the United States.

64.     Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's android operating system, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

65.     Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's "*modified*" cell phone that include Samsung's android operating system] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

66.     Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

67.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's android operating system was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

68.    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's android operating system:

69.    Upon information, Samsung's "modified" cell phone devices that carries as standard, at least that of the Samsung android operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Samsung android operating system(s):

- Early Adoption (2009): Samsung launched its first Android device, the Galaxy i7500, marking its entry into the Android ecosystem.

- Galaxy S Series (2010): The introduction of the Galaxy S series established Samsung as a major player in the smartphone market.

- TouchWiz UI (2010): Samsung developed the TouchWiz user interface to customize the Android experience on its devices.

- Galaxy Note Series (2011): The Galaxy Note introduced the phablet category, combining phone and tablet features with S Pen functionality.

- Android Updates (2011-Present): Samsung has consistently updated its devices to the latest Android versions, enhancing features and security.

- One UI (2018): Samsung launched One UI; a redesigned interface focused on user experience and ease of use on larger screens.

- Foldable Devices (2019): Samsung embraced foldable technology with the Galaxy Fold, showcasing Android's adaptability to new form factors.

- 5G Integration (2019): Samsung was among the first to release 5G-capable smartphones, pushing the boundaries of mobile connectivity.

- Sustainability Initiatives (2020-Present): Samsung has begun integrating eco-friendly practices into its Android devices, focusing on sustainability.

- Ongoing Innovations (2021-Present): Samsung continues to innovate with features like DeX, improved camera technology, and enhanced software experiences; and,

that are running on: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G;

Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G; Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**70.**    Upon information, the Samsung "*modified*" cell phone android operating system manages hardware such as the Samsung "*modified*" cell phone central processing unit (CPU). It provides connections such as: cellular, Wi-Fi, Bluetooth, NFC, and communication with other devices.

Wi-Fi: enables connection to local networks and internet.

Cellular: supports mobile data through 3G, 4G, and 5G networks.

Bluetooth: facilitates short-range communication with other devices.

NFC: allows for contactless transactions and data exchange.

Upon information, the Samsung "*modified*" cell phone android operating system, performs substantially the same function; in substantially the same way; to achieve substantially the same results

as Plaintiff's new, improved upon, and useful "transceiver". In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that a patentee may invoke this doctrine to proceed against the producer of a device if it performs substantially the same function in substantially the same way to obtain the same result. This is often referred to as the *Graver Tank* "triple identity" test for equivalence.

To better understand the equivalency of the production process, features, and functions of the Samsung android operating system to the Plaintiff's patented transceiver invention, Plaintiff have provided relative bullet points for the Samsung android operating system and Plaintiff's patented transceiver, below:

*Samsung android operating system*

- Samsung's processors are custom-designed CPUs that optimize performance and efficiency.
- Optimized Architecture: Android operating system is designed to work seamlessly with Samsung's custom ARM-based CPUs, maximizing performance and efficiency.
- Resource Management: The android operating system efficiently manages CPU resources, allocating tasks to ensure smooth multitasking and responsiveness.
- Power Efficiency: Android operating system incorporates power-saving features that help extend battery life while maintaining CPU performance.
- Hardware Integration: Close integration between android operating system and hardware allows for optimized performance in graphics, processing, and machine learning tasks.
- Security Features: Android operating system utilizes hardware-based security features, such as the Secure Enclave, to protect sensitive data processed by the CPU.

- Regular Updates: Samsung frequently updates android operating system to enhance compatibility and performance with new CPU architectures and features.

- Samsung's approach to CPU scheduling plays a critical role in delivering the seamless, high-performance experience that users expect across Samsung android operating system.

- Android operating system software is tightly integrated with the CPU architecture to ensure optimal performance and energy efficiency. The CPU architecture in Galaxy phones has significantly evolved over the years.

- Android operating system is an open operating system that runs on hundreds of android devices with ARM-based processors (CPUs).

- A key feature of the Samsung android operating system operating system is the Assisted GPS. The Galaxy phones utilize an inbuilt Assisted GPS chip for location detection. This provides a quick and accurate approximation of the user's location based on satellite information.

*Plaintiff's patented transceiver invention [specifications]*

- 46 is used as a stand-alone scanner … 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40…

- wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver…

- FIG. 19 is a perspective view of [] the present invention illustrating the use of a GPS satellite in conjunction with the [] monitoring equipment to relay commands and signals to the cpu or transceiver…

- a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones…

- A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204…

- GPS satellite 204 locates and communicates [] signal 212 with the CPU or transceiver…

- The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU [] to initiate or execute any commands…

- GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202

Android operating system is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process for his invention. See 35 U.S.C. §§ 154(a)(1) & 271(g). The Samsung android operating system is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

A mobile operating system acts as the vital bridge connecting physical hardware to digital software. It tells the processor to open an app, commands the battery to allocate power. Without this middleman, the Galaxy phone would be completely unable to process requests or run the applications users rely on daily. Samsung handles all development and updates internally.

A Galaxy phone rarely works in isolation. The android operating system connects directly to a massive digital marketplace and a broader network of connected devices. This tight integration ensures that managing software, syncing files, and connecting accessories happens with minimal friction.

The android operating system stands as a highly secure, exceptionally user-friendly operating system that serves as the absolute foundation of the Galaxy phone. It provides a heavily protected environment where millions of people can communicate, work, and manage their daily tasks with confidence. Biometric security measures, such as facial ID and fingerprint ID, ensure that only an authorized user can unlock the device.

71.    Beyond simply operating a smartphone, this software connects with watches, tablets, and computers, android OS creates a unified experience that keeps users connected and completely immersed in the Samsung ecosystem. The core features of android OS are a gesture-based user interface that allows connectivity across various Galaxy phones, and the Samsung Watch series.

72.    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's android OS, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's android OS are shipped or imported into the United States.

73.    Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's android OS, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into,

disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

74.     Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or
> offers to sell, sells, or uses within the United States a product which
> is made by a process patented in the United States shall be liable as
> an infringer, if the importation, offer to sell, sale, or use of the
> product occurs during the term of such process patent" [271(g)]

75.     Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor"; [§ 101]

76.     Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and

convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**77.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Android Operating System / ["transceiver"]*

- a communication link is present of at least one of a Wi-Fi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 22 of the '891 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 35 of the '891 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

- wherein the monitoring equipment communicates automatically with the transceiver upon receipt of the signal caused by the distress signal [claim 69 of the '891 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long

92

and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; [claim 1 of the '189 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). [claim 1 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products. [claim 2 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products. [claim 8 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; [claim 9 of the '189 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF)

connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; [claim 13 of the '439 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). [claim 13 of the '439 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. [claim 14 of the '439 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; [claim 19 of the '439 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). [claim 19 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

94

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 4 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

78.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT IV:**

**Samsung's Megapixel Camera for Samsung's "*modified*" Cell Phone**

95

**79.** Count IV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**80.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a megapixel camera, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**81.** Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Samsung's Megapixel Camera begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**82.** Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Megapixel Camera, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Megapixel Camera, infringement occurs when the combination is shipped or imported into the United States.

**83.** Upon information, Plaintiff is alleging the Samsung *"modified"* cell phone, that include Samsung's Megapixel Camera, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Megapixel Camera, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**84.** Plaintiff alleges Samsung's *"modified"* cell phone, that include Samsung's Megapixel Camera, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to *"modify"* a common cell phone, that include Samsung's Megapixel

Camera, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**85.**     Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**86.**     Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Megapixel Camera, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Megapixel Camera, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a);

and Samsung's "*modification*" of the cell phone, that include Samsung's Megapixel Camera, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Megapixel Cameras, are shipped or imported into the United States.

87. Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Megapixel Camera, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung Megapixel Camera, is identified and located inside the Samsung *"modified"* cell phone.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

88.     Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Megapixel Cameras, into the United States that include "*nine standard sensors that are used as biosensors*".

89.     Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own megapixel cameras, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own megapixel cameras] https://news.ycombinator.com/item?id=28423983

90.     Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung *"modified"* cell phone, that include Samsung's Megapixel Cameras, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Megapixel Cameras, into the United States.

91.     Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung *"modified"* cell phone, that include Samsung's Megapixel Camera, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

92.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under §§ 154(a)(1) & 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's Megapixel Camera] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

93.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

94.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Megapixel Camera was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

95.    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the Samsung "megapixel" camera(s) that is *native* to the manufacture of the Samsung "*modified*" cell phones (i.e., Galaxy smartphones): "[t]he first Galaxy S smartphone went on sale 15 years ago. When it debuted in 2010, it featured a single rear-facing camera with autofocus and a 5-megapixel (MP) resolution. Today, the latest and best Galaxy S model, i.e., the Galaxy S25 Ultra, boasts four rear-facing cameras, including a primary shooter with a resolution of 200-megapixel (MP). That's 40 times more than the original Galaxy S model, not to mention other camera advancements"; that is included in: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;   Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy

M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**96.** Upon information, in *Syngenta*, the Federal Circuit solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity (Samsung) before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity (Samsung), or one-party exercising direction and control over other entities (i.e., Rhevision), was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

The Samsung Megapixel camera is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones

that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Samsung megapixel camera is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung "*modified*" cell phone when imported into the United States.

*Phase I* specifications of the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007]; requires Samsung modify the Samsung android operating system platform for managing CBRNE-H detection.

Samsung entered into an "implied" agreement with the Government (DHS S&T) to integrate the CBRNE-H internal sensors that was being developed by at least the awarded third-party contractors of the *Cell-All* initiative: Rhevision; SeaCoast; NASA; Qualcomm; and Synkera.

Upon information and belief, Samsung "*modified*" the cell phone with camera(s) equipped to detect for CBRNE-H. Under the *Cell-All* initiative Rhevision developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, [] develop[ed] advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of [] Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" [], which are composed of nanoparticles that change color in the presence of certain molecules. ***Rhevision []***

*integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.* Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor; compare the results with known toxic compounds."

| PHASE I: INTERNAL SENSOR OF THE *CELL-ALL* INITIATIVE | |
|---|---|
| **Samsung's "Modified" Cell Phone include Camera(s) for CBRNE-H Detection** | |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "*modified*" cell phone with its "*modified*" cell phone camera | Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds. |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "*modified*" cell phone with its "*modified*" cell phone camera | Samsung's "*modified*" cell phone devices, have built-in QR scanners in the camera app, so you don't need a separate app. Simply point the camera at the code, and it should work instantly. Samsung's "*modified*" cell phone camera QR codes can be integrated with CBRNE (chemical, biological, radiological, nuclear, and explosives) detectors and/or sensors to enhance data sharing and operational efficiency. One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information. Scanning a QR code can simplify the process of retrieving sensor data, making it accessible to personnel without specialized training. QR codes can be printed on CBRNE equipment, allowing quick access to emergency protocols. |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Samsung's "*modified*" cell phone with its "*modified*" cell phone camera | Samsung's "*modified*" cell phone-based biosensors are rapidly redefining how the world conducts medical diagnostics, enable precise, real-time detection of biological and chemical agents. Samsung's "*modified*" cell phone devices have a platform in biosensing ecosystems: facilitating the proliferation of biosensors that capitalize on Samsung's "*modified*" cell phones' camera optics, wireless connectivity, and computational power. Optical biosensors utilize the Samsung "*modified*" cell phone cameras and LED flashes to detect visual changes in assays, particularly in colorimetric or fluorescent formats. Images taken by a conventional Samsung cell phone camera can be modified using deep learning algorithms to improve their spatial resolution, signal-to-noise ratio, and color response. |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "*modified*" cell phone with its "*modified*" cell phone camera | Samsung's "*modified*" cell phone cameras megapixel camera, smaller than the head of a pencil eraser captures the image from the array of nanopores in the silicon chip. "The beauty of this technology is that the number of sensors contained in one of the arrays is determined by the *pixel* resolution of the cell phone camera. With the megapixel resolution found in cell phone cameras today, the camera can easily probe a million different spots on the silicon sensor simultaneously. So, users don't need to wire up a million individual sensors," Sailor said. "We only need one. This greatly simplifies the manufacturing process because it allows us to piggyback on all the technology development that has gone into making cell phone cameras lighter, smaller, and cheaper." |
| *"Phase I"- Internal Sensor*<br><br>Samsung's "*modified*" cell phone with its "*modified*" cell phone camera | Radiation incidents on Samsung's "*modified*" cell phone cameras. Complementary Metal Oxide Semiconductor (CMOS) sensor creates a signal which can be isolated from a visible light signal to turn the "*modified*" cell phone into a radiation detector. Samsung's "*modified*" cell phone have CMOS cameras that have been widely adopted throughout the world, which makes them potentially useful as tools for monitoring radiation exposure while traveling in an aircraft. Samsung's "*modified*" cell phone cameras have advanced features, such as accelerated camera *pixel* intensity, higher image quality, and greater rapidity. These features allow Samsung's "*modified*" cell phone to be especially useful in detecting radiation. |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Samsung's *"modified"* cell phone with its *"modified"* cell phone camera | Samsung's *"modified"* cell phone camera sensors: Samsung's *"modified"* cell phone cameras can capture high-resolution images, which can be analyzed for specific biomarker detection. Various applications utilize machine learning and image processing to identify biomarkers in biological samples, such as blood or saliva. Glucose Monitoring: Samsung's *"modified"* cell phone apps can analyze images of blood samples to estimate glucose levels. Skin Analysis: 's *"modified"* cell phone cameras can detect skin conditions or changes that may indicate health issues, such as dehydration or vitamin deficiencies. Samsung's *"modified"* cell phone cameras can diagnose diseases by analyzing images of bodily fluids or tissues. |
| *"Phase I"- Internal Sensor*<br><br>Samsung's *"modified"* cell phone with its *"modified"* cell phone camera | David Breslauer is a graduate student at the University of California, Berkeley, and has developed a fluorescence microscope for portable diagnostics using a cell phone with a built-in camera. Cell phone with built-in camera. The cell phone that is used should at least be able to zoom in and out manually and focus. Using Samsung cell phone cameras modified as inexpensive microscopes. |

Twelve Federal Judges identifies where on the inside of the Samsung devices the front and back camera biosensors are located

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises "***through nine "standard sensors" which "can be used as 'biosensors,'***" Appx126.": "In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'***" Appx126." Samsung uses the same type of sensors in their Samsung "*modified*" cell phones for biosensor detection.

106

**97.**     Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Megapixel Camera, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Megapixel Camera are shipped or imported into the United States.

**98.**     Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Megapixel Camera, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

**99.**     Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

107

**100.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**101.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**102.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Megapixel Camera [cell phone detection device / one of the nine standard biosensors]*

- a multi sensor detection system with a plurality of [] integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; [claim 1 of the '280 patent]

- a cell phone detection system with a plurality of [] integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site [claim 1 of the '280 patent]

- a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone [claim 36 of the '891 patent]

- wherein the communication device has a plurality of sensors for detecting the chemical, biological, [] compounds which is capable of being disposed within each communication device. [claim 26 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- wherein the multi sensor detection device is interconnected with a camera; light and video sensors to allow the user to view the environment from a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site. [claim 102 of the '990 patent]

- wherein the cell phone, the smart phone, [] have a plurality of indicator lights [] corresponding to one chemical, biological, [] agent [] capable of being disposed within the cell phone, the smart phone [claim 119 of the '990 patent]

- a built-in, embedded multi sensor detection system for monitoring products with a plurality integrable sensors detecting for at least one of chemical, biological, []; [claim 145 of the '990 patent]

109

- a cell phone; cell phone detection system for monitoring with a plurality [] integrable sensors detecting for at least one of chemical, biological, []; [claim 145 of the '990 patent]

- further including a camera, light and video sensor to allow the user to access, review and respond to network multi sensor detection systems and view the environment from at least one of a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a workstation or monitoring site. [claim 146 of the '990 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, [] human, [] agents; [claim 4 of the '189 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [], a human sensor, [] [claim 4 of the '189 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, [], comprising: [claim 5 of the '189 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [] a human sensor, []; [claim 5 of the '189 patent]

- wherein the built-in, multi sensor detection device is built in [] monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); [claim 6 of the '189 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, [], a human sensor, []; [claim 6 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 8 of the '189 patent]

110

- interconnected with a camera; light and video sensors to allow the user to view the environment from at least one of a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site. [claim 12 of the '189 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [] a human sensor, []; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

111

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; [claim 5 of the '287 patent]

103.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT V:**

**Samsung's Global Positioning System (GPS) for
Samsung's "*modified*" Cell Phone**

104.    Count V incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

105.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a GPS Receiver, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

106.    Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's GPS Receiver begin as

112

early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

107.    Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's GPS Receiver, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's GPS Receiver, infringement occurs when the combination is shipped or imported into the United States.

108.    Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's GPS Receiver, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the Samsung *"modified"* cell phone, that include Samsung's GPS Receiver, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

109.    Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's GPS Receiver, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's GPS Receiver, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

110.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**111.**    Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's GPS Receiver, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's GPS Receiver, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's GPS Receiver, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's GPS Receivers, are shipped or imported into the United States.

114

**112.** Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's GPS Receivers, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's GPS Receiver, is identified and located inside the Samsung *"modified"* cell phone.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**113.** Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's GPS Receivers, into the United States that include *"nine standard sensors that are used as biosensors"*.

**114.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Global Positioning System (GPS), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels

115

and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group."
https://www.androidauthority.com/pixels-iphones-made-by-same-company-
3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn,
that Apple does to assemble its [smart]phones", [that include their own Global
Positioning System (GPS)] https://news.ycombinator.com/item?id=28423983

115.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant
[Samsung] is accused of using Plaintiff's patented process to manufacture and/or
assemble the Samsung "*modified*" cell phone, that include Samsung's GPS Receiver,
under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence
to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung
is using Plaintiff's patented process but is not shipping or importing the Samsung
*"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's GPS
Receiver, into the United States.

116.   Plaintiff alleges, the resulting patented process used to manufacture and/or
assemble the Samsung "*modified*" cell phone, that include Samsung's GPS Receiver,
infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped
or imported into the United States.

117.   Upon information, the US Court of Appeals for the Federal Circuit held that
applying a single-entity requirement under § 271(g) would impose an undue
evidentiary burden on patentees [Plaintiff] that was contrary to the intent of
Congress. The legislative history of § 271(g) showed that Congress recognized "the
great difficulties a patentee [Plaintiff] may have in proving that the patented process
was used in the manufacture of a product [Samsung's *"modified"* cell phone that
include Samsung's GPS Receiver] in question" where the manufacture occurred
abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

118.   Upon information, part of Congress's solution is laid out in § 295, which shifts
the burden of proof to the accused infringer to prove that the patented process was

not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**119.** Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's GPS Receiver was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**120.** Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung *"modified"* cell phones (i.e., Galaxy smartphones) that include Samsung's GPS Receiver: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G;

Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**121.**    Upon information, Plaintiff describes the Global Positioning System, as:

The satellite-based navigation system made up of a network of 24 satellites placed into orbit by the U.S. Department of Defense. GPS was originally intended for military applications, but in the 1980s, the government made the system available for civilian use.

GPS satellites circle the earth twice a day in a very precise orbit and transmit signal information to earth. GPS receivers take this information and use triangulation to calculate the user's exact

location. Essentially, the GPS receiver compares the time a signal was transmitted by a satellite with the time it was received. The time difference tells the GPS receiver how far away the satellite is. Now, with distance measurements from a few more satellites, the receiver can determine the user's position and display it on the unit's electronic map.



GPS receivers used to be standalone devices, but now they are built into the most basic of Samsung's smartphones and smartwatches. The Samsung "*modified*" cell phone models use A-GPS -- or "Assisted GPS" -- which in basic terms accesses an intermediary server when it is not possible to connect directly via satellite -- indoors, for example -- and this server provides the nearest satellite with additional information to make it possible to more accurately determine a user's position.

Samsung explains that later models also use "wi-fi hotspots and cellular towers to get the most accurate location fast" when GPS is not the most convenient method of location detection. The Galaxy 3GS and later Galaxy models additionally have an integrated digital compass to also provide the direction one is facing, which is quite

119

useful when combined with mapping software. With the inclusion of the original Galaxy phone, Galaxy models can provide real-time navigation assistance.

122.  Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's GPS Receiver, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung "*modified*" cell phones, that include Samsung's GPS Receiver are shipped or imported into the United States.

123.  Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's GPS Receiver, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

124.  Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as

an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

125.   Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor"; [§ 101]

126.   Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed in this section to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or
> multiple dependent form) shall be presumed valid independently of
> the validity of other claims; dependent or multiple dependent claims
> shall be presumed valid even though dependent upon an invalid
> claim [§ 282(a)].

**127.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's GPS Locating and Tracking*

- can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite. [claim 45 of the '891 patent]

- further including a global positioning system (GPS) receiver adapted for communication with at least one satellite [claim 64 of the '891 patent]

- wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver on the vehicle [claim 65 of the '891 patent]

- wherein the distress signal is a signal that gives the location of the vehicle. [claim 70 of the '891 patent]

- wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component. [claim 78 of the '990 patent]

- wherein the multi sensor detection device is capable of transmitting identification data, location data, speed data, environment data, power data, and sensor data. [claim 95 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- [t]he multi sensor detection security systems [] including a global positioning system (GPS) receiver adapted for communication with at least one satellite. [claim 152 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 7 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 8 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 9 of the '189 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 13 of the '439 patent]

- at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; [claim 19 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; [claim 19 of the '439 patent]

- at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; [claim 20 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; [claim 20 of the '439 patent]

- at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; [claim 21 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor

data to be sent to the monitoring equipment; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS

124

connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**128.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT VI:

### Samsung's Biometric Authentication for Samsung's "*modified*" Cell Phone

**129.** Count VI incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**130.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include biometric authentication, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**131.** Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's biometric authentication

begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

132.   Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's biometric authentication, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's biometric authentication, infringement occurs when the combination is shipped or imported into the U.S.

133.   Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's biometric authentication, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's biometric authentication, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

134.   Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's biometric authentication, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's biometric authentication, of at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

135.   Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before

infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § § 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**136.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's biometric authentication, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's biometric authentication, while performing work under a government contract is to avoid infringement liability here in the United States under §§ 154(a)(1) & 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's biometric authentication, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process

127

under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's biometric authentication, are shipped or imported into the United States.

137.    Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's biometric authentication, into the United States that include "*nine standard sensors that are used as biosensors*".

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

138.    Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's biometric authentication, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's biometric authentication, is identified and located inside the Samsung *"modified"* cell phone.

139.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own biometric

authentication, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own biometric authentication] https://news.ycombinator.com/item?id=28423983

140.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's biometric authentication, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's biometric authentication, into the United States.

141.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's biometric authentication, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

142.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that

129

include Samsung's biometric authentication] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

143.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

144.   Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's biometric authentication was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

145.   Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the

following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's biometric authentication are: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

146.   Upon information, Plaintiff alleges, Samsung Galaxy's fingerprint and facial recognition technology, is *native* to then manufacture of the Samsung "*modified*" cell phone:

Samsung Galaxy devices offer advanced biometric security features that provide both convenience and robust protection for your data. Fingerprint-based authentication may feel odd if you've never used this technology before. However, it can be fun to use, especially since the fingerprint sensor hides behind the display in an almost magical fashion.

But why not use both? Well, you can. Galaxy phone users can set up fingerprint scanning and face recognition, use the latter as the primary unlock method, and rely on fingerprint scanning to unlock the phone straight from the Always on Display.

Face recognition won't trigger if your screen is sleeping. It only works from the lock screen. So, you could use both authentication methods for a more flexible user experience.

- You can use the fingerprint sensor to unlock the phone from the Always on Display (AOD).
- Or you can double-tap the AOD to wake up the screen and bypass the lock screen with your face scan.

https://www.sammobile.com/news/no-more-face-id-how-samsung-phones-handle-biometrics/

Since your Galaxy phone or tablet holds your important information, make sure to protect it and keep things private. A great way to increase the security is by setting up a screen lock. You can use a few different screen lock types, such as fingerprint identification, face recognition, pattern, or password. This way, no one else will be able to access your device.

Samsung's biometrics refers to the technology that measures and analyzes biological data. In Samsung's smartphones, this typically involves fingerprint recognition, facial recognition, and iris scanning. Biometric authentication serves multiple purposes.

- Fingerprint recognition is one of the most common biometric methods. It scans and stores your unique fingerprint pattern, allowing you to unlock your phone with just a touch.
- Facial recognition uses advanced algorithms and sensors to identify you based on your facial features. This method is ideal for quick unlocks and supports various functionalities such as payments and app security.
- Iris scanning offers a high level of security by analyzing the unique patterns of your irises. This method is often praised for its accuracy and difficulty to replicate.

147.  When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of Biometric Authentication to enhance security measures.

148.  Prior to Samsung rolling out its Samsung Galaxy smartphone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a biometric fingerprint identifier to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

149.  Plaintiff alleges, Samsung's biometric fingerprint scanner is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones

that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Samsung biometric fingerprint scanner is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

150.    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's biometric authentication, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's biometric authentication are shipped or imported into the United States.

151.    Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's biometric authentication, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

152.    Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as

an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

153.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

154.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below that describes the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

135

**155.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Biometric Authentication*

- wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals [claim 34 of the '752 patent]

- wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals [claim 30 of the '990 patent]

- wherein the multi sensor detection device is capable of transmitting biometric and authentication data including, but is not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature. [claim 99 of the '990 patent]

- wherein the cell phone, the smart phone, [] designed to be used with biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. [claim 122 of the '990 patent]

- further including biometrics of at least one of, but not limited to fingerprints, iris, signature and voice to prevent entry or exit of unauthorized persons. [claim 147 of the '990 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 1 of the '189 patent]

- wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 7 of the '189 patent]

- capable of transmitting biometric and authentication data include, but is not limited to, at least one of fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature. [claim 10 of the '189 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 13 of the '439 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 16 of the '439 patent]

- wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 19 of the '439 patent]

- the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; [claim 22 of the '439 patent]

- wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one

137

of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 23 of the '439 patent]

- at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; [claim 1 of the '287 patent]

- at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; [claim 3 of the '287 patent]

- at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; [claim 4 of the '287 patent]

- at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; [claim 5 of the '287 patent]

- at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; [claim 6 of the '287 patent]

**156.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT VII:**

**Samsung's Disabling Locking Mechanism for
Samsung's "*modified*" Cell Phone**

**157.** Count VII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**158.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a disabling lock, is

*"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

159.   Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's disabling locking mechanism begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

160.   Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's disabling locking mechanism, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's disabling locking mechanism, infringement occurs when the combination is shipped or imported into the United States.

161.   Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's disabling locking mechanism, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's disabling locking mechanism, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

162.   Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's disabling locking mechanism, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's disabling locking mechanism, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's

"authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**163.**    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**164.**    Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's disabling locking mechanism, into the United States that include "*nine standard sensors that are used as biosensors*".

140

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**165.** Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's disabling locking mechanism; and, include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's disabling locking mechanism, is identified and located inside the Samsung *"modified"* cell phone.

**166.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's disabling locking mechanism, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's disabling locking mechanism, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's disabling locking mechanism, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent

141

infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's disabling locking mechanism, are shipped or imported into the United States.

167.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own disabling lock, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own disabling lock] https://news.ycombinator.com/item?id=28423983

168.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung *"modified"* cell phone, that include Samsung's disabling locking mechanism, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's disabling locking mechanism, into the United States.

169.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung *"modified"* cell phone, that include Samsung's disabling

locking mechanism, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

**170.**   Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's disabling locking mechanism] in question" where manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

**171.**   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**172.**   Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's disabling locking mechanism] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and

143

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

173.    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's disabling locking mechanism: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G;

Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**174.**   Upon information, Plaintiff alleges, if the authorized person is locked out of their phone after too many failed unlock attempts, the authorized user can reset it using Samsung Find My Mobile (Samsung). If remote unlocking isn't an option, a manual factory reset via Recovery Mode will wipe the phone and remove the lock screen. The authorized user should be aware that a factory reset erases all data unless the user has a backup.

"Crucially, when your Samsung phone displays the "Too many incorrect unlock attempts" prompt, you need to distinguish whether it's a temporary lock caused by external factors, such as touch screen issues, or a permanent lock due to forgetting your password/PIN/ pattern or reaching the maximum attempt limit.

When you repeatedly enter incorrect password, PIN, or pattern on your Samsung device, the device will temporarily lock itself and display the "Too many incorrect unlock attempts" message to prevent further attempts.

Typically, Samsung's One UI triggers this warning after five or six consecutive failed attempts, imposing an initial 30-second wait time. If you continue to enter the wrong password after each waiting period expires, the lock time will gradually increase—ranging from several minutes to an hour.

Sometimes, accidental screen touches or sensitivity issues can also cause your device to mistakenly assume you are intentionally

trying unsuccessful attempts multiple times to unlock the device. For example, if the screen is unintentionally touched in your pocket, a child plays with your Samsung phone, or a fingerprint sensor malfunctions leading to repeated verification failures, this "Too many incorrect unlock attempts" message can also appear.

Once your Samsung phone reaches this security threshold, you will be locked out, unable to access your data or settings. If the incorrect attempts persist, Samsung may implement stricter security measures, such as requiring verification of your Samsung account to unlock the device.

More extremely, if you've enabled the "Auto factory reset" option in your security settings, a data wipe will be automatically triggered after 15 failed unlock attempts. While this protects your privacy, it can also lead to permanent data loss if you do not have a recent backup."

**175.** When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a Disabling Locking Mechanism to enhance security measures.

**176.** Prior to Samsung rolling out its Galaxy that did not have a disabling locking mechanism, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a Disabling Locking Mechanism to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

177.    Plaintiff alleges, Samsung's Disabling Locking Mechanism is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Samsung Disabling Locking Mechanism is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

178.    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's disabling locking mechanism, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's disabling locking mechanisms are shipped or imported into the United States.

179.    Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's disabling locking mechanism, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

180.    Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

147

"[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

181. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

182. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims

148

shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**183.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Disabling Locking Mechanism*

- an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals [claim 1 of the '497 patent]

- an automatic/mechanical lock disabler interconnected to the cpu and that is mounted to a lock on a product for receiving signal transmissions from the cpu to lock or disable the lock on the product thereby preventing access to the product by unauthorized, untrained, and unequipped individuals [claim 7 of the '497 patent]

- an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving a signal transmission from the cpu to lock or disable the lock on the product thereby preventing access to the product by unauthorized, untrained, and unequipped individuals [claim 13 of the '497 patent]

- wherein the communication device is designed to be equipped with a radio frequency (RF) chip for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 23 of the '990 patent]

- a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 2 of the '189 patent]

- wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the

149

current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 8 of the '189 patent]

- capable of sending signals thereto and receiving signals therefrom to engage (lock), disengage (unlock) and disable (make unavailable) a lock after a specific number of tries that is interconnected to the multi sensor detection system or monitoring equipment. [claim 9 of the '189 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 14 of the '439 patent]

- wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 20 of the '439 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries; [claim 1 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 1 of the '287 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries; [claim 3 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 4 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 5 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 6 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

**184.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT VIII:**

**Samsung's Near-Field Communication (NFC) for
Samsung's "*modified*" Cell Phone**

151

**185.** Count VIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**186.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include NFC, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**187.** Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Near-Field Communication (NFC) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**188.** Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Near-Field Communication (NFC), under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Near-Field Communication (NFC), infringement occurs when the combination is shipped or imported into the United States.

**189.** Upon information, Plaintiff is alleging the Samsung *"modified"* cell phone, that include Samsung's Near-Field Communication (NFC), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Near-Field Communication (NFC), into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**190.** Plaintiff alleges Samsung's *"modified"* cell phone, that include Samsung's Near-Field Communication (NFC), was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung

performed work for the Government to "*modify*" a common cell phone, that include Samsung's Near-Field Communication (NFC), and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**191.**   Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**192.**   Thus, under section 271(g), a party can be liable for infringement for importing into the United States, [], a product made by a patented process, ***regardless of where the process is performed or where the product was ultimately made***. Congress added section 271(g) to increase protection of U.S. technology industries,

153

[] *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**193.**    Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Near-Field Communication (NFC), and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Near-Field Communication (NFC), is identified and located inside the Samsung *"modified"* cell phone.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**194.**    Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Near-Field Communication (NFC), into the United States that include "*nine standard sensors that are used as biosensors*".

154

195.    Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Near-Field Communication (NFC), begin abroad and continues to this day.

196.    Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Near-Field Communication (NFC), while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Near-Field Communication (NFC), was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Near-Field Communication (NFC), are shipped or imported into the United States.

197.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own NFC, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own NFC] https://news.ycombinator.com/item?id=28423983

155

198.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Near-Field Communication (NFC), under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Near-Field Communication (NFC), into the United States.

199.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Near-Field Communication (NFC), infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

200.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Samsung's *"modified"* cell phone that include Samsung's Near-Field Communication (NFC)] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

201.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

202.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung

156

*"modified"* cell phone that include Samsung's Near-Field Communication (NFC) was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**203.** Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Near-Field Communication (NFC): Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04;

Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**204.** Upon information, Plaintiff alleges, Samsung Galaxy phones with NFC capability utilize electromagnetic induction to enable communication between devices within close proximity, typically within 4 centimeters. This technology represents a subset of Radio Frequency Identification (RFID) systems, operating specifically at 13.56 MHz frequency. Unlike traditional RFID systems that primarily support one-way communication, NFC enables bidirectional data exchange, making it ideal for interactive applications.

NFC is based on the RFID protocols. The main difference to RFID is that an NFC device can act not only as a reader, but also as a tag (card emulation mode). In peer-to-peer mode, it is also possible to transfer information between two NFC devices. Because of the short-read range limitations, NFC devices have to be in very close proximity - usually no more than a few centimeters. That's why NFC

is often used for secure communications. Below is an article that explains why Plaintiff chose NFC over that of RFID for his patented CMDC device:

RFID Signals can Detonate Bombs in Cargo Containers: But How Serious is the Vulnerability? August 10, 2011 Homeland Security Today

"In the fall of 2007, a handful of officials from the Department of Homeland Security (DHS) were invited to attend a live demonstration of how a bomb hidden inside a commercial cargo container could be detonated by a homemade radio frequency identification (RFID) container tracking tag operating at a frequency that was mandated by the federal government for cargo containers within US port environments.

A cargo container RFID electronic tag, or seal, contains an electronic reader that receives a port's RFID signal that prompts the container's RFID tag to transmit to port authorities' data regarding the cargo that's been encoded on its RFID tag. But as the demonstration showed, it also can be used to close an electronic circuit when it receives a corresponding RF from a port RFID sender/receiver, thereby detonating the bomb.

Indeed. In the November, 2007 test, an RF receiver tuned to pick up a required US port RFID reader frequency triggered the small explosive that had been placed inside the empty container.

What's important about the demonstration is that the homemade RF receiver was operating at a frequency that not only was mandated to be used within port environs, but also was mandated to be made public despite the fact that "the process of selecting a frequency for container security was contentious," Homeland Security Today was told by Powers Global Holdings, Inc. Chairman, a former FBI agent who worked with CBP on border related security issues while in Laredo, Texas."

Healthcare organizations leverage Samsung Galaxy phones with NFC capability for patient identification and medical device

159

tracking. The technology enables secure, contactless access to patient records while maintaining HIPAA compliance through encrypted data transmission.

Point-of-care testing (POCT) devices play a crucial role as tools for disease diagnostics, and the integration of biorecognition elements with electronic components into these devices widens their functionalities and facilitates the development of complex quantitative assays. Unfortunately, biosensors that exploit large conventional IgG antibodies to capture relevant biomarkers are often limited in terms of sensitivity, selectivity, and storage stability, considerably restricting the use of POCT in real-world applications. Therefore, we used nanobodies as they are more suitable for fabricating electrochemical biosensors with near-field communication (NFC) technology. Moreover, a flow-through microfluidic device was implemented in this system for the detection of C-reactive protein (CRP), an inflammation biomarker.

In recent years, near-field communication (NFC) technology has become widespread in the field of electrochemical sensors, enhancing their functionality and ease of use since enables wireless communication and data transfer at close proximity, simplifying sensor setup, calibration, and data retrieval. This technology allows seamless data exchange between sensors and mobile devices, providing users with an effective way to collect and analyze electrochemical data in real time. Herein, we present a smartphone-controlled NFC potentiostat integrated with a flow-through electrochemical microfluidic device via wireless communication and with the data-display conversion on Samsung smartphones.

160

The trajectory of phones with NFC capability continues toward greater integration and expanded functionality. iOS 18.1's open-source programming capabilities represent a pivotal moment for NFC technology adoption, enabling developers to create more sophisticated and customized solutions.

Emerging applications include smart home automation, where NFC tags trigger complex device interactions, and enhanced supply chain management systems that provide real-time tracking and authentication capabilities.

The combination of Samsung's development framework, expanding device compatibility, and growing ecosystem of NFC-enabled applications creates unprecedented opportunities for businesses and developers. As Samsung Galaxy phones with NFC capability become increasingly sophisticated, the potential for creating meaningful, contactless experiences continues to grow.

Samsung *"modified"* the cell phones to include an NFC reader/writer built-in, which allows the user to tap the back of the phone to another NFC-enabled device, be that a payment terminal, door lock, Bluetooth device, or a simple NFC tag.

Radio-frequency near-field communication have 'written description' in Plaintiff's patent specifications. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a short-range wireless technology 'near-field communication' to enhance security measures.

Prior to Samsung rolling out its Galaxy that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a short-range wireless technology 'near-field communication' to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**205.**    Samsung's short-range wireless technology 'near-field communication' is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Samsung short-range wireless technology 'near-field communication' is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

**206.**    Plaintiff alleges, Samsung's Near-Field Communication (NFC) is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Samsung's Near-Field Communication (NFC) is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

**207.**    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Near-Field Communication (NFC), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Near-Field Communication (NFC) are shipped or imported into the United States.

162

208.   Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Near-Field Communication (NFC), is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

209.   Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

210.   Upon information and belief, each individual claim limitation or element that is listed in this section describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

211.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

212.    *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Near-field Communication (NFC) [short-range RF]*

- wherein the cell phone detector case has a [] Radio Frequency connection, [], all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]
- wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) [claim 72 of the '891 patent]

- wherein the communication device includes telecommunication, telematics, long and short-range radio frequency communication means [claim 14 of the '990 patent]

- wherein the communication device is designed as readers for barcodes will allow a reader to scan a barcode of a product or object and get more information about it [claim 24 of the '990 patent]

- wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component. [claim 78 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 3 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 6 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to

be sent to the monitoring equipment that includes location data and sensor data; [claim 8 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 9 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows [] (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment. [claim 15 of the '439 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. [claim 18 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; [claim 20 of the '439 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being capable of wireless near-field communication (NFC) which

166

allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication

167

with the at least one CPU; [claim 6 of the '287 patent]

213.   Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT IX:

### Samsung's Watch Series for Samsung's "*modified*" Cell Phones

214.   Count IX incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

215.   Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Watch Series, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

216.   Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include "***as an integral part of the Samsung 'modified' the cell phone***" [IPR trial in *DOJ/DHS v. Golden*]; the Samsung Watch Series, which begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

217.   Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Watch Series, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the

Samsung "*modified*" cell phone, that include Samsung's Watch Series, infringement occurs when the combination is shipped or imported into the United States.

Samsung manufactures its smartwatches in multiple locations, including South Korea and Vietnam. While Samsung has reduced its manufacturing presence in China, third-party suppliers in China still contribute to components and assembly.

Samsung watches are primarily manufactured in South Korea, where the company is headquartered. South Korean factories leverage advanced technology and skilled workers to ensure high-quality production. Some components, however, may come from various countries as part of Samsung's global supply chain, including China, Vietnam, and other Asian nations that specialize in electronics manufacturing.

Samsung's decision to manufacture in Vietnam has been motivated by several strategic advantages, including: Cost efficiency allows companies, including Samsung, to enhance their profit margins while maintaining competitive pricing for consumers; Vietnam's geographical positioning plays a crucial role in global supply chains. It offers easy access to significant markets in Asia, especially China and India, making it an attractive hub for manufacturing and distribution; and, the Vietnamese government has introduced policies that foster foreign direct investment (FDI), offering tax breaks and land concessions to multinational companies. This supportive environment has encouraged Samsung to invest heavily in manufacturing facilities. Processors or other electronic parts might come from suppliers in countries like Japan and Taiwan.

169

**218.**    Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's Watch Series, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Watch Series, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**219.**    Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's Watch Series, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's Watch Series, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**220.**    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |

| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
|---|---|---|---|---|
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**221.** Upon information and belief, Samsung continues to import the Samsung *"modified"* cell phones, that include Samsung's Watch Series, into the United States that include "*nine standard sensors that are used as biosensors*".

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**222.** Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Watch Series, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung Watch Series, is identified, according to the PTAB's claim term construction of "built-in, embedded"; as being located inside the Samsung *"modified"* cell phone.

**223.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Watch Series, begin abroad and continues to

171

this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Watch Series; while performing work under a government contract was to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Watch Series, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Watch Series, are shipped or imported into the United States.

224.   Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Watch Series, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Watch Series] https://news.ycombinator.com/item?id=28423983

225.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Watch Series, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence

172

to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the e Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Watch Series, into the United States.

226.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung *"modified"* cell phone, that include Samsung's Watch Series, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

227.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's Watch Series] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

228.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

229.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Watch Series was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

173

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

> (1) that a substantial likelihood exists that the product was made by the patented process, and

> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**230.** Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones): Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung

174

Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE; that include the Samsung Watch Series:



*Galaxy Watch Ultra*: *Case size :47 mm *Weight :60.5 g *Display: Super AMOLED *Sapphire crystal *Durability:10 ATM / IP68 / MIL-STD-810H *Physical User Interface: Quick button, Home & Back button *Health Features: Energy Score with Galaxy AI *Wellness tips *Heart monitoring *Sleep Coaching with Apnea detection *Irregular Heart Rhythm Notifications *Personalized Heart Rate Zones *Automatic workout detection *Body Composition *Cycle *Tracking *Vascular Load *Bedtime Guidance *Antioxidant Index *Battery: 590 mAh *OS: Wear OS powered by Samsung *Memory (RAM) and Storage: 2 GB RAM, 64 GB internal storage *Sensors: Heart rate sensor *Electrical Heart Sensor (ECG) *BIA (Bioelectrical Impedance Analysis) *Blood oxygen (SpO2) *Temperature *Accelerometer *Gyroscope *Alti-Barometer *Ambient Light *Compass *Connectivity: BT 5.3 / Wi-Fi 2.4 GHz and 5 GHz *Dual GPS (L1 and L5 Band) / NFC / LTE12



***Galaxy Watch8 Classic***: *Case size :46 mm *Weight1 :63.5 g *Display: Super AMOLED *Sapphire crystal *Durability: 5 ATM / IP68 / MIL-STD-810H *Material: Stainless steel *Physical User Interface: Rotating bezel, Quick button, Home & Back button *Health Features: Energy Score with Galaxy AI *Wellness tips *Heart monitoring *Sleep Coaching with Apnea detection *Irregular Heart Rhythm Notifications *Personalized Heart Rate Zones *Automatic workout detection *Body Composition *Cycle Tracking *Vascular Load *Bedtime Guidance *Antioxidant Index *445 mAh *OS: Wear OS powered by Samsung *Memory (RAM) and Storage :2 GB RAM, 64 GB internal storage *Sensors: Heart rate sensor *Electrical Heart Sensor (ECG) *BIA (Bioelectrical Impedance Analysis) *Blood oxygen (SpO2) *Temperature *Accelerometer *Gyroscope *Alti-Barometer *Ambient Light *Compass *Connectivity: BT 5.3 / Wi-Fi 2.4 GHz and 5 GHz Dual GPS (L1 and L5 Band) / NFC / LTE



***Galaxy Watch8***: *Case size :(Small) 40 mm, (Large) 44 mm *Weight: (Small) 30g, (Large) 33.8g *Display: Super AMOLED *Sapphire crystal *Durability: 5 ATM / IP68 / MIL-STD-810H *Material: Armor Aluminum *Physical User Interface: Home & Back button *Health Features: Energy Score with Galaxy AI *Wellness tips *Heart monitoring *Sleep Coaching with Apnea detection *Irregular Heart Rhythm Notifications *Personalized Heart Rate Zones *Automatic workout detection Body Composition *Cycle Tracking *Vascular Load *Bedtime Guidance *Antioxidant Index *Battery: (Small) 325 mAh, (Large) 435 mAh *OS: Wear OS powered by Samsung *Memory (RAM) and Storage: 2 GB RAM, 32 GB internal storage *Sensors: Heart rate sensor *Electrical Heart Sensor (ECG) *BIA (Bioelectrical Impedance Analysis) *Blood oxygen (SpO2) *Temperature *Accelerometer *Gyroscope *Alti-Barometer *Ambient Light *Compass *Connectivity: BT 5.3 / Wi-Fi 2.4GHz and 5GHz Dual GPS (L1 and L5 Band) / NFC / LTE



***Galaxy Watch7***: *Case size :(Small) 40 mm, (Large) 44 mm *Weight: (Small) 28.8g, (Large) 33.8g *Display: Super AMOLED *Sapphire crystal *Durability: ATM / IP68 / MIL-STD-810H *Material: Aluminum *Physical User Interface: Home & Back button *Health Features: Energy Score with Galaxy AI *Wellness tips *Heart monitoring *Sleep

Coaching with Apnea detection *Irregular Heart Rhythm Notifications *Personalized Heart Rate Zones *Automatic workout detection *Body Composition *Cycle Tracking *Battery: 247 mAh *OS: Wear OS powered by Samsung *Memory (RAM) and Storage: 2 GB RAM, 32 GB internal storage *Sensors: Heart rate sensor *Electrical Heart Sensor (ECG) *BIA (Bioelectrical Impedance Analysis) *Blood oxygen (SpO2) *Temperature *Accelerometer *Gyroscope *Alti-Barometer *Ambient Light *Compass *Connectivity: BT 5.0 / Wi-Fi 2.4 GHz & 5 GHz / GPS / NFC

**231.** Upon information, Plaintiff alleges, the United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) they construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Samsung's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Samsung camera for CBRNE-H detection; and, a Samsung *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Samsung watch for CBRNE-H detection; allegedly infringes the patented process of Plaintiff's invention. [§ 271(g)]

The Samsung Watch is an equivalent component of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device, that Samsung allegedly infringes when Samsung manufacture, produce, and assemble for shipment; and then imports the patented process into the U.S. [§ 271(g)]

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute, we construed certain claim terms." Those constructions are reproduced in the chart below.

177

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |

Plaintiff claims the Samsung Watch is Samsung's version of a detection capability that is "built in, embedded"; included within; incorporated into, disposed within; affixed to; connected to; or mounted to another device, such that it is an integral part of the [communication] device, or [monitoring equipment]". This theory aligns with Plaintiff's patent specifications—placed "in, on, upon, or adjacent" the device.

"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks – ScienceDirect

---

**PHASE II:  EXTERNAL DECTECTOR UNDER *CELL-ALL***

**Samsung's Cell Phone Integration with an "External" CBRNE-H Detection Device**

---

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device | The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system. During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). |
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device |  |
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device | At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010). |
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device | Smartwatches have several sensors and integrated apps that may track vital indicators, identify hazardous chemicals, and provide emergency notifications The smartwatches' built-in sensors and monitoring features enable them to detect possible hazards like excessive levels of poisonous gasses. |

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device | Smartwatches can detect subtle physiological changes — such as temperature shifts and heart rate variations — that may indicate early infection before symptoms appear. Smartwatch features that measure heart rates, oxygen levels, fitness levels and sleep quality have been marketed as valuable tools for people who are eager to monitor their health. Smartwatches' health apps and sensors provide enough information to accurately predict when a person has become infected with a disease like COVID-19 or the flu. Here are the sensors Samsung lists, and their function: The Samsung Watch include an accelerometer, gyroscope, and barometer, which are used to determine device orientation, user movement, and altitude. The back of all Samsung Watches is equipped with a Heart Rate Monitor, which projects infrared and green light from light-emitting diodes (LEDs) onto the user's skin and photodiodes measure the varying amount of light reflected. Because blood absorbs green light and reflects red light, the amounts of each type of reflected light are compared to determine heart rate. The Samsung Watch adjusts the sampling rate and LED brightness as needed. Samsung added electrical sensors to the Digital Crown and back, allowing the Samsung Watch to take electrocardiogram (ECG) readings; The consumer device is capable of taking an ECG. A blood oxygen monitor was added to the Samsung Watch Series, albeit as a "wellness" device not capable of diagnosing a medical condition. The blood oxygen monitor added red LEDs to the back, allowing the watch to determine oxygen levels by measuring blood color. |
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device | Samsung watches connect to Samsung's "*modified*" cell phones primarily to enhance functionality and user experience. Samsung's watches receive alerts for calls, messages, and app notifications, allowing users to stay informed without checking their phones. Samsung watches monitor health metrics (e.g., heart rate, steps) and sync this data with smartphone apps for comprehensive health tracking. Samsung's watches use the "*modified*" cell phone's GPS for accurate location tracking and navigation assistance. Apps on Samsung's "*modified*" cell phones have corresponding Samsung watch versions, enabling seamless access to features like fitness tracking. Bluetooth Connectivity: Most Samsung watches connect via Bluetooth, allowing for a low-energy, stable connection to the smartphones. Samsung's watches require a companion app on the Samsung "*modified*" cell phone for setup and to manage settings and updates. This connection significantly expands the capabilities of both devices, making them more useful together than separately. |

180

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Samsung's "*modified*" cell phone integrated with an "external" cell phone detection device | In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". |

Draper's Android Tactical Assault Kit (ATAK) Chemical, Biological, Radiological, and Nuclear (CBRN) plug-ins. ATAK can connect to sensors on many platforms (e.g., smartwatches) and has many plugins that warfighters can download … ATAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate).
https://www.dvidshub.net/news/printable/367459

232. Plaintiff alleges, Samsung's Watch Series is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Samsung's Watch Series is *native* to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

233. Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Watch Series, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung "*modified*" cell phones, that include Samsung's Watch Series are shipped or imported into the United States.

234. Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Watch Series, is integrated with, or interconnected to, a CBRNE-

181

H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

235.    Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

236.    Upon information and belief, each individual claim limitation or element that is listed in this section describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

237.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

238.    Upon information, prior to Samsung rolling out its Galaxy phone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included the design for a Samsung Watch i.e., a multi-sensor detection device, that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

239.    Plaintiff alleges, the Samsung Watch Series that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones and smartwatches that Plaintiff alleges infringes,

upon importation or shipment, the patented process of Plaintiff's inventions. [§ 271(g)].

**240.** Plaintiff alleges, the Samsung Watch Series that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is *native* to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States. The PTAB determined the Samsung Watch to be a standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

**241.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Watch Series for External CBRNE-H Detection*

- a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector [claim 1 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and which is capable of being disposed within the detector case [claim 7 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and that is capable of being disposed within the detector case [claim 13 of the '497 patent]

- wherein the communication device is designed to be used as a standalone detection system for the detection of [] at least one of the human vitals sensors of; a heart sensor, a nerve sensor, a perspiration sensor, an inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 31 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- The multi-sensor detection system [] wherein the cell phone, the smart phone, [] is designed to be used as a standalone detection system for the detection of [] human vitals sensors of: a heart

sensor, a nerve sensor, a perspiration sensor, a inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 123 of the '990 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 8 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 9 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 9 of the '189 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 13 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; [claim 14 of the '439 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality

of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: [claim 18 of the '439 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 18 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: [claim 19 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 19 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

186

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [claim 5 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 6 of the '287 patent]

**242.**    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT X:

### Samsung's Wi-Fi Chips for connecting Samsung's "*modified*" Cell Phones

243. Count X incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

244. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Wi-Fi Chip, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

245. Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Wi-Fi Chip, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

246. Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Wi-Fi Chip, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Wi-Fi Chip, infringement occurs when the combination is shipped or imported into the United States.

247. Upon information, Plaintiff is alleging the Samsung *"modified"* cell phone, that include Samsung's Wi-Fi Chip, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Wi-Fi Chip, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

248. Plaintiff alleges Samsung's *"modified"* cell phone, that include Samsung's Wi-Fi Chip, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to *"modify"* a common cell phone, that include Samsung's Wi-Fi Chip, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All*

*Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's implied "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**249.**    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**250.**    Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Wi-Fi Chip, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's Wi-Fi Chip, is identified and located inside the Samsung *"modified"* cell phone.

189

251. Upon information and belief, Samsung continues to make, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wi-Fi Chip, into the United States; that also include "*nine standard sensors that are used as biosensors*".

252. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wi-Fi Chip, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

253. Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Wi-Fi Chip, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Wi-Fi Chip, while performing work under a government contract, to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Wi-Fi Chip, was made abroad to avoid infringement liability under § 271(a) when any part of the patented

process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Wi-Fi Chip, are shipped or imported into the United States.

254.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Wi-Fi Chip, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wi-Fi Chip] https://news.ycombinator.com/item?id=28423983

255.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung *"modified"* cell phone, that include Samsung's Wi-Fi Chip, under 35 U.S.C. §§ 154(a)(1) & 271(g).  is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wi-Fi Chip, into the United States.

191

256.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's Wi-Fi Chip] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

257.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

258.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**259.** Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Wi-Fi Chip: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5

5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**260.**   Upon information, Samsung's latest Galaxy phone introduced a significant shift in the company's approach to wireless connectivity. This move marks a new phase in Samsung's push to control every aspect of its hardware, extending its in-house chip design beyond processors and modems to local wireless communication.

Newer Samsung Galaxy phones have better Wi-Fi chips. This means faster speeds and more stable connections. Older models may struggle more in crowded areas or with high-bandwidth tasks.

Simply put, Wi-Fi is a wireless network between devices, using short range radio waves. Devices that connect to a Wi-Fi network contain antennas and components that can both transmit radio signals and receive them, with the radio messages consisting of packets of data.

Many people associate Wi-Fi with Internet access, but Wi-Fi isn't the Internet connection itself. Wi-Fi is one of the ways that a device can establish a connection to other computers or devices, like a router, which has a connection to the Internet that it shares.

Knowing that Samsung's current range of hardware supports the faster Wi-Fi networking standards is comforting, as you can be assured that your Samsung Galaxy phones will get decent speeds across both the network and from the network's Internet connection.

Even though the terms Wi-Fi and internet are often used interchangeably, the terms refer to two different types of connection. The word internet refers to "wide area network" (WAN). The

internet is a globally connected network that links devices worldwide.

Wi-Fi, on the other hand, is a way of connecting devices on a local area network (LAN). Before the days of Wi-Fi, the only way to connect devices to the internet was through individual cables, which was often inconvenient. By creating an individual Wi-Fi network, you can connect laptops, phones, smart devices, and any other enabled devices both to each other and the internet within a home or office using a secure network.

If you see a device that has "with Wi-Fi" on it – or "Wi-Fi only," it means it can connect to the internet through a Wi-Fi network, and only through a Wi-Fi network. On the other hand, if you see "Wi-Fi + Cellular", it means the device can connect to the internet via both Wi-Fi and cellular networks.

This distinction is important for devices like tablets and smart hotspots. For instance, a Samsung device labeled "Wi-Fi + Cellular" can access the internet anywhere there's cellular coverage, while a "Wi-Fi only" requires a Wi-Fi network to connect.

The most effective way to use the Samsung "*modified*" cell phone (i.e., Samsung Galaxy) for Carbon Monoxide (CO) detection is by employing smart CO detectors. These Samsung "*modified*" cell phone devices connect to the Wi-Fi network and can send notifications to a Samsung "*modified*" cell phone through a dedicated app. Steps for enabling the CO detector.

- Purchase a Smart CO Detector: Research and select a smart CO detector compatible with your Galaxy phone. Consider factors

195

like battery life, range, and app features. Popular brands include Nest Protect, First Alert Onelink, and Kidde RemoteLync.

- Install the Smart CO Detector: Follow the manufacturer's instructions to install the detector in a central location within your home, ideally near bedrooms.

- Download and Install the Companion App: Download the CO detector's companion app from Android apps—Google Play Store onto your Samsung phone.

- Connect the Detector to your Wi-Fi Network: Use the app to connect the detector to your home's Wi-Fi network. This allows the detector to communicate with your Samsung Galaxy phone.

- Configure Notifications: Set up notifications within the app to receive alerts when the detector senses elevated CO levels. Customize notification settings to your preferences.

Integrating your Samsung Galaxy phone into your CO detection system through the Wi-Fi network offers several benefits:

- Remote Monitoring: Receive alerts on your Galaxy phone [Samsung's "*modified*" cell phone] regardless of your location.

- Immediate Notifications: Be instantly notified of elevated CO levels, giving you critical response time.

- Data Logging: Some systems record CO levels over time, allowing you to identify patterns or potential sources of leaks.

- Integration with Smart Home Systems: Connect your CO detection to other smart home devices for automated responses, such as turning off appliances or opening windows.

196

- Convenience: Manage and monitor your CO detectors directly from your Samsung Galaxy phone.

261.  Plaintiff alleges, Samsung's Wi-Fi Chip is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his inventions. [§ 271(g)]. Samsung's Wi-Fi Chip is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the U.S.

262.  Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Wi-Fi Chip, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Wi-Fi Chips are shipped or imported into the United States.

263.  Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Wi-Fi Chip, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

264.  Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1)

& 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

265.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

266.    Upon information and belief, each individual claim limitation or element listed in this section that is available for use to manufacture the patented process for a Samsung *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

267.    Upon information, prior to Samsung rolling out its Galaxy phone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC devices that included Wi-Fi Chips; enables CBRNE-H detection for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

268.    Plaintiff alleges, Samsung's Wi-Fi Chip that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

269.    Plaintiff alleges, Samsung's Wi-Fi Chip that enables a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Samsung "*modified*" cell phones, and is a standard component of the Samsung "*modified*" cell phone when imported into the United States. The PTAB determined the Wi-Fi Chip to be a standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

270.    *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Wi-Fi Chip for connecting Samsung's "modified" Cell Phone*

199

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

201

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]
- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**271.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XI:

### Samsung's Wireless Communication Protocols [Bluetooth, cellular, and Wi-Fi] for connecting the Samsung Watch Series

**272.** Count XI incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**273.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**274.** Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**275.** Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

**276.** Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**277.** Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's Wireless Communication Protocols, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's implied "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**278.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Wireless Communication Protocols, while performing work under a government contract was to avoid infringement liability

here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Wireless Communication Protocols, are shipped or imported into the United States.

**279.**   Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**280.** Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Wireless Communication Protocols, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's Wireless Communication Protocols, is identified and located inside the Samsung *"modified"* cell phone.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**281.** Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung "*modified*" cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication, into the United States that also include "*nine standard sensors that are used as biosensors*".

**282.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese

multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

283.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication Protocols, into the United States.

284.   Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

285.   Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that

206

include Samsung's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

286.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

287.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

288.    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the

following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Wireless Communication Protocols: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

289.   Upon information, Plaintiff alleges, the Samsung Watch Series connects through Wi-Fi, Bluetooth, and/or Cellular to communicate with the Samsung "*modified*" cell phone:

*Wi-Fi*: "To connect your Samsung Watch to WiFi, first ensure that your watch is powered on and functioning properly. Access the settings menu by swiping down from the top of the screen and tapping on the gear icon. From there, navigate to the "Connections" option, then tap on "WiFi." You'll see a list of available networks. Once the list appears, select the WiFi network you wish to connect to and enter the password if required. After entering the password, tap "Connect." If successful, your watch will now be connected to the WiFi network, allowing you to access more features without relying solely on your phone."

"When connected to WiFi, many apps on your Samsung Watch can be accessed with greater efficiency. Staying updated with notifications becomes seamless as the Samsung watch will continue to receive alerts as long as it is connected to WiFi. This is particularly useful when you are away from your phone. With WiFi connectivity, health apps can sync your data to the cloud, ensuring you have accurate and up-to-date fitness records. This means you can monitor your health stats from your watch without needing to connect to your smartphone every time. Software, apps, and firmware updates can be tedious via Bluetooth, or may require your phone to be nearby. Connecting to WiFi allows your Samsung Watch to download updates independently, ensuring it is always running with the latest features and security updates."

*Bluetooth:* You can easily connect your Samsung Watch to your Samsung Phone through a simple step-by-step process. Follow these instructions to ensure a smooth setup.

| Step | Action |
|------|--------|
| 1 | Power on your Samsung Watch. |
| 2 | Download the Galaxy Wearable app from the Play Store. |
| 3 | Open the app and tap on 'Start the app'. |
| 4 | Select your Samsung Watch model from the list. |
| 5 | Follow the on-screen instructions to complete the connection. |

*Cellular*: Step-by-Step Guide to Connecting Your Samsung Watch to Cellular

Step 1: Prepare Your Devices. Ensure that both your watch and smartphone are fully charged. You'll also need to ensure your smartphone has the latest version of the Galaxy Wearable app (previously known as Samsung Gear app).

Step 2: Install the Galaxy Wearable App. If you haven't already, download the Galaxy Wearable app from the Google Play Store or Apple App Store. This app serves as a bridge between your smartphone and your watch, allowing you to manage your watch settings.

Step 3: Pair Your Watch with Your Smartphone

- Open the Galaxy Wearable app on your smartphone.
- Turn on your Samsung watch and swipe to select the "Connect to a new phone" option.

- Follow the on-screen prompts in the Galaxy Wearable app to pair your watch with your phone.

Step 4: Enable Cellular Connectivity

- Once your watch is paired, you can now set up the cellular connection:

- In the Galaxy Wearable app, select the "Mobile plans" option.

- Tap on "Add mobile plan".

- You will see a QR code from your carrier. Hold your watch up to scan this code, or alternatively, you can manually enter the information if needed.

Step 5: Confirm Cellular Connection. After adding your mobile plan, check if your watch displays the cellular signal indicator. This is typically represented by a small signal icon located at the top of your watch's home screen. If it's visible, you're connected!

**290.**  Plaintiff alleges, Samsung's Wireless Communication Protocols is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Samsung's Wireless Communication Protocols are native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

**291.**  Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35

U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

292. Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

293. Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

294. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new,

improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**295.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**296.** Upon information, prior to Samsung rolling out its Galaxy phone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**297.** Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**298.** Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

**299.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Wireless Communication Protocols [Bluetooth, cellular, and Wi-Fi] for connecting the Samsung Watch Series*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- [t]he multi sensor detection security systems [] receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to [] activate or deactivate security systems, activate or deactivate

214

multi-sensor detection systems, or to activate or deactivate cell phone detection systems; [claim 1 of the '189 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; [claim 2 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

215

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]
- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**300.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XII:

### Samsung's Wireless Communication Protocols [Bluetooth, GPS, cellular, and Wi-Fi] for connecting Samsung's "Find My Mobile"

**301.** Count XII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**302.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**303.** Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**304.** Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

**305.** Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**306.** Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**307.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here

218

in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Wireless Communication Protocols, are shipped or imported into the United States.

**308.**     Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**309.** Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Wireless Communication Protocols, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's Wireless Communication Protocols, is identified and located inside the Samsung *"modified"* cell phone.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**310.** Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication Protocols, into the United States that include "*nine standard sensors that are used as biosensors*".

**311.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese

220

multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

312.  Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication Protocols, into the United States.

313.  Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

314.  Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that

221

include Samsung's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

315.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

316.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

317.    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following

Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Wireless Communication Protocols: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

318.    Upon information, Plaintiff alleges, the Samsung "Find My Mobile" app is one of the most important security tools Samsung offers, helping users locate lost devices, protect personal data, and stay connected to people and items that matter, even when devices are offline.

"Losing your Galaxy phone or tablet can be stressful and upsetting. Luckily, your Galaxy device comes with SmartThings Find and Samsung Find, which lets you remotely locate or lock your device if the need ever arises. You can also erase your device's data, so no one will have access to your information. Both SmartThings Find and Samsung Find can be used from a Galaxy phone.

Using a web browser, navigate to the Samsung Find website or SmartThings Find website, and then sign into your Samsung account using your credentials. You'll see a list of your devices on the left side of the screen. Scroll through the list and select your desired device to view its location on the map.

If you think you left your device in a moving vehicle, such as a bus or train, or if you think it was possibly stolen, you can get frequent updates about its location. The Track location feature will send updates every 15 minutes with the device's latest location.

One of the biggest concerns about losing your phone or tablet is someone stealing your personal information. For an extra layer of security, you can remotely lock your device. From the SmartThings Find website or the Samsung Find website, select your desired device, and then select Lock.

If you can't find your phone or tablet anywhere and you're afraid it might be gone forever, you should perform a remote factory data reset on it. By doing this, you'll erase the device's data and no one will be able to access your personal information. Before you reset the device, make sure to back up your data, so you can retrieve it later. From the SmartThings Find website or the Samsung Find website, select your desired device, and then select Erase data.

Accidentally left your phone somewhere? You can use your Galaxy watch to locate it. Your Galaxy watch must be connected to the phone via Bluetooth, or via remote connection over Wi-Fi.

1. On your watch, press the Home button, and then swipe to and tap Samsung Find.

2. Tap Continue, and then follow the prompts to allow the necessary permissions.

3. Next, select your desired device to view its location.

4. Tap the Ring icon (the phone) to make your device ring."

**319.** Plaintiff alleges, Samsung's Wireless Communication Protocols is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Samsung's Wireless Communication Protocols are native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

**320.** Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

**321.** Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the

infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

322.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

323.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

324.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Samsung *"modified"* cell phone, was examined and allowed by the United States

226

Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

325. Upon information, prior to Samsung rolling out its Galaxy phone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

326. Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

327. Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the

Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

**328.**  *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Communication Protocols for connecting Samsung's "Find My Mobile"*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the

communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS

connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**329.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XIII:

### Samsung's Wireless Communication Protocols [NFC or Short-Range RF] for connecting Samsung's "Digital Car Key"

**330.** Count XIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**331.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Wireless

Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

332.    Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

333.    Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

334.    Upon information, Plaintiff is alleging the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

335.    Plaintiff alleges Samsung's *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to *"modify"* a common cell phone, that include Samsung's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with

231

the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

336.   Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

337.   Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Wireless Communication Protocols, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's Wireless Communication Protocols, is identified and located inside the Samsung *"modified"* cell phone.

232

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

**338.** Upon information and belief, Samsung continues to make, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication Protocols, into the United States that include "*nine standard sensors that are used as biosensors*".

**339.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented

process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Wireless Communication Protocols, are shipped or imported into the United States.

340.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

341.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones i.e. Galaxy smartphone, that include Samsung's Wireless Communication Protocols, into the United States.

342.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

**343.**    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

**344.**    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**345.**    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

346. Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Wireless Communication Protocols: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5

5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**347.**   Upon information, Plaintiff alleges, Samsung's "*modified*" cell phone include the standard NFC or short-range RF sensors used to enable the controlling of a vehicle's lock, unlock, and start:

**What is Samsung [Android] digital car key?**

The Samsung Digital Key is a feature that allows you to use your smartphone as a car key. It's part of Samsung Wallet. With the Samsung Digital Key, you can easily lock and unlock your car, start the engine, open the trunk, and adjust your seat and mirror position before entering the car. One of the best things about the Samsung Digital Key is the ability to share your digital key with friends and family members. If you need to lend your car to someone, you can easily share the digital key with them and even set a time limit for access.

Digital Key uses your smartphone to perform the same functions as a car key. Unlock, lock, start your car and more from your smartphone with this NFC (Near Field Communication) or UWB (Ultra-Wideband) technology.

All the information is securely stored in your smartphone's integrated Secure Element and makes it easy to select the key you want to use. Digital Key is currently available in Canada, The United States of America, Republic of Korea, United Kingdom, Germany, Spain, France, Italy, Switzerland, Finland, Sweden, Norway and Denmark.

Digital Key supports digital automobile keys for a number of vehicles from multiple automakers. Digital Keys are supported on devices with Android 13 OS or higher. The most important step is installing the car manufacturer's app or receiving a registration information message from them. If this is your first time using Samsung Wallet, you will be able to proceed after setting up your Samsung Wallet.

The Digital Key is a feature that assists your real car key for convenience. After completing the registration of your car key, you may be able to use the NFC or UWB feature on your Galaxy phone to unlock or set the lock on the handle of the car door to open it. By touching the NFC antenna area of the phone with the digital key registered to the vehicle's door; the door will unlock or lock.

After you place your Galaxy phone on the vehicle's wireless charging pad and your car recognizes your phone; the digital key is authenticated. The screen of your car may let you know if you can start the vehicle using the start button.

The Samsung Digital Key is a convenient feature that turns your Samsung phone into a car key. The ability to unlock your car using your smartphone is a relatively new concept, but it is only a matter of time before this feature becomes ubiquitous. In 2021, Samsung followed in Apple's footsteps by introducing a digital car key feature with the release of their Galaxy S21 series.

348.   Plaintiff alleges, Samsung's Wireless Communication Protocols is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

Samsung's Wireless Communication Protocols are native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

349.    Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Wireless Communication Protocols of at least NFC or short-range RF, are shipped or imported into the United States.

350.    Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

351.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as

an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**352.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**353.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

240

**354.**   Upon information, prior to Samsung rolling out its Galaxy smartphone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**355.**   Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**356.**   Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

**357.**   *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone that include Samsung's Wireless Communication Protocols [NFC and Short-Range RF] for connecting Samsung's "Digital Car Key"*

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

241

- wherein the communication device is designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 22 of the '990 patent]

- internal or external automatic/mechanical lock [] device which is mounted, embedded, affixed, or attached to a product for receiving transmission from the communication device to lock, unlock or disable the lock [claim 33 of the '990 patent]

- wherein the cell phone the smart phone, and the cell phone detector case are capable of sending signals to a vehicle's operating equipment systems comprising at least one of an ignition for starting and stopping, a lock for unlocking and locking [claim 107 of the '990 patent]

- wherein the cell phone, the smart phone, [] are designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of containers, vehicles, houses and businesses through the use of a smart phone, cell phone, PDA, laptop or desktop. [claim 114 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein a communication device, that of a cell phone, smart phone or handheld; capable of sending signals to a vehicle's operating equipment systems of at least one of, but not limited to, [] a lock for unlocking and locking, [] capable of receiving data and diagnostic information of the vehicle's operating equipment systems. [claim 134 of the '990 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, [], or to activate or deactivate cell phone detection systems; [claim 13 of the '439 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, [] [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

242

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 3 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**358.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

**COUNT XIV:**

**Samsung's Nine "Standard Biosensors" for
Samsung's "*modified*" Cell Phone**

359.   Count XIV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

360.   Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Standard Biosensors, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

361.   Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Standard Biosensors, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

362.   Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Standard Biosensors, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Standard Biosensors, infringement occurs when the combination is shipped or imported into the United States.

363.   Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's Standard Biosensors, infringes Plaintiff's patented process

for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Standard Biosensors, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

364.   Plaintiff alleges Samsung's *"modified"* cell phone, that include Samsung's Standard Biosensors, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to *"modify"* a common cell phone, that include Samsung's Standard Biosensors, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

365.   Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

366.   Upon information, twelve Federal Judges infer to say; the Samsung *"modified"* cell phones that include Samsung's Standard Biosensors, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Samsung *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Samsung's Standard Biosensors, is identified and located inside the Samsung *"modified"* cell phone.

367.   Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Standard Biosensors, into the United States that include *"nine standard sensors that are used as biosensors"*.

**368.**  Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Standard Biosensors, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Standard Biosensors, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Standard Biosensors, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung *"modified"* cell phones, that include Samsung's Standard Biosensors, are shipped or imported into the United States.

**369.**  Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Standard Biosensors, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Standard Biosensors] https://news.ycombinator.com/item?id=28423983

**370.**  Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or

247

assemble the Samsung "*modified*" cell phone, that include Samsung's Standard Biosensors, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Standard Biosensors, into the United States.

371.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Standard Biosensors, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

372.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's Standard Biosensors] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

373.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

374.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Standard Biosensors was manufactured, and on the other hand concluded that determining who manufactured

the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**375.** Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Standard Biosensors: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;  Samsung Galaxy F55 5G; Samsung Galaxy F05;

249

Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**376.**    Upon information and belief, Plaintiff claims Twelve Federal Judges "infer to say", (i.e., drawing a conclusion based on indirect evidence and reasoning, rather than explicit statements), that Samsung's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, allegedly infringes Plaintiff's patented invention of a communicating, monitoring, detecting, and controlling (CMDC) device.

**377.**    Upon information, Twelve Federal Judges also inferred to say, "nine standard sensors 'that are native to the manufacture of the Samsung "*modified*" cell phones', can be used as biosensors".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |

| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
|---|---|---|---|---|
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness

251

Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined

252

direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile,

consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

Upon information and belief, Plaintiff alleges that Samsung's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, begin as early as 2007 and continues through this day 30, May, 2016.

Upon information and belief, Plaintiff alleges that Samsung's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, include nine "*standard sensors*" which can be used as biosensors.

254

> **Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:
>
> Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
>
> Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
>
> Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
>
> Microfluidic cassette: Interchangeable cassettes with varying assays
>
> VIS-NIR spectrometer: Food freshness; Melanoma
>
> NNAP Electrodes: Toxic metals and Organic pollutants in water
>
> Optical Waveguide: Pathogens in water and food
>
> Back and front camera: Colorimetric analysis; Image analysis
>
> Microphone: Voice recording stress levels

Upon information, twelve Federal Judges "infer to say"; (i.e., arriving at a conclusion by reasoning from evidence), that Samsung's infringement of Plaintiff's CMDC device occurs when Samsung's "*modified*" cell phone is integrated with, or interconnected to, nine of Samsung's standard sensors for the "*modified*" cell phone, and are used as biosensors.

Plaintiff alleges, that Samsung's nine standard sensors for the "*modified*" cell phone, which are used as biosensors, are "*built-in, embedded*", in accordance with the PTAB's claim term construction of "*built-in, embedded*", and satisfies the NDC local rule 3-1(c) for identifying where in the *modified* cell phone the biosensors are found.

Upon information, Plaintiff alleges the Samsung "*modified*" cell phone infringes Plaintiff's patented CMDC device; because the detection capability that is placed 'in, on, upon, or adjacent' the monitoring device. [Patent specifications]. In the *United States*

*Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below."

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

The Patent Trials and Appeals Board (PTAB) construed "built-in, embedded", as: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device", [the Samsung "*modified*" cell phone].

Plaintiff alleges, the Samsung "*modified*" cell phone device, and, the **nine "standard sensors" which "can be used as 'biosensors** are included in Samsung's manufacture of Plaintiff's patented process abroad for a "*modified cell phone*" that is imported into the United States under 35 U.S.C. § 154(a)(1), and 35 U.S.C. § 271(g).

378.  Plaintiff alleges, Samsung's Standard Biosensors is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Samsung's Standard Biosensors are native to the manufacture of the Samsung

Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

379.  Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Standard Biosensors, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that include Samsung's Standard Biosensors, are shipped or imported into the United States.

380.  Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Standard Biosensors, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

381.  Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**382.** Upon information and belief, each individual claim limitation or element that is listed in this section describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**383.** Upon information and belief, each individual claim limitation or element listed in this section that is available for use to manufacture the patented process for an Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**384.** Upon information, prior to Samsung rolling out its Galaxy smartphone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included

Standard Biosensors that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**385.** Plaintiff alleges, Samsung's Standard Biosensors that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**386.** Plaintiff alleges, Samsung's Standard Biosensors that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States. The PTAB determined the Samsung's Standard Biosensors to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

**387.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone Design that include Nine "Standard Sensors" which are used as Biosensors*

- a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector [claim 1 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and which is capable of being disposed within the detector case [claim 7 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and that is capable of being disposed within the detector case [claim 13 of the '497 patent]

259

- wherein the communication device is designed to be used as a standalone detection system for the detection of [] at least one of the human vitals sensors of; a heart sensor, a nerve sensor, a perspiration sensor, an inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 31 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- The multi-sensor detection system [] wherein the cell phone, the smart phone, [] is designed to be used as a standalone detection system for the detection of [] human vitals sensors of: a heart sensor, a nerve sensor, a perspiration sensor, a inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 123 of the '990 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 8 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 9 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 9 of the '189 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 13 of the '439 patent]

260

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; [claim 14 of the '439 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: [claim 18 of the '439 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 18 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: [claim 19 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive,

261

nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 19 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [claim 5 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 6 of the '287 patent]

**388.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility

that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XV:

### Samsung's Wireless Communication Protocols [Bluetooth, and Wi-Fi] for connecting Waymo's Self-Driving Cars

389.  Count XV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

390.  Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Samsung's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

391.  Upon information, Plaintiff alleges Samsung *"modified"* the cell phone (i.e., now the Galaxy smartphone) device that include Samsung's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

392.  Upon information and belief, Plaintiff alleges Samsung is using Plaintiff's patented process to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

**393.** Upon information, Plaintiff is alleging the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**394.** Plaintiff alleges Samsung's "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Samsung performed work for the Government to "*modify*" a common cell phone, that include Samsung's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Samsung, as a third-party contractor, could not be sued for infringement.

**395.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Samsung before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |

264

| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
|---|---|---|---|---|
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**396.** Upon information and belief, Plaintiff alleges Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Samsung "*modified*" the cell phone, that include Samsung's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Samsung's "*modification*" of the cell phone, that include Samsung's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Samsung "*modified*" cell phones, that include Samsung's Wireless Communication Protocols, are shipped or imported into the United States.

**397.** Upon information, twelve Federal Judges infer to say; the Samsung "*modified*" cell phones that include Samsung's Wireless Communication Protocols, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Samsung "*modified*" cell phones

the detection capability is located. Hereto, the alleged manufactured Samsung's Wireless Communication Protocols, is identified and located inside the Samsung *"modified"* cell phone.

---

**Samsung's "*nine*" Smartphone Biosensors Submitted to the Courts**:

Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

Microfluidic cassette: Interchangeable cassettes with varying assays

VIS-NIR spectrometer: Food freshness; Melanoma

NNAP Electrodes: Toxic metals and Organic pollutants in water

Optical Waveguide: Pathogens in water and food

Back and front camera: Colorimetric analysis; Image analysis

Microphone: Voice recording stress levels

---

398.   Upon information and belief, Samsung continues to make abroad, offer for sell, sell, and purportedly import the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication Protocols, into the United States that include "*nine standard sensors that are used as biosensors*".

399.   Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/.  "Samsung uses the same company to make its

[smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

**400.** Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Samsung] is accused of using Plaintiff's patented process to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Samsung is tasked with presenting evidence to a jury that Samsung is (1) not using Plaintiff's patented process; or (2) Samsung is using Plaintiff's patented process but is not shipping or importing the Samsung *"modified"* cell phones (i.e., Galaxy smartphones), that include Samsung's Wireless Communication Protocols, into the United States.

**401.** Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Samsung "*modified*" cell phone, that include Samsung's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

**402.** Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Samsung's *"modified"* cell phone that include Samsung's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

**403.** Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that

the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

404.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Samsung *"modified"* cell phone that include Samsung's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

405.    Upon information and belief, Samsung is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Samsung "*modified*" cell phones (i.e., Galaxy smartphones) that include Samsung's Wireless Communication Protocols: Samsung Galaxy A14 5G; Samsung Galaxy A34 5G; Samsung Galaxy A54 5G; Samsung Galaxy A24 4G; Samsung Galaxy A05; Samsung Galaxy A05s; Samsung Galaxy A15 5G; Samsung Galaxy A25 5G; Samsung Galaxy A35 5G; Samsung Galaxy A55 5G; Samsung Galaxy

A06; Samsung Galaxy A16 5G; Samsung Galaxy A16 4G; Samsung Galaxy A26 5G; Samsung Galaxy A36 5G; Samsung Galaxy A56 5G; Samsung Galaxy A17 5G; Samsung Galaxy A07 4G; Samsung Galaxy A17 4G; Samsung Galaxy A07 5G; Samsung Galaxy A37 5G; Samsung Galaxy A57 5G; Samsung Galaxy F04; Samsung Galaxy F14 5G; Samsung Galaxy F54 5G; Samsung Galaxy F34 5G; Samsung Galaxy F15 5G;   Samsung Galaxy F55 5G; Samsung Galaxy F05; Samsung Galaxy Z Fold5 5G; Samsung Galaxy Z Fold6 5G; Samsung Galaxy Z Fold7; Samsung Galaxy Z Tri-Fold; Samsung Galaxy M14 5G; Samsung Galaxy M54 5G;  Samsung Galaxy M34 5G; Samsung Galaxy M14 4G; Samsung Galaxy M15 5G; Samsung Galaxy M55 5G; Samsung Galaxy M35 5G; Samsung Galaxy M05; Samsung Galaxy S23 5G; Samsung Galaxy S23 Plus 5G; Samsung Galaxy S23 Ultra 5G; Samsung Galaxy S23 FE 5G; Samsung Galaxy S24 5G; Samsung Galaxy S24 Plus 5G; Samsung Galaxy S24 Ultra 5G; Samsung Galaxy S24 FE 5G; Samsung Galaxy S25; Samsung Galaxy S25 Plus; Samsung Galaxy S25 Ultra; Samsung Galaxy S25 Edge; Samsung Galaxy S25 FE; Samsung Galaxy S26; Samsung Galaxy S26 Plus; Samsung Galaxy S26 Ultra; Samsung Galaxy Z Flip5 5G; Samsung Galaxy Z Flip6 5G; Samsung Galaxy Z Flip7; and Samsung Galaxy Z Flip7 FE.

**406.**    Upon information, Plaintiff alleges, Samsung's "*modified*" cell phone include the standard Wi-Fi and Bluetooth sensors used to enable the controlling of the vehicle's unlock, and stopping:

> [Samsung's] "*modified*" cell phone devices interact with Waymo's self-driving cars and vans for ride-hailing, consider the following:
>
> - App Interface: Users book rides through the Waymo app on their mobile devices.

269

- Location Services: The app uses GPS to determine the user's pickup and drop-off locations.

- Real-Time Updates: Users receive notifications about the car's arrival time and location.

- Vehicle Control: Mobile devices can provide feedback or special requests for the ride.

- Payment Processing: Users can manage payments and track ride costs directly through the app.

- Safety Features: The app includes safety information and emergency contact options for users.

Begin by downloading the Waymo app onto the Samsung "*modified*" cell phone, which is available at the Google Android store. Once installed, open the app and sign up using your email address, phone number, and a strong password. From there, you'll need to add your payment info—Waymo accepts most major credit and debit cards. The app also asks for some basic personal information, ensuring compliance with local ride-hailing regulations.

Here's the step-by-step game plan to get rolling in a self-driving vehicle:

- Open the App & Set Pickup: Tap on the app and enter your pickup location manually or use geolocation.

- Choose Your Destination: Type in where you'd like to go. The app instantly matches you with a nearby Waymo vehicle if available in your city.

- Select Ride Type: Waymo offers different ride options depending on your area, including solo rides or shared options. You'll see fare estimates here as well.

- Confirm & Wait: Once you confirm, the app sends you real-time tracking and an arrival time for your driverless car.

- Hop In: Waymo cars unlock via the app once they arrive — no keys needed. Don't forget to check the vehicle's license plate and Waymo branding before stepping in.

- Essential Smartphone: The app is essential for booking and unlocking the car, so at least a [Samsung "modified" cell phone] smartphone is necessary.

- Use the Provided Controls Wisely: The app and vehicle interface let you pause or stop the ride if needed; don't hesitate to use these features if you feel uncomfortable.

- Safety Protocols: The car has emergency stop buttons and continuous monitoring by a remote safety team ready to intervene if needed.

The Waymo app interacts with mobile devices via Bluetooth and Wi-Fi:

- The Waymo app connects to your vehicle using Bluetooth for initial pairing and communication.

- Wi-Fi is used for high-speed data transfer, such as downloading maps and software updates.

- The app allows users to request rides, track vehicle location, and manage settings through their mobile device.

- Bluetooth enables secure communication between the app and the vehicle for features like unlocking doors.
- Wi-Fi connectivity ensures a stable connection for real-time updates and navigation assistance.
- Users can also access vehicle diagnostics and performance data through the app when connected.

Waymo will begin offering rides in its new purpose-built robotaxi, the Ojai, to select riders in [early 2026], the Alphabet unit said on Thursday, marking the public debut of the China-built model designed from the ground up for autonomous ride-hailing. The Ojai's base vehicle is built by Zeekr, the premium electric-vehicle brand owned by China's Geely, and shipped to the United States, where Waymo installs its sensors and software. The sixth-generation sensor suite installed in Arizona includes 13 cameras, six radars and four LiDAR units, fewer cameras than the Jaguar I-PACE-based system it replaces. https://eletric-vehicles.com/waymo/waymo-opens-its-china-built-ojai-robotaxi-to-first-riders/

Called the Waymo Ojai, the van is built in China by Zeekr and features a suite of 13 cameras, six radar sensors, and four lidar sensors. Waymo has been operating a fleet of autonomous robotaxis for some time now, first in San Francisco and then expanding last year to Los Angeles, Phoenix, Austin, and Atlanta. Now the Alphabet-owned company is preparing to update its lineup, supplementing its modified Jaguar I-Paces with a new van built by Chinese automaker Zeekr. Built exclusively for Waymo, Zeekr constructs the body of the van in China before shipping it to the U.S.,

where Waymo fits its software suite and array of sensors. https://www.caranddriver.com/news/a69938250/waymo-ojai-autonomous-robotaxi-details/

The Waymo Ojai is an autonomous electric van developed as a robotaxi by Waymo, built on a chassis from the Chinese automaker Zeekr and integrated with Waymo's self-driving technology for rider-focused public transportation. Imported to the United States, the vehicle undergoes retrofitting with Waymo's sixth-generation hardware at facilities in Arizona before deployment, enabling expansion of Waymo's commercial robotaxi fleet across multiple markets. Zeekr manufactures the base vans in China before they are shipped to the United States for adaptation. Upon importation, the vehicles are transported to Waymo's integration facility in Mesa, Arizona, operated in partnership with Magna International, where they undergo a retrofitting process to incorporate Waymo's autonomous systems. This U.S. based modification workflow enables efficient scaling of the fleet by combining overseas production efficiencies with domestic customization, allowing completed Ojai vehicles to transition directly into service. https://grokipedia.com/page/Waymo_Ojai

*Waymo Admits to Using Remote Human Operators* (February 2026). At a congressional hearing over autonomous driving systems, Waymo's Chief Safety Officer, Mauricio Peña, acknowledged that the company employs individuals in the Philippines to assist its autonomous vehicles in difficult situations. Despite clarifying that overseas operators only assist and do not control Waymo's vehicles,

273

the disclosure drew pushback from lawmakers about possible cybersecurity vulnerabilities and the company's labor practices.

Though Waymo autonomous vehicles (AV)s are capable of operating autonomously most of the time, the remote assistance (RA)s has a tool to nudge them when they stop on the shoulder of a highway. In this scenario, a US-based agent "could prompt the AV to move forward at 2mph for a short distance at fixed steering angles to exit the travel lane," McNamara says, adding that Waymo cars have never had to use this functionality outside of training.

Waymo's autonomous driving system (ADS) performs substantially the same function; in substantially the same way; to achieve substantially the same results, as Plaintiff's programmed stall, stop, and vehicle slow-down system; and, Plaintiff's remote stall, stop, and vehicle slow-down system.

407.   Plaintiff alleges, Samsung's Wireless Communication Protocols is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Samsung's Wireless Communication Protocols used to communicate with Waymo's self-drive vehicles, are native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States.

408.   Plaintiff alleges Samsung have devoted years to *"modifying"* the cell phone, that include Samsung's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Samsung *"modified"* cell phones, that

include Samsung's Wireless Communication Protocols of at least Wi-Fi and Bluetooth, used to unlock and/or stop the Waymo vehicles, are shipped or imported into the United States.

**409.**    Plaintiff also alleges that when the Samsung *"modified"* cell phone, that include Samsung's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Samsung is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

**410.**    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Samsung to manufacture the Samsung *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**411.**    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new,

275

improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

412.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Samsung "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

413.    Upon information, prior to Samsung rolling out its Galaxy smartphone that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**414.** Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Samsung's production process for manufacturing the Samsung Galaxy smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**415.** Plaintiff alleges, Samsung's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Samsung Galaxy smartphones, and is a standard component of the Samsung Galaxy smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Samsung "*modified*" cell phone.

**416.** *Plaintiff's Claim Limitations that Cover the Samsung "modified" Cell Phone Design that include Samsung's Wireless Communication Protocols [Bluetooth, and Wi-Fi] for connecting Waymo's Self-Driving Vehicles*

- wherein the cell phone [] includes telecommunication and radio communication means that are interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships, UAVs, UGVs, and airplanes [claim 13 of the '752 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

- wherein the communication device is designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 22 of the '990 patent]

- internal or external automatic/mechanical lock [] device which is mounted, embedded, affixed, or attached to a product for receiving transmission from the communication device to lock, unlock or disable the lock [claim 33 of the '990 patent]

- wherein the cell phone the smart phone, and the cell phone detector case are capable of sending signals to a vehicle's operating equipment systems comprising at least one of an ignition for starting and stopping, a lock for unlocking and locking [claim 107 of the '990 patent]

- wherein the cell phone, the smart phone, [] are designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of containers, vehicles, houses and businesses through the use of a smart phone, cell phone, PDA, laptop or desktop. [claim 114 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein a communication device, that of a cell phone, smart phone or handheld; capable of sending signals to a vehicle's operating equipment systems of at least one of, but not limited to, [] a lock for unlocking and locking, [] capable of receiving data and diagnostic information of the vehicle's operating equipment systems. [claim 134 of the '990 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, [], or to activate or deactivate cell phone detection systems; [claim 13 of the '439 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, [] [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

278

- a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the

279

communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

- processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; [Claim 1 of the '898 Patent]

- stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; [Claim 2 of the '898 Patent]

**417.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT

**Willful Infringement Requires a Finding of Direct Infringement First**

In the above sections Plaintiff outlined Samsung's alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g); also, Samsung's alleged infringement upon importation under 35 U.S.C. §§ 154(a)(1) & 271(g); and the alleged infringement under the doctrine of equivalents of Plaintiff's patented

process under 35 U.S.C. §§ 154(a)(1) & 271(g). Plaintiff believes Samsung is liable for the misconduct alleged.

**Knowledge requirement for Willful Patent Infringement**

**Under Rule 14(b):** In *Golden v. United States* CFC Case No. 13-307C, Samsung was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), Samsung was issued an order to appear and was obligated to make an appearance to protect its interest in the subject matter of the suit. Although Samsung failed to appear, beginning in year 2008, Samsung is said to have knowledge of Plaintiff's patented process when Samsung released its first version of a "*modified*" cell phone.

**Correspondence and Service of Complaints:** "Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct … and sufficiently plead a post-filing/post-suit willful infringement claim." *Motion Offense, LLC v. Dropbox, Inc*., No. 6:23-CV-303-ADA, 2024 BL 297370, at *3 (W.D. Tex. Aug. 26, 2024) ("*Motion Offense* sufficiently pleaded post-suit willful infringement because the facts pleaded in the FAC satisfy the three Parity factors.

As the W.D. Tex. court held in *BillJco*, '[s]erving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim.'") (internal citations omitted); *see Textile Comput. Sys. v. Broadway Nat'l Bank*, 620 F. Supp. 3d 557, 568 (W.D. Tex. 2022); *see BillJco, LLC*, 2022 U.S. Dist. LEXIS 17605, 2022 WL 299733, at *9-10 ("Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint

281

also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim."); *see* e.g., *Atlas Glob. Techs., LLC v. Sercomm Corp.*, 638 F. Supp. 3d 721, 728 (W.D. Tex. 2022)

Patent infringement claims that carry with them knowledge requirements, are fact issues to be decided by a jury [U.S. CONS'T. 7th Amend.] on whether Samsung had a sufficient amount of knowledge of Plaintiff's patents and patented processes before, and while Samsung continued its allegedly infringing conduct.

**Plaintiff's Demand for a Jury Trial to Decide Willfulness**

Patent infringement claims are issues-of-facts to be decided by a jury [U.S. CONS'T. 7th Amend.] In this case a jury must decide whether Samsung's alleged willful infringement claims are "wanton, malicious, and bad-faith behavior"; deliberate or intentional; or, that there's no willful infringement at all.

Recently, the Federal Circuit, in *SRI Int'l v. Cisco Sys.*, 2020-1685 (Fed. Cir. Sep. 28, 2021), clarified the confusion caused by an earlier remand to the district court, in which the Federal Circuit instructed the district court to determine whether the infringer's conduct met the "wanton, malicious, and bad-faith behavior required for willful infringement." The district court, surprised by this instruction (as was the patent bar), nevertheless proceeded and found the infringer's conduct insufficient to meet this new, heightened standard.

On appeal for the second time, the case returned to the same three-member panel of the Federal Circuit, which clarified that it was not their intent to create a heightened requirement for willful infringement and reiterated the standard for willful infringement summarized last year in *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc., 946 F.3d 1367 (Fed. Cir. 2020)*: "willfulness requires a jury to find no more than deliberate or intentional infringement."

282

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016).

Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Samsung's conduct is allegedly "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Apple's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing acts (alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g); also, Samsung Samsung's alleged infringement upon importation under 35 U.S.C. §§ 154(a)(1) & 271(g); and the alleged infringement under the doctrine of equivalents of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g). Plaintiff believes Samsung is liable for the misconduct.

## CONCLUSION

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused original cell phone devices of Samsung required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Samsung devices to

function as a CBRNE-H sensing device is already complete. In most all cases the enabled Samsung CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Samsung CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs. This is not true.

Plaintiff has stated a plausible claim for infringement upon import of the Samsung *"modified"* cell phones, direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. §§ 154(a)(1) & 271(g).

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is **when** the Samsung accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015), the PTAB construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Samsung's *"modified"* cell phone that "include within" or "dispose within", a CBRNE-H detection capability; and Samsung's *"modified"* cell phone that "incorporate into", or is "connected to", a CBRNE-H detection capability, infringes

284

upon import, under 35 U.S.C. §§ 154(a)(1) & 271(g), Plaintiff's patented when the Samsung "*modified*" cell phones are shipped or imported into the United States.

> In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below."

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

> No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.
> We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

Also noted, throughout this document a third-party other than Samsung cannot "modify" the Samsung devices without Samsung's consent and a license to do so. Samsung also control the upgrades and updates to the its operating systems that keeps the devices functioning as a CBRNE-H sensing device.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

285

A.   A judgement in favor of Golden that the Defendant's modification of the cell phone to include a CBRNE-H detection capability infringes Golden patented inventions and the asserted patents-in-suit.

B.   A judgement affirming the decision of twelve federal judges when they determined "infringement of Golden's patents occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability".

C.   A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 154(a)(1) & 271(g) by manufacturing Plaintiff's patented process abroad and importing the alleged infringing products into the United States.

D.   A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 154(a)(1) & 271(g) the patented process of the asserted patents as aforesaid; and grant Plaintiff his request for damages.

E.   A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from joint and/or direct infringement of the asserted patents as aforesaid pursuant to 35 U.S.C. § 283;

F.   A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

G.   As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing *modified* cell phone devices that have at a minimum, infringed upon import, directly and/or infringed under the doctrine of equivalents, the asserted patents.

H.      According to twelve federal judges, the Defendant is liable for infringement of the patented process of the asserted patents pursuant to 35 U.S.C. §§ 154(a)(1) & 271(g). The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

I.      Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the United States Constitution.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## <u>VERIFICATION</u>

### Pursuant to 28 U.S.C. § 1746

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 25th day of June, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Amended Complaint for Patent Infringement under 35.U.S.C. §§ 154(a)(1) and 271(g)".

s/ *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25th day of June, 2026, a true and correct copy of the foregoing "Plaintiff's Amended Complaint for Patent Infringement under 35.U.S.C. §§ 154(a)(1) and 271(g)", was served upon the following Defendant via e-mail:

Melissa R. Smith

GILLAM & SMITH, LLP

303 South Washington Avenue

Marshall, Texas, 75670

Phone: (903) 934-8450

Fax: (903) 934-9257

Email: Melissa@gillamsmithlaw.com

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104